## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHARLE SAVAGE, SCOTT SHANE & THE NEW YORK TIMES COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF JUSTICE<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civ. A. No. 22-2477<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF DOUGLAS HIBBARD

I, Douglas Hibbard, declare the following to be true and correct:

1.      I am Chief of the Initial Request Staff (IR Staff) in the Office of Information Policy (OIP), United States Department of Justice (DOJ or "the Department").  In this capacity, I am responsible for supervising the handling of the Freedom of Information Act (FOIA) requests processed by the IR Staff of OIP.  Prior to becoming Chief, I served as Deputy Chief to the IR Staff, Senior Advisor to the IR Staff, and as a Government Information Specialist (formerly FOIA Specialist) on the IR Staff.  The IR Staff of OIP is responsible for processing FOIA requests that have not entered litigation and which seek records from within OIP and from six senior leadership offices of the DOJ, specifically the Offices of the Attorney General (OAG), Deputy Attorney General (ODAG), Associate Attorney General (OASG), Legal Policy (OLP), Legislative Affairs (OLA), and Public Affairs (OPA).

2.      The IR Staff devises appropriate records searches for each FOIA request it processes on behalf of itself and the Department's senior leadership offices and determines

1

whether records are appropriate for release in accordance with the FOIA.  In processing such requests, the IR Staff consults with personnel in the Department's senior leadership offices and, when appropriate, with other components within the DOJ, as well as with others in the Executive Branch.

3.      I make the statements herein on the basis of personal knowledge, including my extensive experience with the FOIA, with OIP, and in handling FOIA requests for senior leadership office records, as well as on information acquired by me in the course of performing my official duties, including information provided to me by others within the Department with knowledge of the types of records at issue in this case and my review of the records at issue in this case.

<u>**Overview of the Investigations**</u>

4.      On January 2, 2008, then-Attorney General Michael Mukasey announced a criminal investigation into the destruction of detainee interrogation videotapes (the "CIA tapes investigation") and appointed Mr. Durham, then First Assistant United States Attorney in the United States Attorney's Office for the District of Connecticut, to serve as the Acting United States Attorney for the Eastern District of Virginia for purposes of this matter.  Mr. Durham's mandate included conducting criminal prosecutions related to the CIA tapes investigation.  *See* Press Release, Statement by Attorney General Michael B. Mukasey Regarding the Opening of an Investigation Into the Destruction of Videotapes by CIA Personnel (Jan. 2, 2008), https://www.justice.gov/archive/opa/pr/2008/January/08_opa_001.html (attached hereto as Exhibit A); *see also* Declaration of John H. Durham dated December 8, 2014 [hereinafter Durham Decl.] ¶ 5, attached hereto as Exhibit B).

5.     On August 24, 2009, then-Attorney General Eric Holder announced an expansion of Mr. Durham's mandate to conduct a preliminary review into whether federal laws were violated in connection with the interrogation of specific detainees at overseas locations (the "CIA interrogations investigation").  Mr. Durham was to recommend to the Attorney General whether there was sufficient basis for full investigations into any of those interrogations.  *See* Press Release, Attorney General Eric Holder Regarding a Preliminary Review into the Interrogation of Certain Detainees (Aug. 24, 2009), https://www.justice.gov/opa/speech/attorney-general-eric-holder-regarding-preliminary-review-interrogation-certain-detainees (attached hereto as Exhibit C; *see also* Durham Decl. ¶ 6.

6.     On November 9, 2010, the Department announced that Mr. Durham, after conducting an exhaustive investigation into the destruction of interrogation videotapes, concluded that he would not pursue criminal charges in that matter.  *See* Press Release, Department of Justice Statement on the Investigation into the Destruction of Videotapes by CIA Personnel (November 9, 2010), https://www.justice.gov/opa/pr/department-justice-statement-investigation-destruction-videotapes-cia-personnel (attached hereto as Exhibit D).

7.     On June 30, 2011, the Attorney General announced that, based on Mr. Durham's recommendation, full criminal investigations into the death in custody of two individuals would be conducted.  Again based on Mr. Durham's findings, the Department determined that an expanded criminal investigation of the remaining matters was not warranted.  *See* Press Release, Statement of the Attorney General Regarding Investigation into the Interrogation of Certain Detainees (June 30, 2011), https://www.justice.gov/opa/pr/statement-attorney-general-regarding-investigation-interrogation-certain-detainees (attached hereto as Exhibit E).  With respect to the

full criminal investigations that were authorized, Mr. Durham was granted the authority to determine whether criminal prosecutions should be brought. *See* Durham Decl. ¶ 6.

8.      On August 30, 2012, the Attorney General announced that the above-referenced investigations into the death of two detainees had been closed.  He explained that Mr. Durham had completed his investigations and that the Department decided not to initiate criminal charges.  The Attorney General expressed "confide[nce] that Mr. Durham's thorough reviews and determination that the filing of criminal charges would not be appropriate have satisfied [the] need [for a thorough examination of the detainee treatment issue]."  *See* Press Release, Statement of Attorney General Eric Holder on Closure of Investigation into the Interrogation of Certain Detainees (Aug. 30, 2012), https://www.justice.gov/opa/pr/statement-attorney-general-eric-holder-closure-investigation-interrogation-certain-detainees  (attached hereto as Exhibit F).

### Plaintiffs' FOIA Requests

9.      By email dated June 7, 2022, Plaintiff Charlie Savage submitted a FOIA request to OIP, the Criminal Division (CRM), and the Mail Referral Unit (MRU).  Plaintiff's request sought "all reports to the attorney general or deputy attorney general describing or presenting findings and recommendations, and all FBI FD-302 forms and FD-1023 forms summarizing witness and source interviews, in connection with John Durham's investigation into the C.I.A.'s rendition, detention and interrogation program."  Plaintiff Savage's request further noted that "[i]n April 2014, I filed a pair of FOIA requests seeking Durham's reports and the FBI 302s from his investigation, and the following month The New York Times and I filed a FOIA lawsuit in the Southern District of New York (14-cv-3777)."   Summarizing the previous litigation, Plaintiff Savage's request further related the following:

> In September 2015, Judge J. Paul Oekten ruled that DOJ could withhold all the
> 302s and several of Durham's reports under Exemption Five as attorney work

product privileged. But the judge also ruled that Holder had expressly adopted several other of Durham's reports and so Exemption Five did not categorically protect them from disclosure, while cautioning that specific portions of them might nevertheless be withholdable on other grounds following more specific litigation to come. However, DOJ appealed that part of his ruling to the Second Circuit (No. 17-2066). In September 2019, a Second Circuit panel largely reversed Judge Oekten on the matters for which he had ruled for The Times, putting forward a narrower interpretation of what constitutes express adoption; under that ruling, DOJ only was required to release portions of Durham's reports that related to the conclusion that some of the detainees believed to have been black-site prisoners were never actually in C.I.A. custody. DOJ released a heavily redacted version of one of those reports; The Times challenged some of the redactions but did not prevail, and the litigation formally ended in July 2021.

Plaintiff's request also sought a fee waiver.  A copy of Plaintiff's FOIA request, dated June 7, 2022, is attached hereto as Exhibit G.  By letter dated June 30, 2022, OIP acknowledged Plaintiff Savage's FOIA request, assigning it tracking number FOIA-2022-01336.  A copy of OIP's acknowledgement letter is attached hereto as Exhibit H.

10.     By letter dated June 28, 2022, Plaintiff Scott Shane submitted a FOIA request to OIP.  Plaintiff's request sought "complete copies of all reports (and exhibits) provided to the attorney general or deputy attorney general that describe or present findings or recommendations concerning John Durham's investigation into the CIA's rendition, detention and interrogation program, and all FBI FD-302 forms and FD-1023 forms summarizing witness and source interviews conducted in connection with that investigation."  Plaintiff's request also sought a fee waiver.  A copy of Plaintiff's FOIA requested, dated June 28, 2022, is attached hereto as Exhibit I.  By letter dated July 22, 2022, OIP acknowledged Plaintiff Shane's FOIA request, assigning it tracking number FOIA-2022-01426.  A copy of OIP's acknowledgement letter is attached hereto as Exhibit J.

**<ins>OIP's Discussions with Plaintiffs Regarding Requests</ins>**

11.     On August 26, 2022, Plaintiff filed suit.  <ins>See</ins> Complaint, ECF No. 1.

12.     On October 12, 2022, OIP, through counsel, asked Plaintiff two questions regarding the scope of the requests:  (1), "whether the June 7, 2022 and June 28, 2022 requests sought the same scope of records," and (2), "whether the only difference between the records sought in these requests as compared [to the] requests at issue in the previous litigation are the requested 'FD-1023s'"? Between October 12 and October 13, 2022 Plaintiffs confirmed that the two requests "call for the same records" and "[t]he only difference between the records sought in these requests as compared requests at issue in the previous litigation are the FD-1023's."  A copy of this email exchange is attached hereto as Exhibit K.

13.     The Department's search efforts located the FD-302s and reports generated in the course of the CIA tapes and interrogations investigations.  Upon completing its search efforts, the Department conveyed to Plaintiffs that it had located no FD-1023s and maintained, as it did in the prior litigation, that the attorney work-product privilege applies to all of the remaining unreleased material responsive to Plaintiffs' requests.  As reflected in the parties' May 1, 2023 Joint Status Report and adopted by the Court's May 2, 2023 minute order, the parties have therefore agreed to bifurcate the briefing in this matter, such that the Government's withholdings pursuant to Exemption 5 of the FOIA, 5 U.S.C. § 552(b)(5) be adjudicated prior to any other FOIA withholdings.  *See* ECF No. 17.

## Previous Proceedings and Limited Finding of Waiver by Second Circuit

14.     In the first litigation over these records in the United States District Court for the Southern District of New York, *The New York Times Company v. DOJ* 14-cv-3777, the Department of Justice, in part, supported its motion for summary judgement with a declaration provided by then Counsel to the United States Attorney for the District of Connecticut John H. Durham, which provided information regarding the investigations as well as the application of the attorney work-

product privilege to the 302s generated during the course of his investigation.  *See generally*, Durham Decl.  Ultimately, in an Opinion and Order dated September 30, 2015 (the "September 2015 Opinion") [Dkt. No. 33], the district court partially granted and partially denied each party's motion for summary judgment.  The district court upheld the withholding of all but five of the responsive documents in their entirety on the basis of Exemption 5.  As to those five remaining documents—which included the May 26, 2011 Final Report on Preliminary Review —the district court held that they were protected by the attorney work-product privilege, but that portions, if not all, of the five documents had been expressly adopted as result of the public statements made by the Attorney General that referred to Durham's consideration of the potentially applicable law and conclusion that the admissible evidence would not be sufficient to obtain and sustain a conviction beyond a reasonable doubt.  September 2015 Opinion at 17-22.

15.     The parties then cross-moved for summary judgment as to whether any information in those five memoranda should be withheld under any other FOIA exemption.  The district court issued an Opinion and Order with respect to those summary judgment motions on February 21, 2017 (the "February 2017 Opinion"). [Dkt No. 55].  The district court again partially granted and partially denied the party's respective motions.  In the February 2017 Opinion, the district court upheld all of the Government's withholdings of national security information pursuant to Exemptions 1 and 3.  The Court also upheld the Government's withholding of information pursuant to Exemptions 6 and 7(C), *id.* at 21-23, as well as some of the Government's withholdings of grand jury information under Exemption 3, *id.* at 5-12.  The district court ordered the Government to produce the five prosecution memoranda, with information subject to Exemptions 1, 3, 5, 6 and 7(C) redacted.  *Id.* at 26.

16.     On June 26, 2017, the Government appealed from the judgment.   The Second Circuit affirmed in part and reversed in part. *New York Times Co. v. U.S. Dep't of Justice*, 939 F.3d 479, 498 (2d Cir. 2019).   Specifically, the Second Circuit reversed the district court's holding that the five memoranda at issue had been expressly adopted.   The Second Circuit concluded, however, that certain of the Attorney General's statements had served as a limited waiver of the work-product protections that otherwise attached to the memoranda.   The Second Circuit found that Attorney General Holder's statements that Durham had "determined that a number of the detainees were never in CIA custody" were "sufficiently specific that they are tantamount to public disclosure of the parts of the relevant memoranda that relate to this finding." *Id.* at 496.   The Second Circuit therefore held that the statements served to waive "the privilege over the sections of the memoranda and exhibits relating to the conclusion that a number of the detainees investigated were not in CIA custody." *Id.*   The Second Circuit made clear, however, that this waiver did not waive the privilege with respect to the whole document. *Id.*

17.     As a result, then-counsel for the Department determined that only one of the five memoranda at issue in the appeal set forth conclusions that a detainee was not in CIA custody: the document described on the OIP's *Vaughn* index as the May 26, 2011 Final Report on Preliminary Review (Document 8), and occasionally referred to in the previous litigation as the "Preliminary Review Memorandum."   Additionally, then-counsel reviewed this document to identify the portions that concluded that an individual had never been kept in CIA custody.   In doing so, the Government looked for textual indications in the memorandum that Mr. Durham had made a determination, conclusion, or finding that an individual had not been in CIA custody.   The Government did not require that Mr. Durham use any specific language formulation, so long as the text indicated in

some way that he had reached a conclusion on this issue.  See Declaration of Jeannette A. Vargas attached hereto as Exhibit L.

### Overview of Material Withheld by OIP

18.    OIP's searches in response to Plaintiffs' requests located the ten unique reports prepared by Durham similarly located in the previous litigation, totaling 1,736 pages.[1]   In coordination with the FBI, OIP also located the FD-302s generated by these investigations.  This declaration is intended to be read in tandem with the corresponding *Vaughn* Index ("Index") prepared by OIP, filed contemporaneously, and attached hereto as Exhibit M, as well as with the Durham Decl. (Exhibit B).  This Index contains descriptions of the reports withheld in full and records withheld in part.  The ten reports as identified in the accompanying Vaughn index are as follows:

- The CIA Tapes Investigation
  - "Tape Destruction Report" – January, 18, 2011
  - "Draft: Declination Report" – April 25, 2012
  - "Declination Report" – May 23, 2012[2]

- The CIA Interrogation Investigation
  - "First Interim Report on Preliminary Review" – November 30, 2010
  - "Recommendation for Full Criminal Investigation into Death of Individual # 1" – December 14, 2010
  - "Second Interim Report on Preliminary Review" – March 2, 2011
  - "Recommendation for Full Criminal Investigation in the Death of Individual # 2" – May 26, 2011

---

[1] OIP Notes that its *Vaughn* Index for the previous litigation included entries for duplicative copies of these reports.  As those duplicative entries do not represent distinct reports but only unique records given the presence of marginalia added to them by the recipients, reference to them have been omitted.  Additionally, given the passage of time, OIP was unable to ascertain whether the various copies of certain of the reports it located during its search in response to the current requests represented the same copies identified in the previous *Vaughn* Index.

[2] The April 25, 2012 draft and May 23, 2012 reports were never the subject of a press release.  Nor was there any press release stating that all aspects of the investigation into the tapes' destructions had been concluded.

- o "Final Report on Preliminary Review" – May 26, 2011
- o "Memorandum of Decision re: Non-Prosecution in the Death of Individual # 1" – March 03, 2012
- o "Memorandum of Decision re: Non-Prosecution in Death of Individual # 2" – July 11, 2012

These materials address the application of Exemption 5 asserted in response to Plaintiffs' FOIA requests over the unreleased portions of the May 26, 2011 Final Report on Preliminary Review (Document 8) as well as the entireties of the FD-302s and the nine other reports.[3]  OIP has determined that all of this material is protected by Exemption 5.

**Explanation of Information Withheld Pursuant to Exemption 5**

19.    Exemption 5 of the FOIA exempts from mandatory disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. 552(b)(5).  As discussed in detail below, all of the records being withheld in whole or in part by OIP are protected under the attorney work-product privilege, and some (specifically, Documents 5 and 7, including their attachments) are additionally protected by the deliberative process privilege, in that they embody legal advice, opinions, analysis, and at times recommendations solicited from and given by a career DOJ attorney engaging in substantive and complex prosecutorial decision-making.   Moreover, Documents 5 and 7 include a number of exhibits, (identified as Documents 5-A to 5-F, and 7A to 7-E of the *Vaughn* Index).  These exhibits are a collection of records gathered by Mr. Durham and his team and that they considered during the course of their investigation.  Specifically, the exhibits consist of inter-agency emails, letters, legal memoranda, reports, and depositions that pre-date the initiation of Mr. Durham's appointment and investigation and were part of a prior investigation

---

[3] Additional exemptions apply to the responsive records but only Exemption 5 will be addressed in this declaration and in the accompanying *Vaughn* Index pursuant to the parties' agreement as adopted by the Court in its May 2, 2023 minute order.

before Mr. Durham's appointment.[4]  Aside from the privileges that attach to these documents because they reflect Mr. Durham's work product and deliberations, four of the exhibits (Documents 7-A through 7-D) are separately and independently protected by the attorney work product privilege and three of the exhibits (Documents 7-B through 7-D) are also separately and independently protected by the deliberative process privilege in connection with the prior investigation.

20.     The reports and FD-302s responsive to Plaintiffs' requests embody legal advice, opinions, analysis, and at times recommendations solicited from and given by a career DOJ attorney engaging in substantive and complex prosecutorial decision-making.  This process involved exhaustive evaluations of legal questions and litigation assessments regarding litigation that could arise from Mr. Durham's CIA tapes and CIA interrogations investigations, including full criminal investigations into the deaths of two detainees.  Within the materials that have been protected in this case, Mr. Durham and his team are exercising their singular and essential role as legal counsel tasked with defending the interests of the United States and enforcing federal laws.[5] Specifically, Mr. Durham was granted authority to investigate whether any laws were violated in connection with the destruction of interrogation videotapes and certain detainee interrogations.  In order to effectively execute this mandate, Mr. Durham and his team, like any DOJ attorneys tasked with evaluating significant questions of law and fact and making complex prosecutorial decisions, must have confidence that they can share frank legal analysis, including assessments of potential litigation strategies and vulnerabilities, without fear that those assessments will be revealed to

---

[4] Document 7-E, and FD-302, does not pre-date Mr. Durham's appointment, however the attachments to the FD-302 all pre-date Mr. Durham's appointment.  The attachments are the same types of records described in this paragraph.
[5] *See, e.g.*, www.justice.gov/about.

potential legal adversaries.  All of the withheld records were created by, or at the direction of, Mr.

Durham, and the reports were presented by Mr. Durham to the Attorney General and/or Deputy

Attorney General.  The withheld records are extremely complex and voluminous in nature,

covering Mr. Durham and his team's interviewing of individuals, evaluation of legal standards and

analysis of evidence, and contain extremely detailed descriptions applying evidence to legal

theories, evaluating the strengths and weaknesses of various defenses, and providing exhaustive

rationales for the ultimate conclusions reached by Mr. Durham himself.  Moreover, two documents

consist of recommendation memoranda to OAG (Documents 5 and 7).  These two documents are

pre-decisional inasmuch as Mr. Durham was seeking approval by the Attorney General to launch

full criminal investigations into the death of two specific detainees, and reveal frank, candid

deliberations on these cases.  Therefore, OIP has determined that all of the records at issue are

protected in full by Exemption 5 of the FOIA under the attorney work-product and deliberative

process privileges, as indicated in the attached *Vaughn* Index.[6]

### Exemption 5: Inter/Intra-Agency Threshold

21.     In order to withhold records from release pursuant to Exemption 5 of the FOIA,

they must be inter- or intra-agency records.  All of the records withheld in full by OIP were created

by and exchanged with officials in DOJ and, accordingly, are intra-agency communications within

the threshold of FOIA Exemption 5.

### Deliberative Process Privilege

---

[6] Excepting the limited portions of the May 26, 2011 Final Report on Preliminary Review, as discussed *supra.*

22.     Two documents consist of recommendation memoranda to OAG (Documents 5 and 7 of the *Vaughn* Index) including their attached exhibits, and are thus also protected by the deliberative process privilege. Additionally, as discussed *supra*, three exhibits to Document 7 (specifically Documents 7-B through 7-D) are also separately and independently protected pursuant to the deliberative process privilege.

23.     The deliberative process privilege is intended to protect the decisionmaking process of government agencies from public scrutiny in order to enhance the quality of agency decisions. To be protected by the deliberative process privilege, the information at issue must be both "pre-decisional" and "deliberative."

24.     Additionally, the FOIA provides that agencies shall withhold information "only if . . .the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in [the statute] . . ." 5 U.S.C. § 552(a)(8)(A)(i).  In assessing whether information should be withheld pursuant to the deliberative process privilege encompassed by Exemption 5 of the FOIA, OIP is mindful that three policy rationales have been recognized by this circuit as underpinning the deliberative process privilege:

"First, [the privilege] protects creative debate and candid consideration of alternatives within an agency, and, thereby, improves the quality of agency policy decisions.  Second, it protects the public from the confusion that would result from premature exposure to discussions occurring before the policies affecting it had actually been settled upon.  And third, it protects the integrity of the decision-making process itself by confirming that

'officials should be judged by what they decided(,) not for matters they considered before making up their minds.'"[7]

25.     With respect to these two documents withheld in full, and as discussed in greater detail *infra*, this material consists of Mr. Durham's recommendation to Department leadership that two cases arising out of the CIA interrogations investigation receive full criminal investigations by Mr. Durham's team.  While Mr. Durham had full autonomy on the conduct of his investigations, and on the prosecutorial decisions he made, on the specific question of whether a full investigation should be launched in connection with any of the interrogations under review in the CIA interrogations investigation, Mr. Durham needed Attorney General approval.  Thus, the purpose of the recommendation memoranda at issue was to provide a legal opinion on whether there was sufficient predication to pursue full criminal investigations in specific cases, which would then inform the Attorney General in making decisions in light of those assessments.  *See* Durham Decl. ¶¶ 6, 15.  Specifically, the memoranda consisted of Mr. Durham's recommendations that, based on his investigations up until that point, further investigation into two particular cases was warranted. Mr. Durham went on to independently conduct the investigations into these matters and, ultimately, decided not to prosecute them.  *See* Durham Decl. ¶ 17.

26.     The recommendation memoranda being withheld by OIP reflect preliminary assessments by Mr. Durham about issues on which he has been asked to make recommendations and provide advice.  The documents are pre-decisional inasmuch as they were drafted for the purposes of informing the final decisionmaker on the scope of the investigations, the Attorney General, on decisions that had not yet been made.  Specifically, the recommendation memoranda

---

[7] *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (quoting *Jordan v. U.S. Dep't. of Just.*, 591 F.2d 753, 772-73 (D.C. Cir. 1978)).

consisted of Mr. Durham's determination that, based on his investigations thus far, further investigations into two particular interrogation cases were appropriate.   Therefore, these memoranda are also deliberative as they reflect Mr. Durham's assessment of the facts, legal opinions, and recommendations to the Attorney General.   The opinions expressed in these documents represent only a recommendation to the Attorney General that must be considered and acted upon.

27.     Additionally, while the selection and inclusion of the specific exhibits to Documents 5 and 7 was in furtherance of Mr. Durham's own pre-decisional recommendations set forth in his memoranda, these exhibits were part of a prior investigation of possible criminal prosecutions related to the detainees that were the subject of Mr. Durham's investigation but that occurred before Mr. Durham's appointment.   For the reasons described below, in addition to the privilege that attaches to these documents because they relate to Mr. Durham's pre-decisional deliberations, certain of them, specifically Documents 7-B through 7-D, are separately and independently protected in their entirety by the deliberative process privilege.

28.     The document identified as Document No. 7-B is pre-decisional because it consists of a draft letter reflecting legal analysis regarding an investigation and possible criminal prosecution.   Similarly, the documents identified as Document No. 7-C are pre-decisional because they consist of drafts of a memorandum reflecting legal analysis and recommendation regarding the outcome of an investigation and possible criminal prosecution.   In addition, Document Nos. 7-B and 7-C are deliberative because they reflect consideration by Department attorneys regarding whether or not to file criminal charges.   Further, Document No. 7-C reflects successive versions of a document that reveals the internal development of the Department's position on a contemplated legal question related to the matters at issue.

29.     Although Document No. 7-D is not a draft, it is also protected by the deliberative process privilege.  Document No. 7-D consists of a Department attorney's recommendation to a senior Department decisonmaker.  Specifically, it is pre-decisional because it was drafted for the purposes of informing the final decisionmaking on a recommendation regarding possible criminal prosecution related to the death of the detainee that was the subject of Durham's investigation, prior to the decision being made.  It is deliberative because it reflects deliberations by a Department attorney regarding the development of a legal determination concerning whether or not to file criminal charges.  Document No. 7-D is a memorandum that reflects preliminary assessments by a Department attorney about legal issues on which they were asked to make a recommendation and give advice.

Foreseeable Harm

30.     Disclosure of these two reports and their exhibits would undermine the ability of Department of Justice officials to freely provide candid and forthright evaluations of the matters before the Attorney General and to the internal development of final agency actions, particularly as they relate to high profile, sensitive investigatory matters, as was the case here.  As discussed above, these two memoranda embody Mr. Durham's recommendation to Department leadership that two cases arising out of the CIA interrogations investigation receive full criminal investigations.  Additionally, Documents 7-B through 7-D reflect the preliminary assessments, deliberations and recommendations of the Department attorneys handling the prior investigation. It is imperative to the Department's decisionmaking process that such materials be prepared with complete candor and thoroughness and not with an eye towards public disclosure.  As a general matter, if memoranda such as these are routinely released to the public, Department employees will be much more circumspect in their discussions with each other and in providing all pertinent

information and viewpoints to senior officials in a thorough and timely manner.  This lack of candor would seriously impair the Department's ability to foster the forthright, internal discussions necessary for efficient and proper Executive Branch decisionmaking.  Certainly, disclosure of such preliminary assessments and opinions would make Department officials much more guarded in providing their views to Executive Branch officials.  Intra-agency decisionmaking is at its best when officials are able to focus on the substance of their recommendations and not on whether their views may at some point be made publicly available.

31.    More specifically as to the documents withheld in this case, all of these materials are preliminary and do not embody final agency actions.  The DOJ attorneys preparing such materials must feel free to create the most thorough and candid documents possible so that Executive Branch decision-makers are well-informed as they ultimately decide on legal questions.  Here, Mr. Durham's decisions were ultimately subject to the Attorney General's approval, meaning that the Attorney General could have declined to approve Mr. Durham's recommendations if the Attorney General were so inclined.  If these memoranda were to be released to the public, Department officials would be wary about providing viewpoints on all angles critical to the decisionmaking process when their input is solicited by Department decisionmakers.  The passage of time here does not vitiate against these harms, nor does the unique nature of investigations of this nature.  Indeed, the very infrequency of such investigations into sensitive matters of national controversy and concern heighten the foreseeable harm in releasing this information.  If a special prosecutor or special counsel is aware that their preliminary evaluations, assessments, and recommendations, such as those contained in these reports, would be released after a designated amount of time passes, they will be hindered in their ability to fully express and document their work, and later special prosecutors and counsels would likewise be

chilled.  In the context of issues of national controversy and concern such as those investigated by special prosecutors and counsels, it is crucial that pre-decisional and deliberative material be kept privileged to ensure the integrity of high profile and sensitive investigations that are central to the Department's mission.   It is therefore critical that DOJ employees' candid views are protected from disclosure to ensure that senior leadership will receive similarly forthright advice on such critical matters in the future.

Attorney Work-Product Privilege - The Reports

32.     All ten reports identified in OIP's *Vaughn* Index cover an exhaustive analysis of legal theories, evidentiary analysis, strengths of various defenses, and detailed descriptions applying evidence to legal theories, and have therefore been withheld in their entireties pursuant to the attorney work-product privilege encompassed by FOIA Exemption 5, with the exception of the May 26, 2011 Final Report on Preliminary Review which has previously been released in part as a result of a limited waiver of work-product discussed *supra*.  *See also* Durham Decl. ¶¶ 9-11, 14-15, 18-19 for specific details about these documents.

33.     The attorney work-product privilege encompassed by Exemption 5 of the FOIA shields from release materials prepared by an attorney or at the direction of an attorney, generated in reasonable anticipation of litigation, 5 U.S.C. § 552(b)(5).  This privilege protects any portion of a document prepared in anticipation of litigation, including material concerning opinions on case-specific matters and legal theories.  The purpose of this privilege is to insulate the adversarial process from public scrutiny by protecting Department attorneys' preparation of litigation materials.

34.     These documents were created by Mr. Durham and his team in the course of making legal determinations on matters assigned by the Department's senior leadership, as well as in

providing legal advice and recommendations on the need to further investigate two of the matters assigned.   These materials exhaustively detail Mr. Durham's frank and comprehensive investigation and analysis of the CIA tapes and CIA interrogations matters, on whether federal laws were violated, and on whether to prosecute any violations of such laws, including a detailed description applying evidence to legal theories, assessment of the strengths of various defenses, and assessment of potential litigation risks in consideration of relevant legal precedent.   More specifically, the documents evaluate, in great detail, possible legal challenges; possible litigation strategies if prosecutions were to ensue, and the likelihood of success should such defense strategies be implemented; particular facts that may play into judicial review and an evaluation of how a Court would consider those facts; and possible implications of and analogy to existing judicial precedent.   Mr. Durham was granted complete freedom in the nature and conduct of his investigations.[8]  *See* Durham Decl. ¶¶ 7, 13.   All of the reports and memoranda of decision reflect the core prosecutorial decisionmaking of Mr. Durham, while assessing the viability or propriety of pursuing further legal action based on his review of the evidence, and application of these assessments to current or contemplated legal actions.   Additionally, the memoranda of recommendation (documents 5 and 7) – which, unlike the other documents, specifically seek Attorney General approval of Mr. Durham's proposed courses of action – likewise include Mr. Durham's legal analysis on two specific interrogation cases in recommending that full criminal investigations be opened into the deaths of these two detainees.   While the Attorney General ultimately approved the recommendations to pursue full investigations into these two cases, the

---

[8] As the Acting United States Attorney for purposes of the investigations, Mr. Durham was directed to report to the Deputy Attorney General, as do all United States Attorneys in the ordinary course. *See* U.S. Attorney's Manual, section 3-1.140 (at the time of these investigations the relevant provision of the U.S. Attorney's Manual was at section 3-2.140); *see also* Exhibit A.

recommendation memoranda themselves, including attachments, go well beyond a simple request for approval and detail  Mr. Durham's legal assessment of these two particular cases.  Specifically, as Mr. Durham stated in his declaration, "[t]hese memoranda contain an in-depth recitation, analysis, and evaluation of the facts and evidence uncovered in the course of [his] preliminary reviews as well as supporting legal and factual justification for [his] recommendation that full criminal investigations were warranted under the governing standards."  Durham Decl. ¶ 15. Additionally, "[t]hese reports further outlined the key areas [he and his team] would pursue in a full criminal investigation, as well as the potentially applicable criminal statutes."  *Id.*  Indeed, the two memoranda of recommendation embody the core attorney work-product which is reflected in all of the documents at issue, and which Exemption 5 of the FOIA is intended to protect.

35.     Additionally, as discussed *supra*, the exhibits attached to Documents 5 and 7 generally relate to a previous investigation independent from Mr. Durham's investigation.  Thus, aside from the privilege that attaches to the exhibits because they reflect Mr. Durham's work product, certain of those exhibits, specifically Documents 7-A through 7-D, are also separately and independently protected by the attorney work-product privilege of Exemption 5 of the FOIA because they constitute the work product of other Department attorneys created during the course of the prior investigation.  More specifically, Documents Nos. 7-A and 7-B are letters drafted by Department attorneys that were created as part of a separate, prior investigation into the death of the detainee that was the subject of Durham's investigation, and reflect legal analysis regarding possible criminal prosecution.[9]  Document Nos. 7-C and 7-D are legal memoranda drafted by Department attorneys as part of the same prior investigation, and similarly reflect legal analysis

---

[9] As noted *supra* Document 7-B is also a draft document.

and recommendations regarding possible criminal prosecution.[10]   As with disclosure of Mr.

Durham's work product, disclosure of these documents would reveal the legal analysis and mental

impressions of Department attorneys who were investigating possible violations of law and factors

they considered to determine whether to initiate legal proceedings.   Such disclosure would reveal

Department attorneys' analysis of facts and agency conduct deemed significant and strategy

regarding potential criminal prosecution that, if pursued, the Department would ultimately handle

on behalf of the Executive Branch.   Accordingly, in addition to retaining protection as attorney

work-product in the context of their use in Mr. Durham's investigation, Document Nos. 7-A

through 7-D are also separately and independently protected in full by the attorney work-product

privilege.

Attorney Work-Product Privilege – The FD-302s

36.     Similarly, as more fully explained in Mr. Durham's Declaration, the FD-302s

generated during the course of the CIA tapes and CIA interrogation investigations are protected in

full by the attorney work-product privilege.   *See* Durham Decl. at ¶¶12, 20.   As explained in that

declaration, the FD-302s memorialize interviews of potential witnesses selected by and conducted

under John Durham's supervision and direction, in connection with his team's evaluation of

whether or not to recommend that further investigation be conducted, whether criminal

prosecutions were warranted, or, in two instances whether to file criminal charges.   *See Id.*

Foreseeable Harm

37.     There is a reasonably foreseeable harm in release of the reports and FD-302s

prepared during the course of the CIA tapes and CIA interrogation investigations.   All of the

reports and FD-302s withheld pursuant to the attorney work-product privilege were created by

---

[10] As noted *supra* Document 7-C consists of successive drafts of this document.

and/or at the direction of an attorney.  The purpose of the attorney work-product privilege is to insulate the adversarial process by protecting Department attorneys' preparation of litigation materials from public scrutiny.  As discussed above and in the Durham Decl., the reports and FD-302s prepared during the course of the CIA tapes and CIA interrogation investigations reflect the mental impressions, strategy, and direction of the attorneys who were involved in the interviews. Disclosure of these documents would reveal CIA tapes and interrogation investigations attorneys' mental impressions, conclusions, opinions, or legal theories concerning anticipated or pending litigation, and have been therefore withheld.  Department of Justice attorneys are singularly tasked with enforcing federal laws and defending the interests of the United States, a critical responsibility which extends to Department attorneys' review of potential legal violations within the Executive Branch itself, as was the case for the CIA interrogation investigation.  Essential to this unique and fundamental role is the internal process which unfolds within the Department, as Department prosecutors engage in factual investigations, evidence-gathering, and careful, frank analysis of the law and evidence specific to cases under their review.  These investigations in turn inform Department attorneys' evaluative processes in which they decide whether violations of the law have occurred, assess the strengths and weaknesses of their cases, and ultimately decide whether to prosecute alleged violations of the law.  This is precisely the investigatory and decisionmaking process that the CIA tapes and interrogation investigations attorneys engaged in during their years-long investigations.  Disclosure of this information would hinder the Government's ability to investigate potential legal violations within the Executive Branch and conduct litigation on behalf of the United States as Department attorneys would no longer feel free to pursue lines of questioning, avenues of investigation, or to memorialize important thoughts on potential litigation strategies for fear that the information might be disclosed to the detriment of the Government's

current and future litigating positions.  The passage of time here does not vitiate against these harms, nor does the unique nature of investigations of this nature.  Indeed, the very infrequency of such investigations into sensitive matters of national controversy and concern heighten the foreseeable harm in releasing this information.  If a special prosecutor or special counsel is aware that their core legal work-product such as that at issue in this case would be released after a designated amount of time passes, they will be hindered in their ability to fully express and document their work, and later special prosecutors and counsels would likewise be chilled.  In the context of issues of national controversy and concern such as those investigated by special prosecutors and counsels, it is crucial that attorney work-product material be kept privileged to ensure the integrity of high profile and sensitive investigations that are central to the Department's mission.  The FD-302s and reports prepared by Mr. Durham and his investigatory team in the course of the CIA tapes and CIA interrogations investigations fit squarely within the core prosecutorial work of the Department and as such, are thus protected by the attorney work-product privilege.

### **Adoption**

38.    As discussed *supra*, the Government previously reprocessed the portions of the May 26, 2011 Final Report on Preliminary Review implicated by the Second Circuit's finding of waiver regarding certain statements by Attorney General Holder's statements that Durham had "determined that a number of the detainees were never in CIA custody."  The Government identified and redacted from the relevant portions of that report the information that was subject to exemptions other than Exemption 5 and released the non-exempt information.

39.    In reaching the determination that remaining withheld material in the reports are protected in by Exemption 5 of the FOIA, OIP considered the Department's official public

statements regarding the CIA tapes and CIA interrogations investigations, including the statements discussed in ¶¶ 4-8 above, and has found no additional official public statement which in any way suggests that the Mr. Durham's extraordinarily detailed reports and memoranda were adopted publicly by the Department.[11]   Based on our review of the documents, public statements, and Mr. Durham's statements (*see generally* Durham Decl.), it is apparent that in all but the recommendation memoranda protected by the deliberative process privilege Mr. Durham was exercising his independent judgment.   While Mr. Durham reported to Department leadership, *see supra* note 8, he was granted full autonomy and independence as to the nature and the conduct of the investigations, including the prosecutorial decisions made.   *See* Durham Decl. ¶¶ 7, 13. Moreover, it is clear from the volume and complexity of all of the documents, including the recommendation memoranda protected by the deliberative process privilege, that no additional public statements by the Department constituted adoption of Mr. Durham's recommendations and decisions.   Finally, these documents are core prosecutorial reports and memoranda, not policy-setting documents.   None of the reports and memoranda provided guidance for agency employees to follow.

## Limited Disclosures of Certain Materials Subsequent to Investigations Closures

---

[11] Also among the public statements reviewed by OIP were comments made publicly by the Department at the United Nations Committee on the Convention Against Torture meeting on November 21, 2014. Although a transcript of the Department's remarks at that meeting is not available, I have been advised by knowledgeable Department personnel that the remarks were substantively identical to the November 2010 and August 2012 Attorney General statements (see Exhibits D & F), with the exception that the number of witnesses interviewed in the course of Mr. Durham's investigations was identified in these remarks. These remarks therefore did not change OIP's conclusion that no adoption of the records at issue has occurred, in that they describe Mr. Durham's investigations, and not the substance of the withheld reports and memoranda themselves.

40.     Senate Select Committee on Intelligence ("SSCI") Vice Chair Mark Warner and Chairman Richard Burr formally requested access to the "Durham Report" or its executive summary on April 24, 2018 and May 7, 2018, respectively.[12]  A copy of these requests are attached hereto as Exhibit N.

41.     In response to this request, on May 07, 2018, then-Assistant Attorney General Boyd, responded, noting that "[t]he Department has agreed to allow the Durham Report's Executive Summary to be viewed by the Senate Majority Leader plus one staffer, the Senate Minority Leader plus one staffer, the SSCI Chairman plus two SSCI staffers, and the SSCI Vice Chairman plus two SSCI staffers, and all SSCI members." The letter further noted that "[t]he executive summary will have redactions of two types.  First, grand jury material that is prohibited from being disclosed pursuant to Federal Rule of Criminal Procedure 6(e) has been redacted. Second, the Central Intelligence Agency requested that certain names be redacted in order to prevent unnecessary and inappropriate disclosure."  A copy of Assistant Attorney General Boyd's letter is attached hereto as Exhibit O.  OIP has determined that there was no waiver of Exemption 5 due to these circumstances.

42.     Separately, as required by its criminal discovery obligations before the Military Commissions Trial Judiciary as set forth in the April 04, 2016 trial conduct order, the Government provided to cleared defense counsel in those proceedings classified summaries of certain FD-302s prepared during the course of John Durham's investigations which contained information regarding the accused's confinement in the CIA Rendition, Detention and Interrogation Program.

---

[12] The "Durham Report" refers to what is herein referred to as the "Tape Destruction Report." *See* Vaughn Index #1.

A copy of the trial conduct order is attached hereto as Exhibit P.[13]  Discovery in those proceedings

was also subject to a protective order limiting defense counsel's use of the material given presence

of classified information, a copy of which is attached hereto as Exhibit Q.  I have been advised

that the FD-302s themselves were not provided to defense counsel; only a summary of them.  OIP

has determined that there was no waiver of Exemption 5 due to these circumstances.

43.     Other than the limited disclosures discussed *supra*, OIP is unaware of the material

responsive to Plaintiffs' FOIA requests having been publicly released and have found no public

availability of these materials.

Segregation of Non-Exempt Information

44.     During OIP's review of the information described above, we carefully reviewed

each of the documents to determine whether any information could be segregated for release.  With

respect to information protected by the attorney work-product privilege, the disclosure of these

documents, and the facts selected for and contained within them, would undermine the core legal

advice and analysis that the privilege is meant to protect by revealing attorneys' assessments of

what was deemed significant in the course of investigations into the destruction of the videotapes

and interrogations of detainees.  Indeed, in the FOIA context, the attorney work-product privilege

categorically protects facts and attorney opinions.  Thus, the documents withheld by OIP pursuant

to Exemption 5, all of which are covered by the attorney work-product privilege, including the

facts therein, are protected in full and contain no reasonably segregable information.[14]  With

respect to records protected by the deliberative process privilege, no portions of the documents

---

[13] Note: the partial declassification of the "SSCI Report" referenced in paragraph 1 of the Trial
Conduct order is a separate report, prepared by the Senate Select Committee on Intelligence, than
any of the reports prepared by Mr. Durham as part of his investigations.
[14] Excepting the May 26, 2011 Final Report on Preliminary Review which has previously been
released in part as a result of a limited waiver of work-product discussed *supra* at ¶16.

were determined to be releasable inasmuch as these documents are also protected in their entirety

by the attorney work-product privilege.

I declare under penalty of perjury that the foregoing is true and correct.

Douglas Hibbard
Chief, Initial Request Staff

Executed this 10th day of October, 2023.

# EXHIBIT A


# Department of Justice

---

**FOR IMMEDIATE RELEASE**
**WEDNESDAY, JANUARY 2, 2008**
**WWW.USDOJ.GOV**

**OPA**
**(202) 514-2007**
**TDD (202) 514-1888**

## Statement by Attorney General Michael B. Mukasey Regarding the Opening of an Investigation Into the Destruction of Videotapes by CIA Personnel

"Following a preliminary inquiry into the destruction by CIA personnel of videotapes of detainee interrogations, the Department's National Security Division has recommended, and I have concluded, that there is a basis for initiating a criminal investigation of this matter, and I have taken steps to begin that investigation as outlined below.

"This preliminary inquiry was conducted jointly by the Department's National Security Division and the CIA's Office of Inspector General. It was opened on December 8, 2007, following disclosure by CIA Director Michael Hayden on December 6, 2007, that the tapes had been destroyed. A preliminary inquiry is a procedure the Department of Justice uses regularly to gather the initial facts needed to determine whether there is sufficient predication to warrant a criminal investigation of a potential felony or misdemeanor violation. The opening of an investigation does not mean that criminal charges will necessarily follow.

"An investigation of this kind, relating to the CIA, would ordinarily be conducted under the supervision of the United States Attorney for the Eastern District of Virginia, the District in which the CIA headquarters are located. However, in an abundance of caution and on the request of the United States Attorney for the Eastern District of Virginia, in accordance with Department of Justice policy, his office has been recused from the investigation of this matter, in order to avoid any possible appearance of a conflict with other matters handled by that office.

"As a result, I have asked John Durham, the First Assistant United States Attorney in the United States Attorney's Office for the District of Connecticut, to serve as Acting United States Attorney for the Eastern District of Virginia for purposes of this matter. Mr. Durham is a widely respected and experienced career prosecutor who has supervised a wide range of complex investigations in the past, and I am grateful to him for his willingness to serve in this capacity. As the Acting United States Attorney for purposes of this investigation, Mr. Durham will report to the Deputy Attorney General, as do all United States Attorneys in the ordinary course. I have also directed the FBI to conduct the investigation under Mr. Durham's supervision.

"Earlier today, the Department provided notice of these developments to Director Hayden and the leadership of the Judiciary and Intelligence Committees of the Congress."

###

08-001

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

THE NEW YORK TIMES COMPANY and
CHARLIE SAVAGE,

                     Plaintiffs,

       -against-

UNITED STATES DEPARTMENT OF JUSTICE,

                     Defendant.

------------------------------------------------------------- x

14 Civ. 3777 (JPO)

## DECLARATION OF JOHN H. DURHAM

I, John H. Durham, pursuant to 28 U.S.C. § 1746, declares the following:

1. I am Counsel to the United States Attorney for the District of Connecticut. I have been employed as a federal prosecutor since December 20, 1982, when I became a Trial Attorney for the New Haven Field Office of the Boston Strike Force on Organized Crime. I served as the Strike Force Chief in the District of Connecticut from 1987 until September 1989. In September 1989, I became Chief of the Criminal Division for the United States Attorney's Office for the District of Connecticut and served in that position until March 1994, when I became the Deputy United States Attorney for the Office.[1] I became Counsel to the United States Attorney in March 2008. At various times, I have also served as the Interim United States Attorney for the District of Connecticut, Special Attorney in the District of Massachusetts, and Special Attorney in the Southern District of New York investigating allegations of corruption within a federal law enforcement agency.

---

[1] In the District of Connecticut, the Deputy United States Attorney is the position commonly known in other districts as the First Assistant United States Attorney.

2.     The statements made in this declaration are based on my personal knowledge of the facts, as well as information obtained and reviewed in the course of my official duties.

3.     I understand that plaintiffs in the above-captioned action submitted two Freedom of Information Act ("FOIA") requests dated April 11, 2014. The first, submitted to the Department of Justice ("DOJ"), sought the following:

> "[A] copy of any reports to the attorney general or deputy attorney general describing or presenting findings from the investigation led by Assistant U.S. Attorney John Durham of the District of Connecticut into the destruction of interrogation videotapes by the Central Intelligence Agency and into whether federal laws were violated in connection with the interrogation of specific detainees at overseas investigations."

(*See* Declaration of Douglas Hibbard dated Dec. 9, 2014 ("Hibbard Decl."), Ex. A). The second, submitted to DOJ and the Federal Bureau of Investigation ("FBI"), sought "copies of the FD-302 reports summarizing interviews conducted as part of" the investigations described above. (*See* Declaration of David E. McCraw dated Oct. 31, 2014, Ex. P).

4.     I submit this *Vaughn* declaration to provide detail and context concerning the records sought in plaintiffs' FOIA requests and DOJ's invocation of FOIA Exemption 5, in conjunction with the work product doctrine, to withhold from public disclosure all FD-302 reports prepared in connection with the investigations described in paragraphs 3, 12, and 20 of this declaration. I understand that DOJ has invoked FOIA Exemption 5, in conjunction with the deliberative process privilege and work product doctrine, to withhold from public disclosure copies of all reports made to the Attorney General and/or Deputy Attorney General describing or presenting my findings concerning these same investigations. (*See generally* Hibbard Decl.).[2]

5.     On January 2, 2008, Attorney General Michael Mukasey appointed me to serve as Acting United States Attorney for the Eastern District of Virginia in connection with a federal

---

[2] All of the responsive records discussed in this declaration are classified pursuant to Executive Order 13,526. Accordingly, the descriptions contained herein are necessarily limited so as not to reveal classified information.

criminal investigation into the destruction of certain videotaped interrogations of detainees by the Central Intelligence Agency (the "CIA tapes investigation"). In my capacity as Acting United States Attorney for the Eastern District of Virginia, I was responsible for directing and supervising the investigative efforts of a team of lawyers and Special Agents of the Federal Bureau of Investigation ("FBI") conducting the investigation into the destruction of the CIA videotapes. The investigation was generally staffed with approximately fourteen FBI Special Agents and five career Department of Justice prosecutors, including myself. My mandate also included conducting any related criminal prosecutions.

6. On August 24, 2009, Attorney General Eric H. Holder expanded my mandate to include a preliminary review into whether federal laws were violated in connection with the interrogation of certain detainees at overseas locations (the "CIA interrogations investigation"). In that capacity, I was to recommend to the Attorney General whether there was sufficient predication for any full investigations into whether the law was violated in connection with any of those interrogations. In the event the Attorney General approved my recommendation to launch a full criminal investigation, I again was to determine whether any criminal prosecutions should be brought. In connection with this assignment, I was responsible for directing and supervising the investigative efforts of a team of lawyers and FBI Special Agents.

**The CIA Tapes Investigation**

7. Beginning with my appointment as Acting United States Attorney for the Eastern District of Virginia, a fully-staffed team of prosecutors and agents was assembled and actively gathered information and evidence relating to the destruction of the videotapes in issue. While I reported directly to the Offices of the Attorney General and Deputy Attorney General, I was given complete freedom with respect to the nature and conduct of the investigation and the

prosecutive decisions made. Indeed, there was a compelling national interest in ensuring that the criminal investigation was conducted in a manner that would engender public trust in its outcome.

8. The questions under active review included, among other things, who destroyed the interrogation videotapes, who made the decision to destroy the tapes, and whether there was the requisite criminal intent in connection with the destruction to warrant federal criminal charges being brought against anyone. More specifically, the team examined whether any person or persons obstructed justice, made false statements, or acted in contempt of court or Congress in connection with the destruction of the videotapes. With respect to potential obstruction of justice offenses, my team investigated whether the destruction of the videotapes violated any order issued by any federal judicial officer, and, if so, what the person or persons' knowledge, motive, and/or intent was in destroying the tapes or causing their destruction. The investigation was extraordinarily thorough and dispassionate.

9. As relevant here, the team prepared two substantive reports in connection with this investigation. Specifically, the team prepared a 1037-page report (comprised of a 723-page memorandum and 314-page appendix) that memorialized our analyses and thought processes concerning whether to initiate any criminal prosecutions and our ultimate conclusion not to file charges. (*See* Hibbard Decl. Ex. C (hereinafter "Vaughn Index") #3, 4). As of November 9, 2010, when the Department of Justice announced this decision, the report existed in draft form pending a classification review. However, at that time, and even at the time classification review had been completed and the report was finalized, on or about January 18, 2011, the team was still actively reviewing several issues and certain evidence, including whether there had been any chargeable instances of false statements or grand jury perjury in the course of the investigation,

4

as well as the circumstances surrounding other prior sworn testimony provided by high-level officials about the tapes' destruction, including whether such testimony was perjurious. The team's evaluation of those open issues was subsequently memorialized in a "memorandum to file," the final and draft versions of which I provided to the Deputy Attorney General in 2012. (*See* Vaughn Index #15, 16).

10. The reports described in paragraph 9 (the "CIA tapes investigation reports") involved an exhaustive analysis of the tremendous volume of evidence amassed during the CIA tapes investigation. Beyond evaluating facts, statements and testimony of witnesses, and other evidence as it related to the criminal investigation of the destruction of the videotapes, the CIA tapes investigation reports assessed the admissibility of the evidence in judicial proceedings and identified other strengths and weaknesses associated with the evidence. In addition, in light of our assessment of the evidence, the reports thoroughly analyzed the type and nature of criminal charges that could be brought against suspected wrongdoers, along with various defenses that could be raised in opposition to any such charges. In evaluating the factual and legal issues that would likely arise in connection with potential criminal prosecutions, the reports are replete with the opinions and mental impressions of the attorneys and agents who conducted the investigation. I modeled the format of the reports from criminal prosecution memoranda, which are prepared in connection with a determination to bring a criminal action. Aspects of the reports' analysis, including discussions of investigative paths pursued, the admissibility of certain evidence, the types of evidence that might be required to successfully bring a prosecution under the pertinent statutes, the likelihood of succeeding in prosecuting certain crimes, and potential defense strategies, also apply to other current or contemplated prosecutions involving similar evidence or similar contemplated charges.

11.    My reports concerning the CIA tapes investigation did not contain any policy recommendations or determinations.  Rather, I analyzed the issues presented from the viewpoint of a prosecutor, assessing whether there existed sufficient evidence to warrant filing criminal charges.  I expected that these reports would remain confidential, and did not disseminate them to any person or entity other than to the offices of the Attorney General and the Deputy Attorney General.

12.    In addition to preparing the CIA tapes investigation reports, as part of the ongoing CIA tapes investigation, the team conducted a series of interviews of potential witnesses, and for each interview, prepared an FD-302.  An FD-302 is a form filled out by one or more FBI Special Agents, which memorializes the statements made by a potential witness in the course of an interview conducted by FBI Special Agents, sometimes in conjunction with federal prosecutors.  My team conducted these interviews in connection with our evaluation of whether criminal prosecutions were warranted.  These interviews were done under my supervision and at my direction.  (*See* Hibbard Decl. Ex. D] ("I have also directed the FBI to conduct the investigation under Mr. Durham's direction.")).  The attorneys on my team selected many of the witnesses to interview.  Along with one or more FBI Special Agents, either I or an attorney from my team attended the overwhelming majority of these interviews.  Attorneys who attended the interviews, including myself, actively participated in questioning the witnesses.  I personally reviewed virtually all of the resulting FD-302s and assisted in editing some of those 302s relating to interviews in which I participated.  To the best of my knowledge, none of the FD-302s prepared in connection with the CIA tapes investigation have been disclosed in connection with any judicial or administrative proceedings to any person outside of the government or have otherwise been publicly disclosed.

### The CIA Interrogations Investigation

13.     Our investigation of whether federal laws were violated in connection with the treatment and interrogation of specific detainees primarily entailed investigating whether any unauthorized interrogation techniques were used by CIA interrogators, and if so, whether such conduct could constitute violations of any applicable criminal statutes. As with the CIA tapes investigation, I had full autonomy and independence with respect to the nature and conduct of the preliminary review of these matters and both of the resulting full criminal investigations. I identified the matters to include within my review.

14.     As the preliminary review unfolded, I generated two interim reports advising the Attorney General and Deputy Attorney General of preliminary reviews that had been completed and closed. (*See* Vaughn Index #1, 5). Ultimately I provided a final report dated May 26, 2011. (*See id.* #7). Among other things, these reports discussed the strengths and weaknesses of the facts and evidence uncovered in the course of the preliminary reviews, the potential applicability of various criminal statutes against that evidence, and ultimately why no full criminal investigations should be pursued with the exception of the two matters described in paragraph 15 below. The reports also discussed limitations on the evidence available to my team, and reviewed previous investigations conducted by other government entities.

15.     On December 14, 2010, and May 26, 2011, respectively, I submitted two reports that provided additional detail to support my recommendation that full criminal investigations be opened to further examine the circumstances surrounding the deaths of two individuals who were in United States custody overseas at the time they died. (*See* Vaughn Index #2, 11). These memoranda contain an in-depth recitation, analysis, and evaluation of the facts and evidence uncovered in the course of my preliminary reviews as well as supporting legal and factual

7

justification for my recommendation that full criminal investigations were warranted under the governing standards. These reports further outlined the key areas we would pursue in a full criminal investigation, as well as the potentially applicable criminal statutes. The Attorney General was the final decisionmaker as to whether these full criminal investigations should be pursued.

16.   On June 30, 2011, the Attorney General announced that he accepted my recommendations to open two full criminal investigations.

17.   With respect to the two full criminal investigations that the investigative team subsequently conducted, both of which involved extensive grand jury proceedings, I ultimately determined that no criminal charges should be filed. My determinations were embodied in two separate reports dated March 14, 2012, and July 11, 2012, and addressed to the Attorney General and Deputy Attorney General. (*See* Vaughn Index #13, 18). On August 30, 2012, the Attorney General announced that the two full criminal investigations were closed.

18.   Similar to the CIA tapes investigation reports described in paragraph 10 of this declaration, the reports described in paragraph 17 immediately above memorialized our analyses and thought processes concerning whether to initiate any criminal prosecutions and our ultimate conclusion not to file charges. Specifically, the reports traced the path of our investigations into the two detainee deaths, highlighting critical investigative steps, and analyzed the substantial volume of evidence gathered during the investigations. Beyond evaluating facts, statements and testimony of witnesses, and other evidence as they related to the criminal investigations, these reports assessed the admissibility of the evidence in judicial proceedings and identified other strengths and weaknesses associated with the evidence. In addition, in light of our assessment of the evidence, the reports thoroughly analyzed the type and nature of criminal charges that could

be brought against suspected wrongdoers, along with various defenses that could be raised in opposition to any such charges. The reports also discussed what the evidenced showed and did *not* show, and evaluated previous investigations conducted by other entities. In evaluating the factual and legal issues that would likely arise in connection with potential criminal prosecutions, the reports are replete with the opinions and mental impressions of the attorneys and agents who conducted the investigations. As a general matter, I modeled the format of the reports from criminal prosecution memoranda, which are prepared in connection with a determination to bring a criminal action.

19. None of the reports generated in the course of the CIA interrogations investigation contained any policy recommendations or determinations. Rather, I analyzed the issues presented from the viewpoint of a prosecutor, assessing whether there existed sufficient evidence to warrant filing criminal charges. I expected that these reports would remain confidential, and did not disseminate them to any person or entity other than to the offices of the Attorney General and the Deputy Attorney General.

20. As with the CIA tapes investigation, my investigation into the treatment of detainees held in United States custody overseas involved the interview of a substantial number of potential witnesses. Each witness's statements made in the course of his/her interview were memorialized in an FD-302. (*See supra* ¶ 12 (describing FD-302s)). Again, these interviews were done under my supervision and at my direction, in connection with assessing whether or not to recommend that further investigation be conducted and in two cases whether to file criminal charges. The attorneys on my team selected many of the witnesses to interview. Either I or an attorney from my team attended the overwhelming majority of these interviews along with one or more FBI Special Agents. Attorneys who attended the interviews, including myself,

actively participated in questioning the witnesses. Again, I personally reviewed virtually all of the resulting FD-302s and assisted in editing a number of the FD-302s generated from interviews in which I participated. To the best of my knowledge, none of the FD-302s prepared in connection with the CIA interrogations investigation have been disclosed in connection with any judicial or administrative proceedings to any person outside of the government or have otherwise been publicly disclosed.

21.    With respect to both the CIA tapes investigation and the CIA interrogations investigation, in addition to the reports described herein, I periodically provided oral briefings to the Attorney General and Deputy Attorney General.


I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of December, 2014.
Hartford, Connecticut

JOHN H. DURHAM

# EXHIBIT C

🇺🇸 An official website of the United States government
Here's how you know



THE UNITED STATES
DEPARTMENT of JUSTICE

TICE NEWS

**Attorney General Eric Holder Regarding a Preliminary Review into the Interrogation of Certain Detainees**

~ Monday, August 24, 2009

"The Office of Profe ional Re pon ibility ha now ubmitted to me it report regarding the Office of Legal Coun el memoranda related to so-called enhanced interrogation techniques. I hope to be able to make as much of that report available as possible after it undergoes a declassification review and other steps. Among other findings, the report recommends that the Department reexamine previous decisions to decline prosecution in several cases related to the interrogation of certain detainees.

"I have reviewed the OPR report in depth Moreover, I have clo ely e amined the full, till cla ified ver ion of the 2004 CIA Inspector General's report, as well as other relevant information available to the Department. As a result of my analysis of all of this material, I have concluded that the information known to me warrants opening a preliminary review into whether federal laws were violated in connection with the interrogation of specific detainees at overseas locations. The Department regularly uses preliminary reviews to gather information to determine whether there is sufficient predication to warrant a full investigation of a matter. I want to emphasize that neither the opening of a preliminary review nor, if evidence warrants it, the commencement of a full investigation, means that charges will necessarily follow.

"A i tant United State Attorney John Durham wa appointed in 2008 by then Attorney General Michael Muka ey to investigate the destruction of CIA videotapes of detainee interrogations. During the course of that investigation, Mr. Durham has gained great familiarity with much of the information that is relevant to the matter at hand. Accordingly, I have decided to expand his mandate to encompass this related review. Mr. Durham, who is a career prosecutor with the Department of Justice and who has assembled a strong investigative team of experienced professionals, will recommend to me whether there is sufficient predication for a full investigation into whether the law was violated in connection with the interrogation of certain detainees.

"There are those who will use my decision to open a preliminary review as a means of broadly criticizing the work of our nation's intelligence community. I could not disagree more with that view. The men and women in our intelligence community perform an incredibly important service to our nation, and they often do so under difficult and dangerous circumstances. They deserve our respect and gratitude for the work they do. Further, they need to be protected from legal jeopardy when they act in good faith and within the scope of legal guidance. That is why I have made it clear in the pa t that the Department of Ju tice will not pro ecute anyone who acted in good faith and within the cope of the legal guidance given by the Office of Legal Counsel regarding the interrogation of detainees. I want to reiterate that point today, and to under core the fact that thi preliminary review will not focu on tho e individual

"I share the President's conviction that as a nation, we must, to the extent possible, look forward and not backward when it comes to issues such as these. While this Department will follow its obligation to take this preliminary step to e amine po ible violation of law, we will not allow our important work of keeping the American people afe to be sidetracked.

"I fully realize that my decision to commence this preliminary review will be controversial. As Attorney General, my duty is to examine the facts and to follow the law. In this case, given all of the information currently available, it is clear to me that this review is the only responsible course of action for me to take."

**Speaker:**
Attorney General: Eric H. Holder, Jr.

3/7/23, 2:50 PM    Attorney General Eric Holder Regarding a Preliminary Review into the Interrogation of Certain Detainees | OPA | Department of Jus…

Case 1:22-cv-02477-JEB Document 25-4 Filed 10/10/23 Page 43 of 122

**Component(s):**

Office of the Attorney General

*Updated August 20, 2015*

# EXHIBIT D

🇺🇸 An official website of the United States government
Here's how you know



THE UNITED STATES
DEPARTMENT *of* JUSTICE
TICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                    Tuesday, November 9, 2010

## Department of Justice Statement on the Investigation into the Destruction of Videotapes by CIA Personnel

WASHINGTON    The following   tatement may be attributed to Matthew Miller, Director, Office of Public Affair

"In January 2008, Attorney General Michael Mukasey appointed Assistant United States Attorney John Durham to investigate the destruction by CIA personnel of videotapes of detainee interrogations. Since that time, a team of prosecutors and FBI agents led by Mr. Durham has conducted an exhaustive investigation into the matter. As a result of that investigation, Mr. Durham has concluded that he will not pursue criminal charges for the destruction of the interrogation videotape   "

---

**Component(s):**
Office of the Attorney General

**Press Release Number:**
10-1267

*Updated September 15, 2014*

# EXHIBIT E

3/7/23, 2:52 PM        Statement of the Attorney General Regarding Investigation into the Interrogation of Certain Detainees | OPA | Department of Justice

Case 1:22-cv-02477-EB  Document 25-4  Filed 10/10/23  Page 47 of 122


An official website of the United States government
Here's how you know

THE UNITED STATES
DEPARTMENT *of* JUSTICE
TICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                             Thursday, June 30, 2011

## Statement of the Attorney General Regarding Investigation into the Interrogation of Certain Detainees

"O n January 2, 2008, Attorney General Michael Muka ey appointed A  i tant United State  Attorney John Durham of the District of Connecticut to conduct a criminal investigation into the destruction of interrogation videotapes by the Central Intelligence Agency  On Augu t 24, 2009, ba ed on information the Department received pertaining to alleged CIA mistreatment of detainees, I announced that I had expanded Mr. Durham's mandate to conduct a preliminary review into whether federal laws were violated in connection with the interrogation of specific detainees at overseas locations.  I made clear at that time that the Department would not prosecute anyone who acted in good faith and within the scope of the legal guidance given by the Office of Legal Counsel regarding the interrogation of detainees. Accordingly, Mr. Durham's review examined primarily whether any unauthorized interrogation techniques were used by CIA interrogators, and if so, whether such techniques could constitute violations of the torture statute or any other applicable  tatute

"In carrying out his mandate, Mr. Durham examined any possible CIA involvement with the interrogation of 101 detainee  who were in United State  cu tody  ub equent to the terrori t attack  of September 11, 2001, a number of whom were determined by Mr. Durham to have never been in CIA custody.  He identified the matters to include within his review by examining various sources including the Office of Professional Responsibility's report regarding the Office of Legal Counsel memoranda related to enhanced interrogation techniques, the 2004 CIA Inspector General's report on enhanced interrogations, additional matters investigated by the CIA Office of Inspector General, the February 2007 International Committee of the Red Cross Report on the Treatment of Fourteen "High Value Detainees" in CIA Custody, and public source information.

"Mr  Durham and hi  team reviewed a tremendou  volume of information pertaining to the detainee     That review included both information and matters that had never previously been examined by the Department.  Mr. Durham has advi ed me of the re ult  of hi  inve tigation, and I have accepted hi  recommendation to conduct a full criminal investigation regarding the death in custody of two individuals.  Those investigations are ongoing.  The Department has determined that an e panded criminal inve tigation of the remaining matter  i  not warranted

"As I noted at the time I announced the expansion of Mr. Durham's authority, the men and women in our intelligence community perform an incredibly important service to our nation, and they often do so under difficult and dangerous circumstances.  They deserve our respect and gratitude for the work they do.  However, I concluded based on information available to me then, and continue to believe now, that the Department needed to thoroughly examine the detainee treatment i  ue  I am confident that Mr  Durham'  thorough review ha  ati fied that need "

Case 1:22-cv-02477-JEB Document 25-4 Filed 10/10/23 Page 48 of 122

**Component(s):**
Office of the Attorney General

**Pre Releae Number**
11-861

*Updated September 15, 2014*

# EXHIBIT F



An official website of the United States government
Here's how you know

THE UNITED STATES
DEPARTMENT *of* JUSTICE
TICE NEWS

**Department of Justice**

**Office of Public Affairs**

FOR IMMEDIATE RELEASE                                                Thursday, August 30, 2012

## Statement of Attorney General Eric Holder on Closure of Investigation into the Interrogation of Certain Detainees

The Attorney General announced today the clo ure of the criminal inve tigation  into the death of two individual  while in United States custody at overseas locations. Below is some background on the investigation and the Attorney General' tatement

### *BACKGROUND ON INVESTIGATION:*

On Jan. 2, 2008, Attorney General Michael Mukasey selected Assistant U.S. Attorney (AUSA) John Durham of the District of Connecticut to conduct a criminal investigation into the destruction of interrogation videotapes by the Central Intelligence Agency (CIA).

On Aug  24, 2009, ba ed on information the Department received pertaining to alleged CIA mi  treatment of detainee  , Attorney General Eric Holder announced that he had expanded Mr. Durham's mandate to conduct a preliminary review into whether federal law  were violated in connection with the interrogation of  pecific detainee  at over ea  location  Attorney General Holder made clear at that time, that the Department would not prosecute anyone who acted in good faith and within the scope of the legal guidance given by the Office of Legal Counsel regarding the interrogation of detainees. Accordingly, Mr. Durham's review examined primarily whether any unauthorized interrogation techniques were used by CIA interrogators, and if so, whether such techniques could constitute violations of the torture statute or any other applicable statute.

In June of last year, the Attorney General announced that Mr. Durham recommended opening full criminal investigations regarding the death of two individual  while in United State  cu tody at over ea  location  , and clo ing the remaining matters. The Attorney General accepted that recommendation. Today, the Attorney General announced that those two inve tigation  conducted over the pa  t year have now been clo ed

### ATTORNEY GENERAL STATEMENT :

"AUSA John Durham has now completed his investigations, and the Department has decided not to initiate criminal charges in these matters. In reaching this determination, Mr. Durham considered all potentially applicable substantive

criminal statutes as well as the statutes of limitations and jurisdictional provisions that govern prosecutions under those statutes. Mr. Durham and his team reviewed a tremendous volume of information pertaining to the detainees. That review included both information and matters that were not examined during the Department's prior reviews. Based on the fully developed factual record concerning the two deaths, the Department has declined prosecution because the admissible evidence would not be sufficient to obtain and sustain a conviction beyond a reasonable doubt.

"During the course of his preliminary review and subsequent investigations, Mr. Durham examined any possible CIA involvement with the interrogation and detention of 101 detainees who were alleged to have been in United States custody subsequent to the terrorist attacks of September 11, 2001. He determined that a number of the detainees were never in CIA custody. Mr. Durham identified the matters to include within his review by examining various sources including the Office of Professional Responsibility's report regarding the Office of Legal Counsel memoranda related to enhanced interrogation techniques, the 2004 CIA Inspector General's report on enhanced interrogations, additional matters investigated by the CIA Office of Inspector General, the February 2007 International Committee of the Red Cross Report on the Treatment of Fourteen 'High Value Detainees' in CIA Custody, and public source information.

"Mr. Durham and his team of agents and prosecutors have worked tirelessly to conduct extraordinarily thorough and complete preliminary reviews and investigations. I am grateful to his team and to him for their commitment to ensuring that the preliminary review and the subsequent investigations fully examined a broad universe of allegations from multiple sources. I continue to believe that our Nation will be better for it.

"I also appreciate and respect the work of and sacrifices made by the men and women in our intelligence community on behalf of this country. They perform an incredibly important service to our nation, and they often do so under difficult and dangerous circumstances. They deserve our respect and gratitude for the work they do. I asked Mr. Durham to conduct this review based on existing information as well as new information and matters presented to me that I believed warranted a thorough examination of the detainee treatment issue.

"I am confident that Mr. Durham's thorough reviews and determination that the filing of criminal charges would not be appropriate have satisfied that need. Our inquiry was limited to a determination of whether prosecutable offenses were committed and was not intended to, and does not resolve, broader questions regarding the propriety of the examined conduct."

**Component(s):**
Office of the Attorney General

**Pre    Relea e Number**
12-1067

*Updated September 15, 2014*

# EXHIBIT G

| | |
|---|---|
| **From:** | Hibbard, Douglas (OIP) |
| **To:** | Jones, Priscilla A (OIP) |
| **Subject:** | FW: [EXTERNAL] NYT FOIA request for Durham CIA investigation materials |
| **Date:** | Wednesday, June 8, 2022 9:44:20 AM |

New request.

Received 6/7/22.

**From:** Charlie Savage <savage@nytimes.com>
**Sent:** Tuesday, June 7, 2022 8:07 PM
**To:** Requests, MRUFOIA (JMD) ████████████████████ FOIA, CRM (CRM)
████████████ Hibbard, Douglas (OIP) ██████████████
**Cc:** Coley, Anthony D. (PAO) ████████████████████; David McCraw
████████████████ Jess Hui ████████████████████
**Subject:** [EXTERNAL] NYT FOIA request for Durham CIA investigation materials

Dear Department of Justice FOIA officer,

This is a request under the Freedom of Information Act that may benefit from higher-level policy consideration at the Department of Justice, and this letter includes substantial contextual information in case that could be useful for any such deliberations.

> The request is for all reports to the attorney general or deputy attorney general describing or presenting findings and recommendations, and all FBI FD-302 forms and FD-1023 forms summarizing witness and source interviews, in connection with John Durham's investigation into the C.I.A.'s rendition, detention and interrogation program. As a member of the news media engaged in gathering information for public education, I also request a fee waiver.

Bottom line up front: This request is similar to a pair of FOIA requests I made in 2014, and which resulted in significant and complex litigation I will summarize in greater detail below, which The New York Times ultimately largely lost. **The legal policy question raised by this request is whether changes in both the law and the facts in the years since 2014 weigh in favor of a decision that these documents should now be processed and released,** with appropriate redactions for matters that remain classified (e.g., names of CIA personnel that have not already become public, and official acknowledgement of the names of countries that hosted black-site prisons).

Background: Durham's investigation began in 2008 when Attorney General Michael Mukasey tasked him to examine the CIA's destruction of videotapes of interrogations, and his scope expanded in 2009 when Attorney General Eric Holder tasked him to also look at whether agency personnel broke laws in their treatment of detainees generally. Durham, then an AUSA

in Connecticut, ultimately decided to charge no one in connection with this matter and ended the final phase of his investigation by 2012. This investigation was important in part because its very existence hindered the parallel inquiry by the Senate Select Committee on Intelligence: witnesses would not talk to the Senate due to their potential criminal exposure, and Durham apparently spurned SSCI requests to coordinate and share information. As a result, the sourcing of the SSCI report executive summary – the best publicly available historical record of the CIA program – was limited to documents, a constraint that critics of the SSCI's efforts made much of. Disclosure of the witness interviews conducted by the FBI in connection with Durham's investigation, along with his findings, would thus substantially add to the historic record and public understanding.

Previous litigation: In April 2014, I filed a pair of FOIA requests seeking Durham's reports and the FBI 302s from his investigation, and the following month The New York Times and I filed a FOIA lawsuit in the Southern District of New York (14-cv-3777). At the time, the SSCI report had not yet been declassified and how much of it would become public was the subject of heated internal deliberations within the Obama administration. Against that backdrop, the Justice Department of that era decided to fight in court to avoid disclosing any of the responsive documents. In September 2015, Judge J. Paul Oekten ruled that DOJ could withhold all the 302s and several of Durham's reports under Exemption Five as attorney work product privileged. But the judge also ruled that Holder had expressly adopted several other of Durham's reports and so Exemption Five did not categorically protect them from disclosure, while cautioning that specific portions of them might nevertheless be withholdable on other grounds following more specific litigation to come. However, DOJ appealed that part of his ruling to the Second Circuit (No. 17-2066). In September 2019, a Second Circuit panel largely reversed Judge Oekten on the matters for which he had ruled for The Times, putting forward a narrower interpretation of what constitutes express adoption; under that ruling, DOJ only was required to release portions of Durham's reports that related to the conclusion that some of the detainees believed to have been black-site prisoners were never actually in C.I.A. custody. DOJ released a heavily redacted version of one of those reports; The Times challenged some of the redactions but did not prevail, and the litigation formally ended in July 2021.

What's new now: This new request is slightly different than the original one in that it also seeks FD-1023 forms, if any, but we are bringing it – and obviously contemplating potential new litigation over the new request – because the law and facts have changed substantially since the summer of 2014, when the Obama-era Justice Department made the decision to stonewall the original FOIA requests and set in motion the litigation I have described above.

Arguments for disclosure: First, as a factual matter, large amounts of the information in these documents that was classified at the time DOJ made the original decision to fight the FOIA lawsuit has since become declassified. While the litigation around the 2014 FOIA requests largely did not turn on Exemption One, that factor hovered in the background and would have

become an issue had more of the responsive documents cleared the Exemption Five hurdle. The declassifications since I filed that request and then lawsuit include not just the 525-page executive summary and key findings section of the SSCI report when it was released in December 2014, but nearly eight more years of declassifications in connection with the military commissions proceedings at Guantanamo that have resulted in rolling releases.

Second, as a legal matter, what can be lawfully withheld under Exemption Five has changed significantly as a result of Congress's enactment of the FOIA Improvement Act of 2016, as authoritatively interpreted by the D.C. Circuit in *Reporters Committee v. FBI*,  3 F.4th 350 (D.C. Cir. 2021). Today, rather than merely asserting that all FD-302 forms and investigative findings reports are categorically withholdable under Exemption Five as attorney work product privileged, the government must put forward particularized findings, for each specific document or portion of a document it wants to withhold, that it "reasonably foresees that disclosure would harm an interest protected by" Exemption 5. Such findings must go beyond "boilerplate, unparticularized, and hypothesized assertion of harm" and constitute a "focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward"; in other words, it must explain "how disclosure 'would' -- not 'could' -- adversely impair" the invoked interest protected by Exception 5.

Third, as a policy discretion matter, I suggest that the Biden administration, especially after taking the above two factors into account, may decide that it is in both its interest and the public interest to decide to make these documents public – with appropriate redactions for specific facts that remain properly classified. This is so for several reasons.

Notably, in the intervening years, it has become even more routine for the department to disclose FD-302 forms. For example, even before the *Reporters Committee* ruling, the Trump-era Justice Department agreed to release hundreds of 302s from the very high profile and sensitive Russia investigation that was eventually overseen and completed by a special counsel, Robert S. Mueller III, in connection with the FOIA case *Leopold and Buzzfeed v. Department of Justice* (D.D.C., 19-cv-01278); the rolling process of reviewing and releasing those tranches of 302s, some with witness names redacted, has continued under the Biden administration.

Moreover, the bureaucratic, political and policy environment has changed significantly since the Obama-era DOJ decided to fight the original FOIA requests in mid-2014. At the time, the C.I.A. program had ended just seven years earlier, and many of the people who had been involved in key ways were still working for the government; eight years later, more of them have retired or otherwise moved on. Moreover, as noted, when the Obama DOJ decided to fight the earlier FOIA requests, the larger administration was then in the midst of a thorny dilemma over how much of the SSCI report, if any, it was going to declassify -- a factor that is

no longer pertinent. In such ways, the intensity of the matter has diminished with the passing of time. It would therefore be appropriate and laudable for the Biden administration and the Garland Justice Department to take a second look at allowing greater transparency for these historically important documents, and to be the ones who receive credit for their release.

Thank you for considering this matter,

Charlie Savage

_____

Charlie Savage
The New York Times

Mobile/Signal/███████████████
Twitter: @charlie_savage

# EXHIBIT H



**U.S. Department of Justice**
Office of Information Policy
*Sixth Floor*
*441 G Street, NW*
*Washington, DC 20530-0001*

*Telephone: (202) 514-3642*

June 30, 2022

Charlie Savage
New York Times
███████████                         Re:      FOIA-2022-01336

Dear Charlie Savage:

      This is to acknowledge receipt of your Freedom of Information Act (FOIA) request dated and received in this Office on June 7, 2022, in which you requested reports concerning the review of the rendition, detention, and interrogation program of the Central Intelligence Agency conducted by United States Attorney John Durham.

      The records you seek require a search in and/or consultation with another Office, and so your request falls within "unusual circumstances."  See 5 U.S.C. 552 § (a)(6)(B)(i)-(iii) (2018).  Because of these unusual circumstances, we need to extend the time limit to respond to your request beyond the ten additional days provided by the statute.  For your information, we use multiple tracks to process requests, but within those tracks we work in an agile manner, and the time needed to complete our work on your request will necessarily depend on a variety of factors, including the complexity of our records search, the volume and complexity of any material located, and the order of receipt of your request.  At this time we have assigned your request to the complex track.  In an effort to speed up our process, you may wish to narrow the scope of your request to limit the number of potentially responsive records so that it can be placed in a different processing track.  You can also agree to an alternative time frame for processing, should records be located, or you may wish to await the completion of our records search to discuss either of these options.  Any decision with regard to the application of fees will be made only after we determine whether fees will be implicated for this request.

      We regret the necessity of this delay, but we assure you that your request will be processed as soon as possible.  If you have any questions or wish to discuss reformulation or an alternative time frame for the processing of your request, you may contact this Office by telephone at the above number, by e-mail at doj.oip.foia@usdoj.gov, or you may write to the Office of Information Policy, United States Department of Justice, Sixth Floor, 441 G Street, NW, Washington, DC 20530-0001.  Lastly, you may contact our FOIA Public Liaison, Valeree Villanueva, at the telephone number listed above to discuss any aspect of your request.

      Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer.  The contact information for OGIS is as follows:  Office of Government

-2-

Information Services, National Archives and Records Administration, Room 2510, 8601
Adelphi Road, College Park, Maryland 20740-6001; e-mail at ogis@nara.gov; telephone at
202-741-5770; toll free at 1-877-684-6448.

Sincerely,
Initial Request Staff
Office of Information Policy
U.S. Department of Justice

# EXHIBIT I



MEDIA
FREEDOM &
INFORMATION
ACCESS CLINIC

ABRAMS INSTITUTE FOR FREEDOM OF EXPRESSION

# Yale Law School

June 28, 2022

*Via FOIA Star*

Douglas Hibbard
Chief, Initial Request Staff
Office of Information Policy
Department of Justice
6th Floor
441 G St NW
Washington, DC 20530

Re:     Freedom of Information Act Request

To Whom It May Concern:

This is a request for disclosure of documents under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Department of Justice ("DOJ") FOIA regulations, 28 C.F.R. § 16.1 *et seq.* This is also a request for a reduction or waiver of fees under 28 C.F.R. § 16.10(k).

This request is submitted on behalf of the Media Freedom & Information Access ("MFIA") Clinic at Yale Law School and journalist Scott Shane. The MFIA Clinic is a law student clinic whose mission is to promote government transparency and that regularly seeks out and makes public agency and court records on matters of public concern. Mr. Shane has been a professional journalist for 40 years and has reported for The New York Times and The Baltimore Sun on issues relating to national security and other topics.

## Background

In 2008, Attorney General Michael Mukasey tasked U.S. Attorney John Durham with investigating the CIA's destruction of interrogation videotapes. The following year, Attorney General Eric Holder expanded Durham's mandate to examine potential violations of law in connection with the interrogations themselves. It has been disclosed in prior FOIA litigation that Durham investigated 101 incidents of alleged CIA mistreatment of detainees, opened formal investigations into two of the incidents, and ultimately decided not to file any charges against anyone. *See New York Times Co. v. U.S. Dep't of Justice,* 939 F.3d 479 (2d Cir. 2019).

The FOIA litigation also disclosed that in the course of this work, Durham submitted at least five reports to the Attorney General presenting the results of his investigations and supporting his various recommendations, dated December 14, 2010, May 26, 2011 (two reports), March 14, 2012 and July 11, 2012. All of Durham's recommendations were accepted by the Attorney General, who issued public statements expressly adopting them.

The prior litigation involved a FOIA request by New York Times reporter Charlie Savage seeking access to the Durham reports and their exhibits as well as to the records of FBI witness interviews conducted during Durham's investigation. Most of the records were ultimately withheld under a variety of FOIA exemptions, including Exemption 5. *See New York Times Co. v. U.S. Dep't of Justice*, 550 F.Supp.3d 26 (S.D.N.Y. 2021) (final ruling on remand). Certain important facts have changed in the eight years since that earlier FOIA request was submitted. For one, at the time of that FOIA request the executive summary of the Senate Select Committee on Intelligence discussing many of the facts probed by Mr. Durham had not yet been made public. For another, that request was made before the 2016 FOIA amendments imposed new burdens on government agencies that seek to withhold records under Exemption 5.

Given the passage of time, subsequent official disclosures, and change in the law, this request seeks full disclosure of materials relating to the Durham investigation that remain a matter of significant public interest and overriding historical importance.

**Documents Requested**

We request complete copies of all reports (and exhibits) provided to the attorney general or deputy attorney general that describe or present findings or recommendations concerning John Durham's investigation into the CIA's rendition, detention and interrogation program, and all FBI FD-302 forms and FD-1023 forms summarizing witness and source interviews conducted in connection with that investigation.

**Application for Waiver or Limitation of Fees**

We also request a waiver and/or reduction of the search, review, and duplication fees associated with this request. 28 C.F.R. § 16.10(k) provides that DOJ will waive or reduce fees if disclosure is "likely to contribute significantly to public understanding of the operations or activities of the government," and the request is not "primarily in the commercial interest of the requester." 28 C.F.R. § 16.10(k)(2). Both factors warrant a fee waiver in this instance.

First, the requested records indisputably "concern identifiable operations or activities of the Federal Government," 28 C.F.R. §16.10(k)(2)(i), and disclosure of these records undeniably is "likely to contribute significantly to public understanding of those operations or activities," 28 C.F.R. §16.10(k)(2)(ii). The CIA's rendition, detention and interrogation program, remains a matter of intense public interest and debate, and disclosure of these records will add substantially to public understanding of these historically important events.

Second, disclosure is not primarily in the commercial interest of either the MFIA Clinic or Mr. Shane. 28 C.F.R. § 16.10(k)(2). Requesters do not seek these records to further any commercial, trade, or profit interest, but for journalistic use by Mr. Shane and public dissemination by the MFIA Clinic.

2

Requestors are therefore entitled to a waiver of search fees and review fees, and a waiver or reduction of duplication fees. If you require further information concerning the basis of this request for a fee waiver and/or limitation, please contact us at the email address listed below.

Should you conclude that requestors are not eligible for a waiver of all fees, we pre-authorize the expenditure of up to $100.00 to process this request. Please contact us via email to obtain our authorization prior to charging any fees above that amount.

**Response Requested in 20 Working Days**

Your prompt attention to this request is appreciated, and we anticipate your response within twenty (20) working days, pursuant to 5 U.S.C. § 552(a)(6)(A)(i).

If this FOIA request is denied in whole or in part, we respectfully request that the DOJ provide a reasonable description of any withheld materials, and a justification for the withholding of such materials, including a reference to the FOIA exemption (or other legal authority) supporting the withholding. 28 C.F.R. § 16.6(d)–(e).

Should you have any questions regarding this request, please contact me at your earliest convenience at the email address listed below. If it will accelerate release of responsive records, please also provide responsive material on a rolling basis. Also, if our request for a fee waiver is not granted in full, please contact me immediately upon making such a determination.

We look forward to working with you on this request. Thank you for your assistance and prompt attention to this matter.

Sincerely,

David A. Schulz
Media Freedom & Information Access Clinic
Yale Law School
Tel:
Email:

3

# EXHIBIT J



**U.S. Department of Justice**
Office of Information Policy
*Sixth Floor*
*441 G Street, NW*
*Washington, DC 20530 0001*

*Telephone: (202) 514-3642*

July 22, 2022

David Schulz
Yale Law School
P.O.Box 208215
New Haven, CT  06511

Re:   FOIA-2022-01426

DRH:MSH

Dear David Schulz:

This is to acknowledge receipt of your Freedom of Information Act (FOIA) request dated and received in this Office on June 28, 2022, in which you requested records concerning the report of U.S. Attorney John Durham related to the detention and interrogation practices of the Central Intelligence Agency.

The records you seek require a search in and/or consultation with another Office, and so your request falls within unusual circumstances.  See 5 U.S.C. 552  (a)(6)(B)(i)-(iii) (2018). Because of these unusual circumstances, we need to extend the time limit to respond to your request beyond the ten additional days provided by the statute.  For your information, we use multiple tracks to process requests, but within those tracks we work in an agile manner, and the time needed to complete our work on your request will necessarily depend on a variety of factors, including the complexity of our records search, the volume and complexity of any material located, and the order of receipt of your request.  At this time we have assigned your request to the complex track.  In an effort to speed up our process, you may wish to narrow the scope of your request to limit the number of potentially responsive records so that it can be placed in a different processing track.  You can also agree to an alternative time frame for processing, should records be located, or you may wish to await the completion of our records search to discuss either of these options.  Any decision with regard to the application of fees will be made only after we determine whether fees will be implicated for this request.

We regret the necessity of this delay, but we assure you that your request will be processed as soon as possible.  If you have any questions or wish to discuss reformulation or an alternative time frame for the processing of your request, you may contact this Office by telephone at the above number, by email at doj.oip.foia@usdoj.gov, or you may write to the Office of Information Policy, United States Department of Justice, Sixth Floor, 441 G Street, NW,

Washington, DC 20530-0001.  Lastly, you may contact our FOIA Public Liaison, Valeree Villanueva, at the telephone number listed above to discuss any aspect of your request.

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer.  The contact information for OGIS is as follows:  Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001; e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448.

Sincerely,
Initial Request Staff
Office of Information Policy
U.S. Department of Justice

# EXHIBIT K

**From:** Hammond, Derek (USADC)
**To:** Dykstra, Sam (OIP); Butler, Christina (CRM)
**Subject:** FW: [EXTERNAL] Re: Savage et al. v. US DOJ, 22-cv-02477
**Date:** Wednesday, October 12, 2022 4:10:42 PM

FYI

**Derek S. Hammond**
Assistant United States Attorney
United States Attorney's Office
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: ███████████
Email: ██████████████████

**From:** Rachel Davidson ███████████████████████
**Sent:** Wednesday, October 12, 2022 4:09 PM
**To:** David McCraw ██████████████
**Cc:** Hammond, Derek (USADC) ████████████████████; Sumar, Al-Amyn ███
██████████████████████████████████
**Subject:** Re: [EXTERNAL] Re: Savage et al. v. US DOJ, 22-cv-02477

Derek,

That is fine with us.

To answer your question: the requests call for the same records.

Best,
Rachel Davidson


On Wed, Oct 12, 2022 at 4:01 PM David McCraw ██████████████████ > wrote:

> Derek,
>
> We can live with that.  Thanks.
>
> David
>
>
> David E. McCraw
> Senior Vice President & Deputy General Counsel
> The New York Times Company
> 620 Eighth Avenue

New York, New York 10018
Phone: ███████████
Fax: 212-556-4634

On Wed, Oct 12, 2022 at 3:46 PM Hammond, Derek (USADC) ████████████████
wrote:

> David,
>
> At this time DOJ cannot commit to being able to identify the universe of responsive records by a
> date certain since, aside from the need to locate the records, DOJ cannot review potential
> locations for the records until the attorneys assigned to this matter have been granted the
> requisite security clearances. However, DOJ is willing to provide an update on the status of its
> efforts by November 16th and an explanation if it anticipates requiring additional time beyond
> December 12th to locate these records.
>
> Thanks,
>
> **Derek S. Hammond**
> Assistant United States Attorney
> United States Attorney's Office
> District of Columbia
> 601 D Street, N.W.
> Washington, D.C. 20530
> Phone: ███████████
> Email: █████████████████████

---

**From:** David McCraw ████████████████████
**Sent:** Wednesday, October 12, 2022 3:03 PM
**To:** Hammond, Derek (USADC) ███████████████████████
**Cc:** Rachel Davidson █████████████████████████████; Sumar, Al-Amyn ████
██████████████████████████
**Subject:** Re: [EXTERNAL] Re: Savage et al. v. US DOJ, 22-cv-02477

Derek,

I believe the requests call for the same records (Rachel can confirm).

I will find out the answer to your second question.

We appreciate the explanation of the complexity. Can we get a commitment that the
department will be able to identify the universe and propose a production schedule by Dec. 12?

David

David E. McCraw
Senior Vice President & Deputy General Counsel
The New York Times Company
620 Eighth Avenue
New York, New York 10018
Phone: ██████████
Fax: 212-556-4634

On Wed, Oct 12, 2022 at 2:55 PM Hammond, Derek (USADC) ██████████████████
wrote:

> Hi David,
>
> Sorry for the delay. I have been coordinating with the Department regarding your email this
> morning.  For a little bit of clarification, the records Plaintiffs have requested contain highly
> classified information. Currently, no one in the Office of Information Policy (OIP) or in the
> Criminal Division possesses the requisite clearance levels to gain access to these records or
> conduct a search for additional responsive records. The process has been initiated for the
> attorney advisor assigned to this request for OIP and for the attorney assigned to this request
> for the Criminal Division to be granted the requisite clearances, but this will take time as this
> process involves an extensive approval process.  Moreover, once those clearances have been
> granted, the Department understands that these files only exist in paper form and searching
> the locations where files likely responsive to Plaintiffs' requests are located will require the
> attorneys assigned in both offices to visit in person and manually review boxes of records,
> which will require more time than is typical in a FOIA case. Lastly, given the passage of time
> since John Durham's investigation concluded and the search for the earlier requests were
> conducted, as well as Plaintiffs' inclusion of a new type of record, the Department will need
> time to ascertain where all the documents are located as they are not likely in a centralized
> location.   While the Department is diligently processing Plaintiffs' requests, in light of the
> above, the Department is unable to commit to being able to identify the total number of
> responsive documents by November 14th. Sixty days to provide an initial update is
> reasonable given these classification issues as well as the complexities for actually identifying
> and reviewing the records.
>
> Additionally, OIP had some questions regarding these requests we were hoping to raise with
> Plaintiffs that will help facilitate our search (once we gain access). Specifically, we would like
> to know:
>
> - Whether these two requests seek same scope of records?
> - Whether the only difference between the records sought in these requests as

compared requests at issue in the previous litigation are the requested "FD-1023s"?

Thanks,

**Derek S. Hammond**
Assistant United States Attorney
United States Attorney's Office
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: ███████████
Email: ██████████████████

---

**From:** David McCraw ████████████████████
**Sent:** Wednesday, October 12, 2022 2:30 PM
**To:** Hammond, Derek (USADC) ████████████████
**Cc:** Rachel Davidson ████████████████████; Sumar, Al-Amyn ████
████████████████
**Subject:** Re: [EXTERNAL] Re: Savage et al. v. US DOJ, 22-cv-02477

Derek,

If the government is unable to agree to the proposal I sent this morning, I suggest we submit to the court a report with our competing proposals. I have revised the report to reflect that disagreement (although obviously I would prefer to come to some sort of agreement).

Let me know how you want to proceed.

David

On Wed, Oct 12, 2022 at 7:39 AM David McCraw ████████████████████> wrote:

Derek,

While we don't disagree with the idea of finishing processing before setting a briefing schedule, the proposal is too open-ended for us.  Sixty days from now we could be exactly where we are today.  Here is what would work for us: The government, by Nov. 14, will notify plaintiffs of the total number of documents to be reviewed and processed and propose a production schedule.  The parties will provide a status report to the court by Nov. 21.  The thirty days to identify the universe and calibrate production is typical in our FOIA cases, especially for a request that has been pending for months.

Happy to discuss if that would be useful.

David


David E. McCraw
Senior Vice President & Deputy General Counsel
The New York Times Company
620 Eighth Avenue
New York, New York 10018
Phone: ███████████
Fax: 212-556-4634



On Tue, Oct 11, 2022 at 5:31 PM Hammond, Derek (USADC)
███████████████████████ wrote:

> David,
>
> Because the search is not complete, the Department cannot commit to a date by which
> record processing would be finished.
>
> Thanks,
>
> **Derek S. Hammond**
> Assistant United States Attorney
> United States Attorney's Office
> District of Columbia
> 601 D Street, N.W.
> Washington, D.C. 20530
> Phone: ███████████
> Email: ████████████████████
>
> ─────────────────────────────────
>
> **From:** David McCraw ██████████████████
> **Sent:** Tuesday, October 11, 2022 5:23 PM
> **To:** Hammond, Derek (USADC) <████████████████████
> **Cc:** Rachel Davidson ████████████████████>; Sumar, Al-Amyn ████
> ██████████████████
> **Subject:** Re: [EXTERNAL] Re: Savage et al. v. US DOJ, 22-cv-02477
>
> Derek,
>
> Thanks for the email.  Let me check with our reporting team and confer with Rachel.
>
> One question: Can we get a commitment that the processing will be complete by

12/12?  That would make it easier on our side to accept the delay.

David

David E. McCraw
Senior Vice President & Deputy General Counsel
The New York Times Company
620 Eighth Avenue
New York, New York 10018
Phone: ███████████
Fax: 212-556-4634

On Tue, Oct 11, 2022 at 2:46 PM Hammond, Derek (USADC)
███████████████████████ wrote:

> David,
>
> My apologies for the delay.  Given that the Department has not yet issued a final
> response to the FOIA requests at issue in this case, we believe that the Court should
> defer setting any briefing schedule in this matter. The Department has initiated its
> searches for responsive records and that effort is ongoing.  As such, we would
> propose filing another Joint Status Report with the Court on December 12, 2022, to
> provide an update on the Departments efforts to respond to the requests.  If you
> would like to discuss further, I'm happy to jump on a call at 4:30 today.
>
> I have drafted a joint status report reflecting all of this for your review.  Please let me
> know if you have any proposed edits and whether I have your consent to add your
> signatures and file.
>
> Thank you,
>
> **Derek S. Hammond**
> Assistant United States Attorney
> United States Attorney's Office
> District of Columbia
> 601 D Street, N.W.
> Washington, D.C. 20530
> Phone: ███████████
> Email: ██████████████████████
>
> _____
> **From:** David McCraw ████████████████████
> **Sent:** Tuesday, October 11, 2022 10:09 AM

**To:** Hammond, Derek (USADC) ███████████████ ; Rachel Davidson ████████████████████████ ; Sumar, Al-Amyn ███ ███████████████████

**Subject:** [EXTERNAL] Re: Savage et al. v. US DOJ, 22-cv-02477

Derek,

I am following up on this. Are you free for a call at 4:30 to discuss scheduling?

David


David E. McCraw
Senior Vice President & Deputy General Counsel
The New York Times Company
620 Eighth Avenue
New York, New York 10018
Phone: ██████████
Fax: 212-556-4634


On Fri, Oct 7, 2022 at 1:30 PM David McCraw ████████████████ wrote:

> Derek,
>
> I am writing to find a time to discuss a briefing schedule in the DOJ FOIA case.  I
> have copied here Rachel Davidson, who represents Scott Shane.  Would 2:30 or
> 4:30 on Tuesday work?
>
> David
>
>
> David E. McCraw
> Senior Vice President & Deputy General Counsel
> The New York Times Company
> 620 Eighth Avenue
> New York, New York 10018
> Phone: ██████████
> Fax: 212-556-4634

| | |
|---|---|
| **From:** | Hammond, Derek (USADC) |
| **To:** | Dykstra, Sam (OIP); Butler, Christina (CRM) |
| **Subject:** | FW: [EXTERNAL] Re: Savage et al. v. US DOJ, 22-cv-02477 |
| **Date:** | Thursday, October 13, 2022 10:35:09 AM |

FYI

**Derek S. Hammond**
Assistant United States Attorney
United States Attorney's Office
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: ███████████
Email: █████████████████

**From:** David McCraw ██████████████████
**Sent:** Thursday, October 13, 2022 10:33 AM
**To:** Hammond, Derek (USADC) <████████████████████
**Cc:** Rachel Davidson ██████████████████████  Sumar, Al-Amyn ████
████████████████████
**Subject:** Re: [EXTERNAL] Re: Savage et al. v. US DOJ, 22-cv-02477

Derek,

I also wanted to answer your question from yesterday.  The only difference between the records sought in these requests as compared requests at issue in the previous litigation are the FD-1023's.

David

On Wed, Oct 12, 2022 at 2:55 PM Hammond, Derek (USADC) <████████████████████  wrote:

Hi David,

Sorry for the delay. I have been coordinating with the Department regarding your email this morning.  For a little bit of clarification, the records Plaintiffs have requested contain highly classified information. Currently, no one in the Office of Information Policy (OIP) or in the Criminal Division possesses the requisite clearance levels to gain access to these records or conduct a search for additional responsive records. The process has been initiated for the attorney advisor assigned to this request for OIP and for the attorney assigned to this request for the Criminal Division to be granted the requisite clearances, but this will take time as this process involves an extensive approval process.  Moreover, once those clearances have been granted, the

Department understands that these files only exist in paper form and searching the locations where files likely responsive to Plaintiffs' requests are located will require the attorneys assigned in both offices to visit in person and manually review boxes of records, which will require more time than is typical in a FOIA case. Lastly, given the passage of time since John Durham's investigation concluded and the search for the earlier requests were conducted, as well as Plaintiffs' inclusion of a new type of record, the Department will need time to ascertain where all the documents are located as they are not likely in a centralized location.   While the Department is diligently processing Plaintiffs' requests, in light of the above, the Department is unable to commit to being able to identify the total number of responsive documents by November 14th. Sixty days to provide an initial update is reasonable given these classification issues as well as the complexities for actually identifying and reviewing the records.

Additionally, OIP had some questions regarding these requests we were hoping to raise with Plaintiffs that will help facilitate our search (once we gain access). Specifically, we would like to know:

- Whether these two requests seek same scope of records?
- Whether the only difference between the records sought in these requests as compared requests at issue in the previous litigation are the requested "FD-1023s"?

Thanks,

**Derek S. Hammond**
Assistant United States Attorney
United States Attorney's Office
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: ████████████
Email: ██████████████████████

---

**From:** David McCraw <████████████████
**Sent:** Wednesday, October 12, 2022 2:30 PM
**To:** Hammond, Derek (USADC) <██████████████████████
**Cc:** Rachel Davidson ██████████████████████████ Sumar, Al-Amyn <██
████████████████████
**Subject:** Re: [EXTERNAL] Re: Savage et al. v. US DOJ, 22-cv-02477

Derek,

If the government is unable to agree to the proposal I sent this morning, I suggest we submit to the court a report with our competing proposals. I have revised the report to reflect that disagreement (although obviously I would prefer to come to some sort of agreement).

Let me know how you want to proceed.

David

On Wed, Oct 12, 2022 at 7:39 AM David McCraw ███████████████ wrote:

> Derek,
>
> While we don't disagree with the idea of finishing processing before setting a briefing schedule,
> the proposal is too open-ended for us.  Sixty days from now we could be exactly where we are
> today.  Here is what would work for us: The government, by Nov. 14, will notify plaintiffs of the
> total number of documents to be reviewed and processed and propose a production schedule.
> The parties will provide a status report to the court by Nov. 21.  The thirty days to identify the
> universe and calibrate production is typical in our FOIA cases, especially for a request that has
> been pending for months.
>
> Happy to discuss if that would be useful.
>
>  David
>
>
> David E. McCraw
> Senior Vice President & Deputy General Counsel
> The New York Times Company
> 620 Eighth Avenue
> New York, New York 10018
> Phone: ███████████
> Fax: 212-556-4634
>
>
> On Tue, Oct 11, 2022 at 5:31 PM Hammond, Derek (USADC) ███████████████████ wrote:
>
>> David,
>>
>> Because the search is not complete, the Department cannot commit to a date by which
>> record processing would be finished.
>>
>> Thanks,
>>
>> **Derek S. Hammond**
>> Assistant United States Attorney

United States Attorney's Office
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: ███████████
Email: ████████████████████

**From:** David McCraw ██████████████████████ >
**Sent:** Tuesday, October 11, 2022 5:23 PM
**To:** Hammond, Derek (USADC) ████████████████████
**Cc:** Rachel Davidson < ████████████████████████ ; Sumar, Al-Amyn ████████ ████████████████████ >
**Subject:** Re: [EXTERNAL] Re: Savage et al. v. US DOJ, 22-cv-02477

Derek,

Thanks for the email.  Let me check with our reporting team and confer with Rachel.

One question: Can we get a commitment that the processing will be complete by 12/12?  That would make it easier on our side to accept the delay.

David

David E. McCraw
Senior Vice President & Deputy General Counsel
The New York Times Company
620 Eighth Avenue
New York, New York 10018
Phone: ███████████
Fax: 212-556-4634

On Tue, Oct 11, 2022 at 2:46 PM Hammond, Derek (USADC) ████████████████████████ wrote:

> David,
>
> My apologies for the delay.  Given that the Department has not yet issued a final response to the FOIA requests at issue in this case, we believe that the Court should defer setting any briefing schedule in this matter. The Department has initiated its searches for responsive records and that effort is ongoing.  As such, we would propose filing another Joint Status Report with the Court on December 12, 2022, to provide an update on the Departments efforts to respond to the requests.  If you would like to discuss further, I'm

happy to jump on a call at 4:30 today.

I have drafted a joint status report reflecting all of this for your review.  Please let me know if you have any proposed edits and whether I have your consent to add your signatures and file.

Thank you,

**Derek S. Hammond**
Assistant United States Attorney
United States Attorney's Office
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: ████████████
Email: █████████████████████

**From:** David McCraw ████████████████████
**Sent:** Tuesday, October 11, 2022 10:09 AM
**To:** Hammond, Derek (USADC) ████████████████; Rachel Davidson <████████████████>; Sumar, Al-Amyn <██████████████████████>
**Subject:** [EXTERNAL] Re: Savage et al. v. US DOJ, 22-cv-02477

Derek,

I am following up on this. Are you free for a call at 4:30 to discuss scheduling?

David


David E. McCraw
Senior Vice President & Deputy General Counsel
The New York Times Company
620 Eighth Avenue
New York, New York 10018
Phone ████████████
Fax: 212-556-4634


On Fri, Oct 7, 2022 at 1:30 PM David McCraw ████████████████████ wrote:

Derek,

I am writing to find a time to discuss a briefing schedule in the DOJ FOIA case.  I have

copied here Rachel Davidson, who represents Scott Shane.  Would 2:30 or 4:30 on Tuesday work?

David


David E. McCraw
Senior Vice President & Deputy General Counsel
The New York Times Company
620 Eighth Avenue
New York, New York 10018
Phone: ███████
Fax: 212-556-4634

# EXHIBIT L

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE NEW YORK TIMES COMPANY
AND CHARLIE SAVAGE,

       Plaintiffs,

          v.

THE UNITED STATES DEPARTMENT
OF JUSTICE,

       Defendant.

ECF CASE

Civil Action No. 14 Civ. 3777 (JPO)

## DECLARATION OF JEANNETTE A. VARGAS

I, Jeannette A. Vargas, pursuant to the provisions of 28 U.S.C. § 1746, declare, under

penalty of perjury, as follows:

1.      I am an Assistant United States Attorney in the office of Audrey Strauss, Acting

United States Attorney for the Southern District of New York, attorney for Defendant (the

"Government"). I am the attorney assigned to this matter brought under the Freedom of

Information Act, 5 U.S.C. § 552 ("FOIA"), and am familiar with the proceedings herein. I

submit this declaration in support of the Defendant's motion for summary judgment following

remand.

2.      On June 26, 2017, the government appealed the judgment that had been entered in this

case, which required the Government to disclose in part five prosecution memoranda prepared by

John Durham. The Government contended that these memoranda were protected in their entirety

under FOIA Exemption 5. On September 27, 2019, the Second Circuit issued a decision

affirming in part and reversing in part the judgment. *New York Times Co. v. U.S. Dep't of*

*Justice*, 939 F.3d 479, 498 (2d Cir. 2019). Specifically, the Second Circuit reversed this Court's

holding that the five memoranda at issue had been expressly adopted and therefore had lost the

protection of Exemption 5.  The Second Circuit concluded, however, that certain statements made by then-Attorney General Eric Holder had served as a limited waiver of the work product protections that otherwise attached to the memoranda. The Second Circuit therefore affirmed the withholding of the five memoranda under Exemption 5, except it directed the Department of Justice "to release the portions of John Durham's memoranda and associated exhibits that relate to the conclusion that some of the detainees were not in CIA custody."

3.      Following the issuance of the Second Circuit's opinion, I, along with other counsel for the Government, determined that only one of the five memoranda at issue in the appeal set forth conclusions that a detainee was not in CIA custody:  the document described on the Government's *Vaughn* index as Document 7, referred to in the Government's motion papers as the Preliminary Review Memorandum.

4.      I, along with other Government counsel, reviewed this document to identify the portions that concluded that an individual had never been kept in CIA custody.  In doing so, the Government looked for textual indications in the memorandum that Durham had made a determination, conclusion, or finding that an individual had not been in CIA custody. The Government did not require that Durham use any specific language formulation, so long as the text indicated in some way that he had reached a conclusion on this issue.

5.      I, along with other Government counsel, identified several sections or portions of the Preliminary Review Memorandum that explicitly discussed a finding by Durham that certain individuals had never been in CIA custody.  Specifically, portions of pages 3, 7-9, and 26-29 included such information.  The Government reprocessed the portions of those pages implicated by the Second Circuit's decision. The Government identified and redacted from the relevant

2

portions the information that was subject to exemptions other than Exemption 5, and released the non-exempt information to the New York Times.

6.      Attached as Exhibit A is a true and correct copy of the reprocessed version of the Preliminary Review Report, which was released to the Plaintiffs on January 20, 2020.

7.      In the course of preparing these motion papers, I realized that one bullet point on page 7 of the Preliminary Review Memorandum had been inadvertently redacted in the version released to the Plaintiffs. That page has been reprocessed with the bullet point disclosed (with the exception of one redaction of information protected under Exemptions 1 and 3). The reprocessed page is attached hereto as Exhibit B.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  New York, New York
          September 28, 2020

                                        /s/ Jeannette A. Vargas
                                        JEANNETTE A. VARGAS

# EXHIBIT M

**Savage v. U.S. Department of Justice** 22-cv-2477 (DDC)

DOJ Office of Information Policy (OIP) *Vaughn* Index

| Document No. | Date | Description | Exemption 5 - Privileges[1] | Pages | 2014 Vaughn Index No.[2] |
|---|---|---|---|---|---|
| | | **The CIA Tapes Investigation** | | | |
| 1 | 01/18/2011 | Tape Destruction Report, table of contents & appendices | AWP | 1037 | 3 and 4 |
| 2 | 04/25/2012 | Draft: Reasons for Declination Regarding Potential Charges of Perjury, False Statement, or Obstruction of Justice Arising From Investigation of CIA Tapes Destruction | AWP | 61 | 15 |
| 3 | 05/23/2012 | Reasons for Declination Regarding Potential Charges of Perjury, False Statement, or Obstruction of Justice Arising From Investigation of CIA Tapes Destruction | AWP | 61 | 16 |
| | | **The CIA Interrogation Investigation** | | | |
| 4 | 11/30/2010 | First Interim Report on Preliminary Review | AWP | 15 | 1 |
| 5 | 12/14/2010 | Recommendation for Full Criminal Investigation into Death of Individual #1 | AWP +DPP | 12 | 2 |
| 5-A | 2/20/2004 | Exhibit A – Letter from CIA OIG to DOJ attorney concerning possible violations of federal criminal law on the Death of Individual # 1 | AWP +DPP | 2 | 19 |
| 5-B | 10/25/2005 | Exhibit B – Email from DOD personnel to DOJ attorney regarding the disposition of | AWP +DPP | 3 | 20 |

---

[1] "AWP" refers to the "attorney work product" privilege and "DPP" refers to the "deliberative process privilege."
[2] These numbers correspond to the refences made in the 2014 case filings, including the Durham Decl. attached to OIP's declaration as Exhibit B.

| | | | | | |
|---|---|---|---|---|---|
| | | investigations concerning the Death of Individual # 1 | | | |
| 5-C | 02/22/2005 | Exhibit C - Letter from CIA OIG to DOJ attorney confirming a conversation concerning possible violations of federal criminal law on the Death of Individual # 1 | AWP +DPP | 2 | 21 |
| 5-D | 11/3/2005 | Exhibit D – CIA OIG report on the Death of Individual #1 | AWP +DPP | 94 | 22 |
| 5-E | 11/9/2006 | Exhibit E – Fax cover and Letter from DOJ attorney to CIA OIG concerning an investigation into the Death of Individual # 1 | AWP +DPP | 1 | 23 |
| 5-F | 05/3/2005 | Exhibit F – Classified Deposition Transcript related to the Death of Individual #1 | AWP +DPP | 95 | 24 |
| 6 | 03/02/2011 | Second Interim Report on Preliminary Review | AWP | 20 | 5 |
| 7 | 5/26/2011 | Recommendation for Full Criminal Investigation into Death of Individual #2 | AWP +DPP | 19 | 11 |
| 7-A | 9/11/2003 | Exhibit A –Letter from DOJ attorney to CIA OIG regarding possible criminal prosecution on the Death of Individual #2 | AWP +DPP | 1 | 25 |
| 7-B | 12/29/2003 | Exhibit B - Letter from DOJ attorney to CIA OIG regarding possible criminal prosecution on the Death of Individual #2 | AWP +DPP | 1 | 26 |
| 7-C | 12/29/2003 | Exhibit C – Legal recommendation memoranda by a DOJ attorney regarding possible criminal prosecution on the Death of Individual #2 (including a prior draft) | AWP +DPP | 13 | 27 |
| 7-D | 03/24/2004 | Exhibit D – Memo to file: legal recommendation memoranda by a DOJ attorney regarding possible criminal prosecution on the Death of Individual #2 | AWP +DPP | 9 | 28 |
| 7-E | 07/19/2010 | Exhibit E – FD-302 | AWP +DPP | 1 (plus 21 pages of attachments) | 29 |

| 8 | 05/26/2011 | Final Report on Preliminary Review | Released in part, Ex. 1, 3, 5(AWP), 6, and 7(C) | 30 | 7 |
|---|---|---|---|---|---|
| 9 | 03/14/2012 | Memorandum of Decision re: Non-Prosecution in the Death of Individual #1 | AWP | 50 | 13 |
| 10 | 07/11/2012 | Memorandum of Decision re Non-Prosecution in the Death of Individual # 2 | AWP | 188 | 18 |

# EXHIBIT N

RICHARD BURR, NORTH CAROLINA, CHAIRMAN
MARK R. WARNER, VIRGINIA, VICE CHAIRMAN

JAMES E. RISCH, IDAHO
MARCO RUBIO, FLORIDA
SUSAN M. COLLINS, MAINE
ROY BLUNT, MISSOURI
JAMES LANKFORD, OKLAHOMA
TOM COTTON, ARKANSAS
JOHN CORNYN, TEXAS

DIANNE FEINSTEIN, CALIFORNIA
RON WYDEN, OREGON
MARTIN HEINRICH, NEW MEXICO
ANGUS S. KING, JR., MAINE
JOE MANCHIN, WEST VIRGINIA
KAMALA HARRIS, CALIFORNIA

MITCH McCONNELL, KENTUCKY, EX OFFICIO
CHARLES SCHUMER, NEW YORK, EX OFFICIO
JOHN McCAIN, ARIZONA, EX OFFICIO
JACK REED, RHODE ISLAND, EX OFFICIO

CHRISTOPHER A. JOYNER, STAFF DIRECTOR
MICHAEL CASEY, MINORITY STAFF DIRECTOR
KELSEY STROUD BAILEY, CHIEF CLERK

# United States Senate

SELECT COMMITTEE ON INTELLIGENCE

WASHINGTON, DC 20510–6475

April 24, 2018

The Honorable Jeff Sessions
Attorney General of the United States
Department of Justice
Washington, DC 20530

Dear Attorney General Sessions:

As we prepare for the upcoming nomination hearing of Ms. Gina Haspel for Director of the Central Intelligence Agency (CIA), I write to formally request a copy of former Assistant U.S. Attorney John Durham's investigation report into the destruction of interrogation videotapes by the CIA (known as the Durham Report).

In light of the CIA's decision to release the internal investigation into the destruction of interrogation videotapes by former CIA Acting Director Michael Morell (known as the Morell Report), I believe that the Durham Report would be helpful to understand Ms. Haspel's role. The Morell Report relies heavily on the conclusions reached by Assistant U.S. Attorney Durham. To the extent this material is classified or contains Personally Identifiable Information, the committee handles this material as specified by law and regulation.

We appreciate your prompt attention to this matter.

Sincerely,

Mark R. Warner
Vice Chairman

cc:   Ms. Gina Haspel
Deputy Director
Central Intelligence Agency

**From:** ████████ Intelligence)
**To:** Lasseter, David F. (OLA)
**Subject:** Document Request
**Date:** Monday, May 7, 2018 11:13:14 AM

David –

Chairman Burr would like two copies of the Durham report executive summary, appropriately redacted, provided to the Senate Select Committee on Intelligence.  It is my understanding, based on conversations with DOJ personnel over the weekend, that the executive summary can be provided for review by SSCI Members and Staff Directors.

If you have any questions about the Chairman's request, please let me know.

Thank you,

C

# EXHIBIT O



**U.S. Department of Justice**

Office of Legislative Affairs

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

**TOP SECRET//CRU-GST/HCS//NOFORN/ORCN**
**UNCLASSIFIED WHEN SEPARATED FROM CLASSIFIED ENCLOSURE**

The Honorable Richard Burr
Chairman
Senate Select Committee on Intelligence                    **MAY 0 7 2018**
United States Senate
Washington, DC  20510

The Honorable Mark Warner
Vice Chairman
Senate Select Committee on Intelligence
United States Senate
Washington, DC  20510

Dear Mr. Chairman and Mr. Vice Chairman:

This responds to your request to the Attorney General for a copy of former Assistant U.S. Attorney John Durham's investigation report (Durham Report) into the destruction of interrogation videotapes by the CIA. The Department of Justice (Department) understands and respects the Committee's important oversight role. Further, the Department is aware of the timeliness of this particular issue and has made every effort to respond accordingly.

The Department, in coordination with other Executive Branch entities, has agreed to provide the Durham Report's Executive Summary which will provide the Senate Select Committee on Intelligence (SSCI) with the information that it is seeking. The executive summary will have redactions of two types. First, grand jury material that is prohibited from being disclosed pursuant to Federal Rule of Criminal Procedure 6(e) has been redacted. Second, the Central Intelligence Agency requested that certain names be redacted in order to prevent unnecessary and inappropriate disclosure.

The Department has agreed to allow the Durham Report's Executive Summary to be viewed by the Senate Majority Leader plus one staffer, the Senate Minority Leader plus one staffer, the SSCI Chairman plus two SSCI staffers, and the SSCI Vice-Chairman plus two SSCI staffers, and all SSCI members.

**TOP SECRET//CRU-GST/HCS//NOFORN/ORCN**
**UNCLASSIFIED WHEN SEPARATED FROM CLASSIFIED ENCLOSURE**

TOP SECRET//CRU-GST/HCS//NOFORN/ORCN
UNCLASSIFIED WHEN SEPARATED FROM CLASSIFIED ENCLOSURE

The Honorable Richard Burr
The Honorable Mark Warner
Page Two


       Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

                             Sincerely,

                             Stephen E. Boyd
                             Assistant Attorney General


cc:    The Honorable Mitch McConnell
       Majority Leader
       United States Senate

       The Honorable Charles E. Schumer
       Minority Leader
       United States Senate

TOP SECRET//CRU-GST/HCS//NOFORN/ORCN
UNCLASSIFIED WHEN SEPARATED FROM CLASSIFIED ENCLOSURE

# EXHIBIT P

## MILITARY COMMISSIONS TRIAL JUDICIARY
## GUANTANAMO BAY, CUBA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**KHALID SHAIKH MOHAMMAD,<br>WALID MUHAMMAD SALIH<br>MUBARAK BIN ATTASH,<br>RAMZI BINALSHIBH,<br>ALI ABDUL-AZIZ ALI,<br>MUSTAFA AHMED ADAM AL<br>HAWSAWI** | **AE 397F**<br><br>**TRIAL CONDUCT ORDER**<br><br>Government Proposed Consolidation of Motions to Compel Information Relating to the CIA's Former Rendition, Detention, and Interrogation Program<br><br>**5 April 2016** |

1. The Government moved[1] for the Commission to adopt the structure for discovery currently used in *United States v. Al Nashiri*[2] and permit consolidated litigation of all outstanding Defense motions for information regarding the CIA's former Rendition, Detention, and Interrogation (RDI) program in an effort to eliminate cumulative discovery and unnecessary litigation.[3] The Defense response[4] asserted the Government proposals as to discoverable information do not fully satisfy the requests for discovery articulated in the enumerated motions and requested further argument. The Government reply,[5] taking cognizance of the declassification of large amounts of information by

---

[1] AE 397 (GOV), Government Proposed Consolidation of Motions to Compel Information Relating to the CIA's Former Rendition, Detention, and Interrogation Program, filed 28 December 2015.

[2] *United States v. Al Nashiri,* AE 120AA, Order, Government Motion To Reconsider AE 120C, In Part, So the Commission May Take Into Account Declassification Efforts Underway At Prior Prosecution Request, Clarify the Discovery Standard the Commission Is Applying, and Safeguard National Security While Ensuring A Fair Trial, 24 June 2014.

[3] Specifically, the Prosecution seeks consolidation of AE 112 (WBA, RBS, AAA, MAH), AE 114 (WBA, RBS, AAA, MAH), AE 114F (KSM, WBA, RBS, AAA), AE 190 (AAA), AE 194 (AAA), AE 195 (AAA), AE 252 (AAA), AE 260 (MAH), AE 286 (AAA), AE 308 (AAA), AE 310 (MAH), AE 350C (AAA), AE 3500 (AAA), and AE 375 (MAH). *See* AE 397, para 2.

[4] AE 397A (AAA), Mr. al Baluchi's Response To Government's Proposed Consolidation of Motions to Compel Information Relating to the CIA's Former Rendition, Detention and Interrogation Program, filed 25 January 2016.

[5] AE 397B (GOV), Government Reply to Mr. al Baluchi's Response to Government's Proposed consolidation of Motions to Compel Information Relating to the CIA's Former Rendition, Detention and Interrogation Program, filed 5 February 2016.

virtue of the Senate Select Committee on Intelligence Executive Summary of a

"Committee Study of the Central Intelligence Agency's Detention and Interrogation

Program,[6]" (SSCI Report) requested the Commission use the "Nashiri construct" as the

systemic basis for further Discovery.

2. The systemic discovery construct, as requested by the Government for this case, uses

10 categories of "discoverable information":

a. A chronology identifying where each Accused was held in detention between the date of his capture and the date he arrived at Guantanamo Bay, Cuba, in September 2006;

b. A description of how each Accused was transported between the various locations, including how he was restrained and how he was clothed;

c. All records, photographs, videos, and summaries the Government of the United States has in its possession, which document the condition of each Accuseds' confinement at each location, and the Accused's' conditions during each movement between the various locations;

d. The identities of medical personnel (examining and treating physicians, psychologists, psychiatrists, mental-health professionals, dentists, etc.), guard force personnel, and interrogators, whether employees of the United States Government or employees of a contractor hired by the United States Government, who had direct and substantial contact with each Accused at each location and participated in the transport of the Accused between the various locations;

e. Standard operating procedures, policies, or guidelines on handling, moving, transporting, treating, interrogating, etc., high value detainees at and between the various facilities identified in paragraph (a);

f. The employment records of individuals identified in paragraph (d), limited to those documents in the file memorializing adverse action and positive recognition in connection with performance of duties at a facility identified in paragraph (a) or in transporting the Accused between the various facilities;

g. The records of training in preparation for the performance of duties of the individuals identified in paragraph (d) at the various facilities or during transport of the Accused;

---

[6] *See* AE 013RRR (GOV), Government Motion to Amend AE 013DDD Second Amended Protective Order #1 To Protect Against Disclosure of National Security Information, filed 30 January 2015.

h. Statements obtained from interrogators, summaries of interrogations, reports produced from interrogations, interrogation logs, and interrogator notes of interrogations of each Accused and all co-conspirators identified in the Charge Sheet;

i. Requests with any accompanying justifications and legal reviews of same to employ Enhanced Interrogation Techniques on each Accused and all co-conspirators; and

j. Documents memorializing decisions (approving or disapproving), with any additional guidance, on requests identified in paragraph (i) to employ Enhanced Interrogation Techniques.

3. These 10 categories of discovery, coupled with the unclassified discovery being provided by the Government[7] and previous orders to provide classified discovery, satisfy the basic discovery obligations of the United States relating to information from the CIA's former RDI program. As necessary the Commission will entertain motions for further discovery after the Defense has received, and had an opportunity to assimilate, what has been or is being provided at this time.

4. **IT IS HEREBY ORDERED**:

a. The Government motion for this Commission to adopt the systemic 10 category construct for discovery of information relating to the CIA's former RDI program is **GRANTED.**

b. The Government motion to consolidate discovery motions involving information not included within the CIA's former RDI program is **DENIED**. Each motion will be addressed on its merits.

So **ORDERED** this 5th day of April, 2016.


//s//
JAMES L. POHL
COL, JA, USA
Military Judge

---

[7] This unclassified discovery includes the recently declassified information from the SSCI Report.

# EXHIBIT Q

## MILITARY COMMISSIONS TRIAL JUDICIARY
## GUANTANAMO BAY, CUBA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**KHALID SHAIKH MOHAMMAD,<br>WALID MUHAMMAD SALIH<br>MUBARAK BIN ATTASH,<br>RAMZI BINALSHIBH,<br>ALI ABDUL AZIZ ALI,<br>MUSTAFA AHMED ADAM<br>AL HAWSAWI** | **AE 013BBBB**<br><br>*Third Amended*<br>**PROTECTIVE ORDER #1**<br><br>**To Protect Against Disclosure of<br>National Security Information**<br><br>6 July 2015 |

Upon consideration of the submissions regarding the Government's motion for a protective order to protect classified information in this case the Commission finds: this case involves classified national security information, including TOP SECRET / SENSITIVE COMPARTMENTED INFORMATION (SCI), the disclosure of which would be detrimental to national security; the storage, handling, and control of which requires special security precautions; and the access to which requires a security clearance and a need-to-know. Accordingly, pursuant to authority granted under 10 U.S.C. § 949 p-1 to p-7, Rules for Military Commissions (R.M.C.) 701 and 806, Military Commissions Rule of Evidence (M.C.R.E.) 505, Department of Defense Regulation for Trial by Military Commissions (2011) **§**17-3, and the general judicial authority of the Commission, in order to protect the national security, and for good cause shown, the following Protective Order is entered.

## 1. SCOPE

a. This Protective Order establishes procedures applicable to all persons who have access to or come into possession of classified documents or information in connection with this case,

regardless of the means by which the persons obtained the classified information. These procedures apply to all aspects of pre-trial, trial, and post-trial stages in this case, including any appeals, subject to modification by further order of the Commission or orders issued by a court of competent jurisdiction.

b. This Protective Order applies to all information, documents, testimony, and material associated with this case that contain classified information, including but not limited to any classified pleadings, written discovery, expert reports, transcripts, notes, summaries, or any other material that contains, describes, or reflects classified information.

c. Counsel are responsible for advising their clients, translators, witnesses, experts, consultants, support staff, and all others involved with the defense or prosecution of this case, respectively, of the contents of this Protective Order.

## 2. DEFINITIONS

a. As used in this Protective Order, the term "Court Information Security Officer (CISO)" and "Assistant Court Information Security Officer (**AC**ISO)" refer to security officers, appointed by the Military Judge, to serve as the information security advisor to the judge, to oversee information security provisions pertaining to the filing of motions, responses, replies, and other documents with the Commission, and to manage information security during sessions of the Commission. The CISO and ACISO will be administered an oath IAW Rule 10, Military Commissions Rules of Court (5 May 2014).

b. The term "Chief Security Officer, Office of Special Security" refers to the official within the Washington Headquarters Service responsible for all security requirements and missions of the Office of Military Commissions and to any assistants.

2

c. The term "Defense" includes any counsel for an accused in this case and any employees, contractors, investigators, paralegals, experts, translators, support staff, Defense Information Security Officer, or other persons working on the behalf of an Accused or his counsel in this case.

d. The term "Defense Information Security Officer" (DISO) refers to a security officer, serving as information security advisor to the Defense, who oversees information security provisions pertaining to the filing of motions, response, replies, and other documents with the Commission.

e. The term "Government" includes any counsel for the United States in this case and any employees, contractors, investigators, paralegals, experts, translators, support staff or other persons working on the behalf of the United States or its counsel in this case.

f. The words "documents" and "information" include, but are not limited to, all written or printed matter of any kind, formal or informal, including originals, conforming and non-conforming copies, whether different from the original by reason of notation made on such copies or otherwise, and further include, but are not limited to:

(1) papers, correspondence, memoranda, notes, letters, cables, reports, summaries, photographs, maps, charts, graphs, inter-office and intra-office communications, notations of any sort concerning conversations, meetings, or other communications, bulletins, teletypes, telegrams, facsimiles, invoices, worksheets, and drafts, alterations, modifications, changes, and amendments of any kind to the foregoing;

(2) graphic or oral records or representations of any kind, including, but not limited to: photographs, maps, charts, graphs, microfiche, microfilm, videotapes, and sound or motion picture recordings of any kind;

3

(3) electronic, mechanical, or electric records of any kind, including, but not limited to: tapes, cassettes, disks, recordings, electronic mail, instant messages, films, typewriter ribbons, word processing or other computer tapes, disks or portable storage devices, and all manner of electronic data processing storage; and

(4)  information acquired orally.

g. The terms "classified national security information and/or documents," "classified information," and "classified documents" include:

(1) any classified document or information that was classified by any Executive Branch agency in the interests of national security or pursuant to Executive Order, including Executive Order 13526, as amended, or its predecessor Orders, as "CONFIDENTIAL," "SECRET," "TOP SECRET," or any information  controlled as "SENSITIVE COMPARTMENTED INFORMATION (SCI);"

(2) any document or information, regardless of its physical form or characteristics, now or formerly in the possession of a private party that was derived from United States Government information that was classified, regardless of whether such document or information has subsequently been classified by the Government pursuant to Executive Order, including Executive Order 13526, as amended, or its predecessor Orders, as "CONFIDENTIAL," "SECRET," "TOP SECRET," or additionally controlled as "SENSITIVE COMPARTMENTED INFORMATION (SCI)";

(3) verbal or non-documentary classified information known to the Defense;

(4) any document or information as to which the Defense has been notified orally or in writing that such document or information contains classified information, including, but not limited to the following:

4

(a) Information that would reveal or tend to reveal details surrounding the capture of an accused other than the location and date;

(b) Information that would reveal or tend to reveal the foreign countries in which:  Khalid Shaikh Mohammad and Mustafa Ahmed Adam al Hawsawi were detained from the time of their capture on or about 1 March 2003 through 6 September 2006; Walid Muhammad Salih Bin 'Attash and Ali Abdul Aziz Ali were detained from the time of their capture on or about 29 April 2003 through 6 September 2006; and Ramzi Bin al Shibh was detained from the time of his capture on or around 11 September 2002 through 6 September 2006; *and*

(c) The names, identities, and physical descriptions of any persons involved with the capture, transfer, detention, or interrogation of an accused or specific dates regarding the same, from on or around the aforementioned capture dates through 6 September 2006.

The Original Classification Authority (OCA) has provided additional classification guidance (Attachment B (classified), AE 013RRR, Classification Guidance for Information About the Central Intelligence Agency's Former Rendition, Detention and Interrogation Program) which is hereby incorporated in this Order.

(5) any document or information obtained from or related to a foreign government or dealing with matters of U.S. foreign policy, intelligence, or military operations, which is known to be closely held and potentially damaging to the national security of the United States or its allies.

5

(6) The terms "classified national security information and/or documents," "classified information," and "classified documents" do not include documents or information officially declassified by the United States by the appropriate (OCA).

h. "National Security" means the national defense and foreign relations of the United States.

i. "Access to classified information" means having authorized access to review, read, learn, or otherwise come to know classified information.

j. "Secure area" means a physical facility accredited or approved for the storage, handling, and control of classified information.

k. "Unauthorized disclosure of classified information" means any knowing, willful, or negligent action that could reasonably be expected to result in a communication or physical transfer of classified information to an unauthorized recipient. Confirming or denying information, including its very existence where the very existence of the information is classified, constitutes disclosing that information.

## 3. COURT INFORMATION SECURITY OFFICER

a. A Court Information Security Officer (CISO) and Assistant Court Information Security Officer(s) (ACISO) for this case have been designated by the Military Judge.

b. The CISO and any ACISO are officers of the court. *Ex parte* communication by a party in a case, to include the Office of Military Commissions, DoD General Counsel, or any intelligence or law enforcement agency, with the CISO/ASICO is prohibited except as authorized by the M.C.A. or the Manual for Military Commissions (M.M.C.). This is to preclude any actual or perceived attempt to improperly influence the Commission in violation of 10

U.S.C. §949b. This does not include administrative matters necessary for the management of the security responsibilities of the Office of Trial Judiciary.

c. The CISO/ACISO shall ensure that all classified or protected information is appropriately safeguarded at all times during Commission proceedings and that only personnel with the appropriate clearances and authorizations are present when classified or protected evidence is presented before Military Commissions.

d. The CISO shall consult with the OCA of classified documents or information, as necessary, to address classification decisions or other related issues.

4. **DEFENSE INFORMATION SECURITY OFFICER**

a**.** Upon request of Defense Counsel for an accused, the Convening Authority shall provide a Defense Information Security Officer (DISO) for the defendant.

b. The DISO is, for limited purposes associated with this case, a member of the Defense Team, and therefore shall not disclose to any person any information provided by the Defense, other than information provided in a filing with the Military Commission. In accordance with M.C.R.E. 502, the *DISO* shall not reveal to any person the content of any conversations he hears by or among the defense, nor reveal the nature of documents being reviewed by them or the work generated by them, except as necessary to report violations of classified handling or dissemination regulations or any Protective Order issued in this case, to the Chief Security Officer, Office of Special Security. Additionally, the presence of the DISO, who has been appointed as a member of the Defense Team, shall not be construed to waive, limit, or otherwise render inapplicable the attorney-client privilege or work product protections.

c. The DISO shall perform the following duties:

7

(1) Assist the Defense with applying classification guides, including reviewing pleadings and other papers prepared by the defense to ensure they are unclassified or properly marked as classified.

(2) Assist the Defense in performing their duty to apply derivative classification markings pursuant to E.O. 13526 §2.1(b).

(3) Ensure compliance with the provisions of any Protective Order.

d. To the fullest extent possible, the classification review procedure must preserve the lawyer-client and other related legally-recognized privileges.

(1) The Defense may submit documents to the Chief Security Officer, Office of Special Security with a request for classification review. If the Defense claims privilege for a document submitted for classification review, the defense shall banner-mark the document "PRIVILEGED."

(2) The Chief Security Officer, Office of Special Security, shall consult with the appropriate OCA to obtain classification review of documents submitted for that purpose. The Chief Security Officer, Office of Special Security, shall not disclose to any other entity any information provided by a DISO, including any component of the Office of Military Commissions, except that the entity may inform the military judge of any information that presents a current threat to loss of life or presents an immediate safety issue in the detention facility. This does not include administrative matters necessary for the management of the security responsibilities of the Office of Military Commissions.

(3) Submission of documents for classification review shall not be construed to waive, limit, or otherwise render inapplicable the attorney-client privilege or work product protections.

8

5.  **ACCESS TO CLASSIFIED INFORMATION**

a. Without authorization from the Government, no member of the Defense, including defense witnesses, shall have access to classified discovery in connection with this case unless that person has:

(1) received the necessary security clearance from the appropriate DoD authorities and signed an appropriate non-disclosure agreement, as verified by the Chief Security Officer, Office of Special Security,

(2) signed the Memorandum of Understanding Regarding Receipt of Classified Information (MOU), attached to this Protective Order, and

(3) a need-to-know for the classified information at issue, as determined by the Government for that information.

b. In order to be provided access to classified discovery in connection with this case, each member of the Defense shall execute the attached MOU, file the executed originals of the MOU with the Chief Security Officer, Office of Special Security, and submit copies to the **CISO**. The execution and submission of the MOU is a condition precedent to the Defense having access to classified discovery for the purposes of these proceedings. The Chief Security Officer, Office of Special Security and CISO shall not provide copies of the MOUs to the Prosecution except upon further order of the Military Commission. The Chief Security Officer can provide the Prosecution the names of the Defense team members, identified on the record, who have executed the MOU. The MOUs for Defense Team members who have been provided *ex parte* may be provided, under seal, to the Chief Security Officer, Office of Special Security, and the CISO under seal and will not be further released without authority of the Commission.

Appellate Exhibit 013BBBB
Page 9 of 23

c. The substitution, departure, or removal of any member of the Defense, including defense witnesses, from this case for any reason shall not release that person from the provisions of this Protective Order or the MOU executed in connection with this Protective Order.

d. Once the Chief Security Officer, Office of Special Security, verifies that counsel for the Accused have executed and submitted the MOU, and are otherwise authorized to receive classified discovery in connection with this case, the Government may provide classified discovery to the Defense.

e. All classified documents or information provided or obtained in connection with this case remain classified at the level designated by the OCA, unless the documents bear a clear indication that they have been declassified. The person receiving the classified documents or information, together with all other members of the Defense or the Government, respectively, shall be responsible for protecting the classified information from disclosure and shall ensure that access to and storage of the classified information is in accordance with applicable laws and regulations and the terms of this Protective Order.

f. No member of the Defense, including any defense witness, is authorized to disclose any classified information obtained during this case, outside the immediate parameters of these military commission proceedings. If any member of the Defense or any defense witness receives any summons, subpoena, or court order, or the equivalent thereof, from any United States or foreign court or on behalf of any criminal or civil investigative entity within the United States or from any foreign entity, the Defense, including defense witnesses, shall immediately notify the military judge, the Chief Security Officer, Office of Special Security, and the Government so that appropriate consideration can be given to the matter by the Commission and the OCA of the materials concerned. Absent authority from the Commission or the Government, the Defense and

10

defense witnesses are not authorized to disseminate or disclose classified materials in response to such requests. The Defense, and defense witnesses and experts, are not authorized to use or refer to any classified information obtained as a result of their participation in commission proceedings in any other forum, or in a military commission proceeding involving another detainee.

## 6.  USE, STORAGE, AND HANDLING PROCEDURES

a. The Office of the Chief Defense Counsel, Office of Military Commissions, has approved secure areas in which the Defense may use, store, handle, and otherwise work with classified information. The Chief Security Officer, Office of Special Security, shall ensure that such secure areas are maintained and operated in a manner consistent with this Protective Order and as otherwise reasonably necessary to protect against the disclosure of classified information.

b. All classified information provided to the Defense, and otherwise possessed or maintained by the Defense, shall be stored, maintained, and used only in secure areas. Classified information may only be removed from secure areas in accordance with this Protective Order and applicable laws and regulations governing the handling and use of classified information.

c. Nothing in this Protective Order shall be construed to interfere with the right of the Defense to interview witnesses, regardless of their location. If the Defense receives a document containing information described in §2(g) or memorializes information described in §2(g), while in a non-secure environment, the Defense shall:

(1) maintain positive custody and control of the material at all times;

(2) unless under duress, relinquish control of the material only to other personnel with the appropriate security clearance and a need-to-know;

(3) transport the material in a manner not visible to casual observation;

(4) not add information (including markings) corroborating the material as classified until returning to a secure area;

(5) not electronically transmit the information via unclassified networks;

(6) transport the material to a secure area as soon as circumstances permit; and,

(7) after returning to a secure area, mark and handle the material as classified.

d. Consistent with other provisions of this Protective Order, the Defense shall have access to the classified information made available to them and shall be allowed to take notes and prepare documents with respect to such classified information in secure areas.

e. The Defense shall not copy or reproduce any classified information in any form, except in secure areas and in accordance with this Protective Order and applicable laws and regulations governing the reproduction of classified information.

f. Defense counsel can conduct open source searches from a computer not identifiable with the U.S. government. The raw search material can be stored in an unclassified format or on an unclassified system. However, if an individual has access to classified information, any information described in §§2(g)(2) and 2(g)(4) will be marked or treated as classified in a Military Commissions pleading if the information is specifically referenced to information available in the public domain.

g. All documents prepared by the Defense that are known or believed to contain classified information, including, without limitation, notes taken or memoranda prepared by counsel and pleadings or other documents intended for filing with the Commission, shall be transcribed, recorded, typed, duplicated, copied, or otherwise prepared only by persons possessing an appropriate approval for access to such classified information. Such activities shall

12

take place in secure areas, on approved word processing equipment, and in accordance with procedures approved by the Chief Security Officer, Office of Special Security.

h. The Defense may submit work product for classification review using the procedures outlined in §4(d). Except as provided in §6, all such documents and any associated materials containing classified information or information treated as classified under §§6f and g such as notes, memoranda, drafts, copies, typewriter ribbons, magnetic recordings, and exhibits shall be maintained in secure areas unless and until the OCA or Chief Security Officer, Office of Special Security advises that those documents or associated materials are unclassified in their entirety. None of these materials shall be disclosed to the Government unless authorized by the Commission, by counsel for an Accused, or as otherwise provided in this Protective Order.

i. The Defense may discuss classified information only within secure areas and shall not discuss, disclose, or disseminate classified information over any non-secure communication system, such as standard commercial telephones, office intercommunication systems, or non-secure electronic mail.

j. The Defense shall not disclose any classified documents or information to any person, including counsel in related cases of Guantanamo Bay detainees in Military Commissions or other courts (including, but not limited to, habeas proceedings), except those persons authorized by this Protective Order, the Commission, and counsel for the Government with the appropriate clearances and the need-to-know that information. The Commission recognizes the presentation of a joint defense may necessitate disclosure on a need-to-know basis to counsel for co-accused.

k. To the extent the Defense is not certain of the classification of information it wishes to disclose, the Defense shall follow procedures established by the Office of Military Commissions for a determination as to its classification. In any instance where there is any doubt as to whether

13

information is classified, the Defense must consider the information classified unless and until it receives notice from the Chief Security Officer, Office of Special Security, this information is not classified.

l. Until further order of this Commission, the Defense shall not disclose to an Accused any classified information not previously provided by an Accused to the Defense, except where such information has been approved for release to an Accused and marked accordingly.

m. Except as otherwise stated in this paragraph, and to ensure the national security of the United States, at no time, including any period subsequent to the conclusion of these proceedings, shall the Defense make any public or private statements disclosing any classified information accessed pursuant to this Protective Order, or otherwise obtained in connection with this case, including the fact that any such information or documents are classified. In the event classified information enters the public domain without first being properly declassified by the United States Government, counsel are reminded they may not make public or private statements about the information if the information is classified. (*See* paragraph 2g of this Protective Order for specific examples of information which remains classified even if it is in the public domain). In an abundance of caution and to help ensure clarity on this matter, the Commission emphasizes that counsel shall not be the source of any classified information entering the public domain, nor should counsel comment on information which has entered the public domain but which remains classified.

## 7.  PROCEDURES FOR FILING DOCUMENTS

a. See Rule 3, Motion Practice, Military Commissions Trial Judiciary Rules of Court (5 May 2014).

b. For all filings, other than those filed pursuant to M.C.R E. 505, in which counsel know, reasonably should know, or are uncertain as to whether the filing contains classified information

14

or other information covered by Chapter 19-3(b), DoD Regulation for Trial By Military Commission, counsel shall submit the filing by secure means under seal with the Chief Clerk of the Trial Judiciary.

     c. Documents containing classified information or information the Defense Counsel believes to be classified shall be filed pursuant to the procedures specified for classified information.

     d. Classified filings must be marked with the appropriate classification markings on each page, including classification markings for each paragraph and subparagraph. If a party is uncertain as to the appropriate classification markings for a document, the party shall seek guidance from the Chief Security Officer, Office of Special Security, who will consult with the OCA of the information or other appropriate agency, as necessary, regarding the appropriate classification.

     e. All original filings will be maintained by the Director, Office of Court Administration, as part of the Record of Trial. The Office of Court Administration shall ensure any classified information contained in such filings is maintained under seal and stored in an appropriate secure area consistent with the highest level of classified information contained in the filing.

     f. Under no circumstances may classified information be filed in an otherwise unclassified filing except as a separate classified attachment. In the event a party believes an unsealed filing contains classified information, the party shall immediately notify the Chief Security Officer, Office of Special Security, and *CISO/ACISO*, who shall take appropriate action to retrieve the documents or information at issue. The filing will then be treated as containing classified information unless and until determined otherwise. Nothing herein limits the

15

Government's authority to take other remedial action as necessary to ensure the protection of the classified information.

g. Nothing herein requires the Government to disclose classified information. Additionally, nothing herein prevents the Government or Defense from submitting classified information to the Commission *in camera* or *ex parte* in these proceedings or accessing such submissions or information filed by the other party. Except as otherwise authorized by the Military Judge, the filing party shall provide the other party with notice on the date of the filing.

**8. PROCEDURES FOR MILITARY COMMISSION PROCEEDINGS**

a. Except as provided herein, and in accordance with M.C.R.E. 505, no party shall disclose or cause to be disclosed any information known or believed to be classified in connection with any hearing or proceeding in this case.

(1) Notice Requirements: The parties must comply with all notice requirements under M.C.R.E. 505 prior to disclosing or introducing any classified information in this case including classified information introduced through the testimony of an accused.

(2) Closed Proceedings

(a) While proceedings shall generally be publicly held, the Commission may exclude the public from any proceeding, *sua sponte* or upon motion by either party, in order to protect information, the disclosure of which could reasonably be expected to damage national security.  If the Commission closes the courtroom during any proceeding in order to protect classified information from disclosure, no person may remain who is not authorized to access classified information in accordance with this Protective Order, which the **CISO** shall verify prior to the proceeding.

16

(b) No participant in any proceeding, including the Government, Defense, witnesses, or courtroom personnel, may disclose classified information, or any information that tends to reveal classified information, to any person not authorized to access such classified information in connection with this case.

b. Delayed Broadcast of Open Proceedings

(1) Due to the nature and classification level of the classified information in this case, the Commission finds that to protect against the unauthorized disclosure of classified information during proceedings open to the public, it will be necessary to employ a forty-second delay in the broadcast of the proceedings from the courtroom to the public gallery. This is the least disruptive method of both insuring the continued protection of classified information while providing the maximum in public transparency.

(2) Should classified information be disclosed during any open proceeding, this delay will allow the Military Judge to take action to suspend the broadcast - including any broadcast of the proceedings to all locations other than just the public gallery of the courtroom (e.g., any closed-circuit broadcast of the proceedings to a remote location) - so that the classified information will not be disclosed to members of the public.

(3) The broadcast may be suspended by the Military Judge whenever it is reasonably believed that any person in the courtroom has made or is about to make a statement or offer testimony disclosing classified information.

(4) The Commission shall be notified immediately when the broadcast is suspended. In that event, and otherwise if necessary, the Commission may stop the proceedings to evaluate whether the information disclosed, or about to be disclosed, is classified information

17

as defined in this Protective Order. The Commission may also conduct an *in camera* hearing to address any such disclosure of classified information.

c. Other Protections

(1) During the examination of any witness, the Government may object to any question or line of inquiry that may require the witness to disclose classified information not found previously to be admissible by the Commission. Following such an objection, the Commission will determine whether the witness's response is admissible and, if so, may take steps as necessary to protect against the public disclosure of any classified information contained therein.

(2) Classified information offered or admitted into evidence will remain classified at the level designated by the OCA and will be handled accordingly. All classified evidence offered or accepted during trial will be kept under seal, even if such evidence was inadvertently disclosed during a proceeding. Exhibits containing classified information may also be sealed after trial as necessary to prevent disclosure of such classified information.

d. Record of Trial

(1) It is the responsibility of the Government, IAW 10 U.S.C §948l(c) to control and prepare the Record of Trial. What is included in the Record of Trial is set out by R.M.C. 1103. The Director, Office of Court Administration, shall ensure that the Record of Trial is reviewed and redacted as necessary to protect any classified information from public disclosure.

(2) The Director, Office of Court Administration, shall ensure portions of the Record of Trial containing classified information remain under seal and are properly segregated from the unclassified portion of the transcripts, properly marked with the appropriate security markings, stored in a secure area, and handled in accordance with this Protective Order.

**9.  UNAUTHORIZED DISCLOSURE**

a. Any unauthorized disclosure of classified information may constitute a violation of United States criminal laws. Additionally, any violation of the terms of this Protective Order shall immediately be brought to the attention of the Commission and may result in disciplinary action or other sanctions, including a charge of contempt of the Commission and possible referral for criminal prosecution. Any breach of this Protective Order may also result in the termination of access to classified information. Persons subject to this Protective Order are advised that unauthorized disclosure, retention, or negligent handling of classified documents or information could cause damage to the national security of the United States or may be used to the advantage of an adversary of the United States or against the interests of the United States. The purpose of this Protective Order is to ensure those authorized to receive classified information in connection with this case will never divulge that information to anyone not authorized to receive it, without prior written authorization from the OCA and in conformity with this Order.

b. Any party upon becoming aware of any unauthorized access to or loss, theft, or other disclosure of classified information, shall promptly notify the Chief Security Officer, Office of Special Security, and shall take all reasonably necessary steps to retrieve such classified information and protect it from further unauthorized disclosure or dissemination.

**10.  SURVIVAL OF ORDER**

a. The terms of this Protective Order and any signed MOU shall survive and remain in effect after the termination of this case unless otherwise determined by a court of competent jurisdiction.

Appellate Exhibit 013BBBB
Page 19 of 23

b. This Protective Order is entered without prejudice to the right of the parties to seek

such additional protections or exceptions to those stated herein as they deem necessary.

So ORDERED this 6th day of July 2015.


*//s//*
JAMES L. POHL
COL, JA, USA
Military Judge

20

ATTACHMENT

21

**MILITARY COMMISSIONS TRIAL JUDICIARY**
**GUANTANAMO BAY, CUBA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | ***AMENDED* MEMORANDUM OF UNDERSTANDING** |
| v. | |
| | Regarding the Receipt of Classified Information |
| KHALID SHAIKH MOHAMMAD, WALID MUHAMMAD SALIH MUBARAK BIN ATTASH, RAMZI BINALSHIBH, ALI ABDUL AZIZ ALI, MUSTAFA AHMED ADAM AL HAWSAWI | |

I, _____ [**print or type full name**], have

been provided a copy of, and have read, the *Third Amended* Protective Order #1 relating to the

protection of classified information in the above-captioned case.  I understand that in connection

with this case I will receive classified documents and information that is protected pursuant to

both the terms of this Protective Order and the applicable laws and regulations governing the use,

storage, and handling of classified information.  I also understand that the classified documents

and information are the property of the United States and refer or relate to the national security

of the United States.

I agree that I will not use or disclose any classified documents or information, except in

strict compliance with the provisions of this Protective Order and the applicable laws and

regulations governing the use, storage, and handling of classified information.  I have further

familiarized myself with the statutes, regulations, and orders relating to the unauthorized

disclosure of classified information, espionage, and other related criminal offenses, including but

not limited to 50 U.S.C. § 421; 18 U.S.C. § 641; 18 U.S.C. § 793; 50 U.S.C. § 783; and

Executive Order 13526.

I agree to take all reasonable precautions to prevent any unauthorized use or disclosure of any classified documents or information in my possession or control. I understand that failure to comply with this Protective Order and the applicable laws and regulations governing the use, storage, and handling of classified information could result in sanctions or other consequences, including criminal consequences. I understand that the terms of this this Protective Order and the applicable laws and regulations governing the use, storage, and handling of classified information shall survive and remain in effect after the termination of this case. Any termination of my involvement in this case prior to its conclusion will not relieve me from the terms of this Protective Order and the applicable laws and regulations governing the use, storage, and handling of classified information.

I make the above statements under penalty of perjury.

_____          _____

Signature                                                    Date

2