**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CHARLIE SAVAGE, SCOTT SHANE, and THE
NEW YORK TIMES COMPANY,

     Plaintiffs,

v.

UNITED STATES DEPARTMENT OF JUSTICE,

     Defendant.

Case No. 1:22-cv-2477 (JEB)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 2

I.       The Durham Investigations ................................................................................. 2

II.      The Prior Litigation ............................................................................................ 5

III.     Post-Litigation Developments ............................................................................ 5

         A.       Public Disclosures ................................................................................... 5

         B.       The FOIA Improvement Act of 2016 ....................................................... 9

         C.       DOJ's Recent Disclosures of FD-302s .................................................... 11

         D.       DOJ's Disclosures of Special Counsel Reports from Sensitive
                  Investigations Has Become the Norm ..................................................... 13

IV.      The Instant Requests .......................................................................................... 15

LEGAL STANDARD ........................................................................................................... 15

ARGUMENT .......................................................................................................................... 16

I.       DOJ Has Not Established Foreseeable Harm from Disclosure ......................... 17

         A.       The Foreseeable Harm Requirement ...................................................... 17

         B.       DOJ Has Not Shown Foreseeable Harm from Release of the Records .... 21

II.      Portions of the Durham Reports Are in the Public Domain .............................. 26

III.     This Suit Is Not Precluded by the Prior Litigation ........................................... 33

CONCLUSION ...................................................................................................................... 34

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                **Page(s)**

*ACLU of Mass. v. ICE*,
   2023 U.S. Dist. LEXIS 138596 (D. Mass. Aug. 9, 2023)......................................................18

*ACLU v. DOD*,
   628 F.3d 612 (D.C. Cir. 2011) .......................................................................................................26

*ACLU Immigrants' Rts. Project v. U.S. Immigr. & Customs Enf't*,
   58 F.4th 643 (D.D.C. 2023) ...........................................................................................................11

*Afshar v. Dep't of State*,
   702 F.2d 1125 (D.C. Cir. 1983) ........................................................................................27, 30, 33

*Black Hills Clean Water All. v. U.S. Forest Serv.*,
   2022 U.S. Dist. LEXIS 117092 (D.S.D. June 29, 2022) ..........................................................18

*Blank Rome LLP v. Dep't of the Air Force*,
   2016 U.S. Dist. LEXIS 128209 (D.D.C. Sept. 20, 2016) ..........................................................24

*Cayuga Nation v. DOI*,
   2022 U.S. Dist. LEXIS 54559 (D.D.C. Mar. 25, 2022).............................................................17

*Chiquita Brands Int'l v. SEC*,
   805 F.3d 289 (D.C. Cir. 2015) .......................................................................................................16

*Clemente v. FBI*,
   2022 U.S. Dist. LEXIS 210724 (D.D.C. Nov. 21, 2022) .........................................................20

*CNN v. FBI*,
   293 F. Supp. 3d 59 (D.D.C. 2018)..................................................................................27, 28, 30

*Colo. Wild Pub. Lands v. U.S. Forest Serv.*,
   2023 U.S. Dist. LEXIS 160540 (D.D.C. Sept. 11, 2023) ..........................................................17

*Cottone v. Reno*,
   193 F.3d 550 (D.C. Cir. 1999) .............................................................................................27, 30

*Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*,
   436 F. Supp. 3d 90 (D.D.C. 2019) ..........................................................................................10, 16

*Ctr. for Pub. Integrity vs. U.S. Dep't of Energy*,
   287 F. Supp. 3d 50 (D.D.C. 2018) .................................................................................................31

*Dep't of Air Force v. Rose*,
   425 U.S. 352 (1976)...........................................................................................................................15

*Dep't of State v. Ray*,
  502 U.S. 164 (1991).................................................................................16

*Drake v. FAA*,
  291 F.3d 59 (D.C. Cir. 2002).................................................................34

*Fitzgibbon v. CIA*,
  911 F.2d 755 (D.C. Cir. 1990).................................................................32

*Florez v. CIA*,
  829 F.3d 178 (2d Cir. 2016).................................................................32

*Food Mktg. Inst. v. Argus Leader Media*,
  139 S. Ct. 2356 (2019).................................................................18

*Fortson v. Harvey*,
  407 F. Supp. 2d 13 (D.D.C. 2005).................................................................11

*FTC v. Grolier Inc.*,
  462 U.S. 19 (1983).................................................................19

*Garside v. Webster*,
  733 F. Supp. 1142 (S.D. Ohio 1989) .................................................................12

*Georgia v. DOJ*,
  2023 U.S. Dist. LEXIS 28341 (D.D.C. Feb. 20, 2023) .................................................................20

*Herrera v. Wyoming*,
  139 S. Ct. 1686 (2019).................................................................33

*Jud. Watch v. DOJ*,
  2019 U.S. Dist. LEXIS 163473 (D.D.C. Sept. 24, 2019) .................................................18, 21

*Jud. Watch v. DOJ*,
  2020 U.S. Dist. LEXIS 221477 (D.D.C. Nov. 25, 2020) .................................................................13

*\*Jud. Watch v. HHS*,
  525 F. Supp. 3d 90 (D.D.C. 2021).................................................................27, 31

*Knight First Amend. Inst. at Columbia Univ. v. CIA*,
  11 F.4th 810 (D.C. Cir. 2021).................................................................31

*Leopold v. DOJ*,
  487 F. Supp. 3d 1 (D.D.C. 2020).................................................................4, 12

*Lucky Brand Dungarees v. Marcel Fashions Grp.*,
  140 S. Ct. 1589 (2020).................................................................33

*Milner v. Dep't of the Navy*,
    562 U.S. 562 (2011)...........................................................................................16

*Mobley v. CIA*,
    806 F.3d 568 (D.C. Cir. 2015)...........................................................................31

*Montana v. United States*,
    440 U.S. 147 (1979)...........................................................................................34

*Mountgordon v. U.S. Coast Guard*,
    2023 U.S. Dist. LEXIS 153531 (D.D.C. Aug. 30, 2023) ......................................21

*N.Y. Times Co. v. DOJ*,
    138 F. Supp. 3d 462 (S.D.N.Y. 2015)...........................................................5, 24, 29

*N.Y. Times Co. v. DOJ*,
    235 F. Supp. 3d 522 (S.D.N.Y. 2017)...................................................................5

*N.Y. Times Co. v. DOJ*,
    939 F.3d 479 (2d Cir. 2019)................................................................................5

*Nat'l Ass'n of Crim. Def. Lawyers v. Exec. Off for U.S. Att'ys*,
    844 F.3d 246 (D.C. Cir. 2016) ......................................................................18, 22

*Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*,
    169 F.3d 16 (D.C. Cir. 1999)...............................................................................26

*North v. DOJ*,
    810 F. Supp. 2d 205 (D.D.C. 2011) .....................................................................31

*NPR v. DHS*,
    2022 U.S. Dist. LEXIS 176411 (D.D.C. Sept. 28, 2022) ......................................17

*Picard v. Sage Realty*,
    2021 U.S. Dist. LEXIS 243460 (S.D.N.Y. Dec. 21, 2021) ....................................25

*Pizzuti v. United States*,
    809 F. Supp. 2d 164 (S.D.N.Y. 2011)...................................................................11

*Pub. Citizen v. OMB*,
    598 F.3d 865 (D.C. Cir. 2009) .............................................................................16

*Raphael v. DOJ*,
    2003 U.S. Dist. LEXIS 6515 (E.D. Pa. Mar. 31, 2003).........................................11

*\*Reporters Comm. for Freedom of the Press v. FBI*,
    3 F.4th 350 (D.C. Cir. 2021) ....................................................................... *passim*

*River v. U.S. Army Corps of Eng'rs*,
  2023 U.S. Dist. LEXIS 107436 (D.D.C. June 21, 2023) .......................................20

*Seife v. FDA*,
  43 F.4th 231 (2d Cir. 2022) .............................................................................9

*Taylor v. Sturgell*,
  553 U.S. 880 (2008) .................................................................................33, 34

*United States v. Fifer*,
  206 F. App'x 502 (6th Cir. 2006) ...................................................................25

*United States v. Wong*,
  2018 U.S. Dist. LEXIS 190662 (N.D. Cal. Nov. 2, 2018).....................................25

*Vanda Pharms. v. FDA*,
  2023 U.S. Dist. LEXIS 51853 (D.D.C. Mar. 27, 2023)....................................17, 26

*Williams & Connolly v. SEC*,
  662 F.3d 1240 (D.C. Cir. 2011) ......................................................................25

**Statutes**

Freedom of Information Act, 5 U.S.C. § 552 ................................................. *passim*

FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538 (2016).................... *passim*

**Other Authorities**

H.R. Rep. No. 391, 114th Cong., 2d Sess. (2016) ....................................................9, 10

S. Rep. No. 4, 114th Cong., 1st Sess. (2015)..............................................................10

*\*FOIA Update: OIP Guidance: Applying the "Foreseeable Harm" Standard
  Under Exemption Five*, DOJ Off. of Info. Policy (Jan. 1, 1994) ......................19, 20

Hon. Katherine B. Forrest, *Guidelines Regarding Appropriate Use of 302 Forms
  in Crim. Trials*, Fed. Defs. of N.Y. Second Cir. Blog (June 11, 2018) .................25

*Mem. from the Off. of the Att'y Gen. to Heads of Dep'ts & Agencies on the
  Freedom of Info. Act* (Oct. 4, 1993) ...............................................................10

*Mem on Crim. Discovery from Donald A. Davis, U.S. Att'y for W. Dist. of Mich.*
  (Oct. 2010) .................................................................................................25

*OIP Summary of the FOIA Improvement Act of 2016*, DOJ Off. of Info. Policy
  (Aug. 17, 2016) ...............................................................................................9

Plaintiffs Charlie Savage, The New York Times Company (together, "The Times"), and Scott Shane respectfully submit this memorandum of points and authorities in support of their cross-motion for summary judgment and in opposition to the motion for summary judgment of Defendant Department of Justice (the "Department" or "DOJ").

## PRELIMINARY STATEMENT[1]

More than two decades after the "war on terror" began, and more than 11 years after DOJ ended investigations into the conduct of the Central Intelligence Agency ("CIA") during that war, serious questions linger about the lack of accountability for abuses. The investigations, led by prosecutor John Durham, examined the CIA's torture of detainees abroad and its destruction of videotapes capturing episodes of that torture. Ultimately Mr. Durham recommended, and DOJ agreed, that no one be criminally charged, even in the cases of two detainees who died in U.S. custody, for which Mr. Durham recommended and completed full criminal investigations. The documents produced by Mr. Durham's inquiries have been kept largely secret — even as Attorney General Eric Holder, who oversaw and closed the investigations, said after his tenure that disclosure of Mr. Durham's work "would be a good thing." The Reporters Comm. for Freedom of the Press, Interview with Former Att'y Gen. Holder (Oct. 14, 2015), https://bit.ly/3ukjAyR at 5:46-48.

He is right. But release of the records is not just a matter of compelling public interest — it is also required by law. In prior Freedom of Information Act ("FOIA") litigation brought by The Times, the courts concluded that the documents related to Mr. Durham's investigations fall

---

[1] This brief uses the following abbreviations: "Sumar Decl." for the accompanying declaration of Al-Amyn Sumar; "DOJ SUMF" for DOJ's Statement of Material Facts Not In Dispute (ECF No. 25-1); "DOJ Br." for DOJ's Memorandum of Points and Authorities in Support of its Motion for Summary Judgment (ECF No. 25-2); and "Hibbard Decl." for the declaration of Douglas Hibbard (ECF No. 25-4).

within Exemption 5 and could be withheld, with minor exceptions. However, the factual and legal landscape have changed since the filing of the previous FOIA requests and litigation. As a factual matter, in 2014, the Government declassified the 525-page executive summary of the Senate Select Committee on Intelligence's ("SSCI") report on the CIA's rendition, detention, and interrogation program ("SSCI Report"). In the years since, additional facts about that program have become public, including through official proceedings before the military commissions at Guantanamo Bay. These and other disclosures mirror information contained in the records of the Durham investigations, which under the "public domain" doctrine vitiates the Department's categorical invocation of Exemption 5.[2]

As a legal matter, Congress's enactment of the FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538 (2016), imposed stricter requirements for agencies to withhold records pursuant to discretionary exemptions. An agency must now demonstrate that the disclosure of the specific information sought would foreseeably cause specific and identifiable harm. And where an agency fails to make that showing — as DOJ has failed to here, instead repeating essentially the same generic assertions it offered in the prior litigation, that disclosure of any past reports might chill the candor of future ones — its assertion of Exemption 5 fails.

## FACTUAL BACKGROUND

I.      **The Durham Investigations**

In the aftermath of the terrorist attacks of September 11, 2001, the CIA began carrying out interrogations of terrorism suspects at various locations throughout the world. *See, e.g.*, S. Select Comm. on Intelligence, Comm. Study of the CIA's Detention & Interrogation Program, S. Rep. No. 113-288 (2014) ("SSCI Report") at 11-17, https://bit.ly/3QRjeXV (attached as Sumar

---

[2] Exemption 5 is the sole exemption at issue on these cross-motions. *See* DOJ Br. at 28 n.5.

Decl. Ex. A). These interrogations often employed controversial and severe techniques that many

observers have described as torture in violation of international and domestic law. *See, e.g.*, Scott

Shane, *U.S. Engaged in Torture After 9/11, Review Concludes*, N.Y. Times (Apr. 16, 2013),

https://nyti.ms/3QP89GW (attached as Sumar Decl. Ex. B).

 In November 2005, the CIA destroyed 92 videotapes documenting some of these harsh

interrogations. *See, e.g.*, Mark Mazzetti, *CIA Destroyed Tapes of Interrogations*, N.Y. Times

(Dec. 6, 2007), https://nyti.ms/40I1FhC (attached as Sumar Decl. Ex. C); Mark Mazzetti, *U.S.

Says CIA Destroyed 92 Tapes of Interrogations*, N.Y. Times (Mar. 2, 2009),

https://nyti.ms/47FhtUA (attached as Sumar Decl. Ex. D). Public disclosure of the destruction of

tapes prompted calls for an investigation into whether the CIA's actions violated federal criminal

law. *See, e.g.*, Faye Fiore & Chuck Neubauer, *Bipartisan Outrage Over CIA Videos*, L.A. Times

(Dec. 10, 2007), https://bit.ly/3SHvAED (attached as Sumar Decl. Ex. E). On January 2, 2008,

Attorney General Michael Mukasey appointed John Durham, who at that time worked in the

United States Attorney's Office for the District of Connecticut, to serve as the lead prosecutor

and determine whether criminal charges should be lodged against any individual. Peter Lattman,

*Mukasey Appoints Durham To Lead Probe Over CIA Tapes*, Wall St. J. (Jan. 2, 2008),

https://on.wsj.com/3R5pDAj (attached as Sumar Decl. Ex. F).

 On August 24, 2009, while the tape destruction investigation was ongoing, Attorney

General Eric Holder expanded the scope of Mr. Durham's investigation to cover a second,

related topic: whether the interrogation of specific detainees overseas violated federal law. Ewen

MacAskill, *US Att'y Gen. Poised for Crim. Investigation into Reported CIA Abuses*, The

Guardian (Aug. 24, 2009), https://bit.ly/40JGR9p (attached as Sumar Decl. Ex. G). In June 2011,

Mr. Durham recommended that full criminal investigations be opened into the deaths of two

individuals who had been held in American custody overseas. Press Release, DOJ Off. of Pub. Affs., *Statement of the Att'y Gen. Regarding Investigation into the Interrogation of Certain Detainees* (June 30, 2011), https://bit.ly/3ugeiEx (attached as Sumar Decl. Ex. H). Attorney General Holder accepted Mr. Durham's recommendations in full, and enlisted Mr. Durham to carry out the further investigations that he recommended. *Id.* On August 30, 2012, Attorney General Holder announced that the investigations would be closed in their entirety based on Mr. Durham's "thorough reviews and determination that the filing of criminal charges would not be appropriate." Press Release, DOJ Off. of Pub. Affs., *Statement of Att'y Gen. Eric Holder on Closure of Investigation into the Interrogation of Certain Detainees* (Aug. 30, 2012), https://bit.ly/3MJzZDi (attached as Sumar Decl. Ex. I). Attorney General Holder did not release the documents related to the investigations and, as noted below, The Times's effort to obtain them through litigation was largely unsuccessful.

As relevant here, Mr. Durham's investigative work generated a number of documents: (1) three reports related to the investigation into the destruction of tapes, two of which addressed possible charges of obstruction of justice and other crimes arising from the investigation; (2) seven reports related to the investigation of the CIA's interrogation program and detainee deaths, including exhibits appended to two of the reports; and (3) FD-302 forms, which the FBI uses to memorialize interviews. *See* Hibbard Decl. Ex. M; *Leopold v. DOJ*, 487 F. Supp. 3d 1, 7 n.1 (D.D.C. 2020) (FD-302s are "investigative records that document factual information elicited from interviewees (e.g., targets, witnesses, others with pertinent information) during FBI criminal and national security investigations." (The documents in the first two categories are referred to here as the "Durham Reports.")

## II.      The Prior Litigation

The Times sued over the same documents at issue here in May 2014. *See* Compl., *N.Y. Times Co. v. DOJ*, No. 14-cv-3777 (S.D.N.Y. May 28, 2014), ECF No. 2. The district court held that the FD-302s fell within the scope of Exemption 5 as protected attorney work product. *N.Y. Times Co. v. DOJ*, 138 F. Supp. 3d 462, 475-76 (S.D.N.Y. 2015). But it found that DOJ had "expressly adopted" some of the reports as the bases for agency decisions, vitiating to some extent the application of Exemption 5. *Id.* at 476-79. In a later ruling, the court upheld limited redactions to the documents. *N.Y. Times Co. v. DOJ*, 235 F. Supp. 3d 522, 536-42 (S.D.N.Y. 2017). On appeal, the Second Circuit reversed, explaining that the memoranda did not represent DOJ's "binding 'working law'" and so could not have been expressly adopted. *N.Y. Times Co. v. DOJ*, 939 F.3d 479, 492 (2d Cir. 2019). Nevertheless, the Second Circuit also found that Attorney General Holder had waived the attorney work product privilege with respect to "sections of the memoranda and exhibits relating to the conclusion that a number of the detainees investigated were not in CIA custody" by giving public statements that were "specific enough to have effectuated disclosure of [those] parts." *Id.* at 496. DOJ subsequently released these portions of the documents.

## III.     Post-Litigation Developments

### A.  Public Disclosures

In the years since the Durham investigations concluded, the federal Government has made numerous disclosures regarding the CIA's use of torture, the sum total of which underscore the inappropriateness of withholding here.

*The SSCI Report.* The December 2014 declassification of the executive summary of the SSCI Report is likely the most significant such disclosure.[3] Like the Durham investigations, the SSCI Report "had its roots in an investigation into the CIA's destruction of videotapes of CIA detainee interrogations that began in December 2007[,]" but the study formally commenced in March 2009 to examine the CIA's detention and interrogation practices. *See* SSCI Report at iv. Spurred by the same events and focusing on the same questions, the early efforts of the SSCI investigation, and especially its review of the destruction of the videotapes, "[were] complicated by the existence of [the parallel] Department of Justice investigation." *Id.* at vii. The SSCI inquiry reviewed "more than six million pages of CIA materials, [including] operational cables, intelligence reports, internal memoranda and emails, briefing materials, interview transcripts, contracts, and other records." *Id.* at vii-viii. Yet, despite the nearly identical scope of the two investigations, "CIA employees and contractors who would otherwise have been interviewed by the Committee staff were under potential legal jeopardy [because of the ongoing Durham investigation], and therefore the CIA would not compel its workforce to appear before the Committee." *Id.* at vii.

The Committee's five-year-long investigation ultimately culminated in about 6,700 pages of findings, more than 500 of which were declassified for the public in December 2014. The declassified portions of the SSCI Report detailed the brutality, inefficacy, mismanagement, and opacity of the CIA's torture program — a program acting beyond the scope approved by DOJ or CIA headquarters. "The CIA did not conduct a comprehensive or accurate accounting of the number of individuals it detained, and held individuals who did not meet the legal standard for

---

[3] Though the full declassified portions of the SSCI Report reveal the breadth of disclosures on the CIA's use of torture, several sections contain particularly close parallels to the Durham Reports. *See, e.g.*, SSCI Report at 54-61, 443-56.

detention." *Id.* at xxi. "The CIA [also] coordinated the release of classified information to the media," the SSCI Report found. *Id.* at xvii. All the while, the CIA evaded and impeded congressional and executive oversight of the program. *Id.* at xiv-xvii.

Further declassifications and disclosures, which postdate the SSCI Report, only underscore the degree to which the Government has released information likely contained in the records of the Durham investigations:

*Military Commissions Testimony*. Testimony at Guantanamo Bay military commission proceedings is yet another source of significant public disclosure. In such proceedings, the public audio feed is delayed by 40 seconds, allowing both the commission and the Government to block the public from hearing testimony — and giving an imprimatur of acknowledgement to testimony that is allowed through. In 2020 and 2022 proceedings, Dr. James E. Mitchell — a psychologist who was a key architect of the CIA's interrogation program — testified about the use of waterboarding and other highly coercive interrogation practices on CIA detainees. *See, e.g.*, Carol Rosenberg*, Guantánamo Testimony Exposes Role of Doctors in C.I.A. Interrogations*, N.Y. Times (Jan. 27, 2020), https://nyti.ms/3QM3Lsg (attached as Sumar Decl. Ex. L) (full proceeding available at Transcript of Commission Proceeding, *United States v. Khalid Sheikh Mohammed* (Jan. 23, 2020), https://bit.ly/3ugwo9l (attached as Sumar Decl. Ex. M)); Carol Rosenberg, *Chains, Shackles and Threats: Testimony on Torture Takes a Dramatic Turn*, N.Y. Times (Jan. 30, 2020), https://nyti.ms/3MTY4Hz (attached as Sumar Decl. Ex. N) (full proceeding available at Transcript of Commission Proceeding, *United States v. Khalid Sheikh Mohammed* (Jan. 28, 2020), https://bit.ly/3QQu28O (attached as Sumar Decl. Ex. O)); Carol Rosenberg, *C.I.A. Captive Was Too Small for Waterboard, Interrogator Testifies*, N.Y. Times (May 3, 2022), https://nyti.ms/3sEA2cT (attached as Sumar Decl. Ex. P) (full proceeding

available at Transcript of Commission Proceeding, *United States v. Khalid Sheikh Mohammed*

(May 2, 2022), https://bit.ly/3up8gl8 (attached as Sumar Decl. Ex. Q)). Dr. Mitchell also

published a memoir in 2016 detailing his participation in interrogations at CIA black sites, which

was approved by CIA's prepublication review. James E. Mitchell, Ph.D. & Bill Harlow,

*Enhanced Interrogation: Inside the Minds and Motives of the Islamic Terrorists Trying to

Destroy America* (2016).

     *CIA Inspector General Reports.* Recent years have also seen the partial release of two

CIA Inspector General ("IG") reports from 2004 and 2008 about the use of torture on specific

detainees. In 2004, the agency's watchdog issued a report on the torture of Abd al-Rahim al-

Nashiri, which has been declassified in stages in 2008, 2009, and 2016. *See* CIA Inspector Gen.,

*Special Review: Counterterrorism Detention and Interrogation and Interrogation Activities*

(Sept. 2001 – Oct. 2003) (May 7, 2004), https://bit.ly/3Gcvqxy (attached as Sumar Decl. Ex.

MM). The report revealed new information about Mr. al-Nashiri's arrival at a CIA black site, the

use of waterboarding on him, and how the use of waterboarding deviated from DOJ guidelines.

*Id.* at 33-37. Subsequently, in 2008, the CIA IG issued another report on the torture of Ammar

al-Baluchi, portions of which were declassified in 2019 as part of the Guantanamo Bay military

commission proceedings, but which only became public in 2022 as part of Mr. al-Baluchi's

habeas corpus suit. Rep. of the Off. of the CIA Inspector Gen. Regarding Allegations of Torture

By Ammar al Baluchi, *Al-Baluchi v. Gates*, No. 08-cv-02083-PLF (D.D.C. Mar. 10, 2022), ECF

No. 225-3 (attached as Sumar Decl. Ex. NN). There, again, the IG described the use of enhanced

interrogation techniques on al-Baluchi. *Id.* 5-12.

     *The Soufan Memoir*. In 2020, the CIA allowed the unredacted republication of a 2011

memoir by former FBI agent Ali Soufan, recounting his interrogations of CIA detainees. *See,*

*e.g.*, Charlie Savage & Carol Rosenberg, *CIA Uncensors Memoir of FBI Agent Who Protested Torture of Terrorists*, N.Y. Times (Aug. 29, 2020), https://nyti.ms/40Mtmpv (attached as Sumar Decl. Ex. J); *Compare Pages From an Uncensored Book on Investigating Terrorism*, N.Y. Times (Aug. 29, 2020), https://nyti.ms/3ummWkW (attached as Sumar Decl. Ex. K).

B.  The FOIA Improvement Act of 2016

The facts are not the only thing that have changed. On June 30, 2016, President Obama signed into law the FOIA Improvement Act of 2016. *OIP Summary of the FOIA Improvement Act of 2016*, DOJ Off. of Info. Policy (Aug. 17, 2016), https://bit.ly/3QDjtG0 (attached as Sumar Decl. Ex. R). The law's enactment was motivated in part by "concerns that some agencies were overusing FOIA exemptions that allow, but do not require, information to be withheld from disclosure," with the greatest concerns about "agency overuse and abuse of Exemption 5 and the deliberative process privilege." *Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) ("*RCFP*") (cleaned up); *accord, e.g.*, *Seife v. FDA*, 43 F.4th 231, 235 (2d Cir. 2022). For example, a report by the House Committee on Oversight and Government Reform that accompanied the House version of the bill: "Exemption five has been singled out as a particularly problematic exemption. Some have taken to calling it the 'withhold it because you want to' exemption." H.R. Rep. No. 391, 114th Cong., 2d Sess. (2016) at 10, https://bit.ly/3SXdYEO (attached as Sumar Decl. Ex. S). A similar report by the Senate Judiciary Committee accompanying the Senate version of the bill made essentially the same observation:

> There is a growing and troubling trend towards relying on [FOIA's] discretionary exemptions to withhold large swaths of Government information, even though no harm would result from disclosure. For example, according to the OpenTheGovernment.org 2013 Secrecy Report, Federal agencies used Exemption 5, which permits nondisclosure of information covered by litigation privileges such as the attorney-client

> privilege, the attorney work product doctrine, and the deliberative
> process privilege, more than 79,000 times in 2012—a 41%
> increase from the previous year.

S. Rep. No. 4, 114th Cong., 1st Sess. (2015) at 3, https://bit.ly/46vsNSw (attached as Sumar

Decl. Ex. T).

Among the law's provisions is a "foreseeable harm" requirement, which directs the

agency to withhold information only where it "reasonably foresees that disclosure would harm

an interest protected by an exemption[.]" 5 U.S.C. § 552(a)(8)(A)(i)(I). The requirement has its

origins in a 1993 DOJ policy under which the Department would defend an agency's assertion of

a FOIA exemption "only in those cases where the agency reasonably foresees that disclosure

would be harmful to an interest protected by an exemption." *Mem. from the Off. of the Att'y Gen.*

*to Heads of Dep'ts & Agencies on the Freedom of Info. Act* (Oct. 4, 1993), https://bit.ly/40MbyuI

(attached as Sumar Decl. Ex. U). DOJ reversed the policy in 2001 but reinstated it in 2009.

Sumar Decl. Ex. T at 3; *see also Ctr. for Investigative Reporting v. U.S. Customs & Border*

*Prot.*, 436 F. Supp. 3d 90, 104 (D.D.C. 2019) (noting that "Attorney General Eric Holder

implemented the President's directive [to administer FOIA with a presumption of openness] by

establishing the foreseeable-harm requirement"). Cognizant of that policy and consistent with it,

Congress envisioned that the Act's foreseeable harm provision would obligate the agency to

"articulate both the nature of the harm from release and the link between the specified harm and

specific information contained in the material withheld." *RCFP*, 3 F.4th at 369 (quoting H.R.

Rep. No. 391, 114th Cong., 2d Sess. 9 (2016), at 9) (cleaned up). The requirement applies only

to requests made after June 30, 2016, the Act's date of enactment. *Id.* at 358.[4]

---

[4] For this reason, the foreseeable harm standard was not at issue in the prior litigation. *See* DOJ
Br. at 26 n.4 (observing that "the Second Circuit did not mention the effect of the 2016 law on
this litigation").

Notably, the Act also underscored an agency's segregability obligations. FOIA now explicitly requires an agency to "consider whether partial disclosure of information is possible whenever [it] determines that a full disclosure of a requested record is not possible" and "take reasonable steps necessary to segregate and release nonexempt information." 5 U.S.C. § 552(a)(8)(A)(ii); *see ACLU Immigrants' Rts. Project v. U.S. Immigr. & Customs Enf't*, 58 F.4th 643, 654 (D.D.C. 2023) (noting that through this provision Congress "reinforced the segregability obligation").

C.   DOJ's Recent Disclosures of FD-302s

Another key development since the prior litigation is the apparent shift in DOJ's attitude toward increasing and voluntary release of FD-302s to FOIA requesters. The Department has not formally announced a change in policy, and it has previously released (and continues to release) 302s and other witness statements to FOIA requesters in one-off cases — a fact that also undercuts DOJ's position here. *See, e.g.*, *N.Y. Times Co. v. Exec. Off. for U.S. Att'ys*, No. 22-cv-03609 (S.D.N.Y.) (successful FOIA suit for release of FD-302 from investigation of prosecution of Michael Flynn); Linda Moon & Gabe Rottman, *FBI document shows agents knew Bryan Carmody was a journalist during questioning*, Reporters Comm. for Freedom of the Press (Dec. 17, 2019), https://bit.ly/46ha9xr (noting that FBI released 302 in response to FOIA lawsuit) (attached as Sumar Decl. Ex. V); *Pizzuti v. United States*, 809 F. Supp. 2d 164, 168 (S.D.N.Y. 2011) (noting a plaintiff received a redacted FD-302 report via FOIA); *Fortson v. Harvey*, 407 F. Supp. 2d 13, 17-18 (D.D.C. 2005) (notes on witness statements compiled by the Chief Trial Judge of the U.S. Army Trial Judiciary during an investigation into an equal opportunity complaint ordered produced pursuant to a FOIA request); *Raphael v. DOJ*, 2003 U.S. Dist. LEXIS 6515, at *2 (E.D. Pa. Mar. 31, 2003) (noting plaintiff was provided a partially redacted

11

version of 302 report and ordering defendant to produce an unredacted version for review at a

pretrial conference); *Garside v. Webster*, 733 F. Supp. 1142, 1151 (S.D. Ohio 1989) (ordering

the FBI to process and release a 302 report to FOIA plaintiff). But in recent years the Department

has made even more substantial releases of FD-302s to FOIA requesters in high-profile matters,

reflecting a judgment that the documents or portions of them can be released without harming

the interests underlying the work-product privilege.

   Two cases in particular stand out. In the first, which is ongoing, two news organizations

sued DOJ seeking, among other things, the FD-302s created during Special Counsel Robert

Mueller's investigation into Russian interference in the 2016 United States presidential election.

*See* Compl., *Leopold v. DOJ*, No. 19-1278 (RBW) (D.D.C. May 2, 2019), ECF No. 1; Compl.,

*CNN v. DOJ*, No. 19-1626 (RBW) (D.D.C. June 4, 2019), ECF No. 1. Though DOJ successfully

asserted the work-product privilege as to some of the documents, *Leopold*, 487 F. Supp. 3d at 15,

it broadly released redacted versions of the FD-302s in its possession — over 5,000 pages in

total. Jason Leopold, *The FBI Has Released A Final Batch Of Memos From The Mueller Probe*,

BuzzFeed News (Dec. 1, 2020), https://bit.ly/49OMJTh (attached as Sumar Decl. Ex. W). Some

portions of the documents had already appeared in the Mueller report, but other portions

contained "many details . . . never before revealed to the public." *Id.* Though DOJ finished main

productions of the FD-302s in December 2020, it would go on to release another 126 pages of

documents about Michael Flynn in January 2021 after President Trump pardoned him. Jason

Leopold, *Mueller Memos: The FBI Just Released Its Secret Interviews with Michael Flynn After*

*BuzzFeed News Waged A Legal Fight*, BuzzFeed News (Jan. 15, 2021), https://bit.ly/49va6kx

(attached as Sumar Decl. Ex. X). Once again the documents contained details that not been

publicly known. *Id.* The FBI is continuing to process and release attachments to the FD-302s.

*See* Joint Status Rep., *Leopold v. DOJ*, No. 19-1278 (RBW) (D.D.C. Sept. 9, 2023), ECF No. 135.

In the second case, DOJ released redacted versions of 12 FD-302s of FBI interviews with Bruce Ohr, a career DOJ official. In 2018, Mr. Ohr became the center of a conspiracy theory about the origins of the FBI's investigation into the Trump campaign's ties to Russia. *See* Michael D. Shear et al., *Embracing Conspiracy Theory, Trump Escalates Attack on Bruce Ohr*, N.Y. Times (Aug. 17, 2018), https://nyti.ms/49Jq0aS (attached as Sumar Decl. Ex. Y). A conservative group sued for release of the forms, which the Department initially withheld in full but subsequently released with redactions. *FBI 302 Interviews with Bruce Ohr on Spygate Released To Jud. Watch*, Jud. Watch (Aug. 8, 2019), https://bit.ly/46cPx9G (attached as Sumar Decl. Ex. Z); Josh Gerstein, *FBI Releases Bruce Ohr Interview Reports*, Politico (Aug. 8, 2019), https://politi.co/47HGOxf (attached as Sumar Decl. Ex. AA). Notably, DOJ made no redactions to the records on Exemption 5 grounds. (DOJ made redactions under several other exemptions, which the district court ultimately upheld. *Jud. Watch v. DOJ*, 2020 U.S. Dist. LEXIS 221477, at *15 (D.D.C. Nov. 25, 2020).)

D. DOJ's Disclosures of Special Counsel Reports from Sensitive Investigations Has Become the Norm

In recent years, it has also increasingly become the routine and expected practice that DOJ will publicly release the final reports to the Attorney General from highly sensitive Special Counsel investigations:

*The Mueller Report.* In 2019, Attorney General William P. Barr publicly released the nearly 450-page report by Special Counsel Robert S. Mueller III into Russia's assistance to the 2016 Trump campaign and the nature of interactions between people associated with that campaign and Russian government officials or proxies, along with a volume on efforts to impede

the investigation by Mr. Trump that raised obstruction of justice concerns. Special Counsel

Robert S. Mueller, III, *Rep. On The Investigation Into Russian Interference In The 2016*

*Presidential Election: Volume I of II*, DOJ (Mar. 2019), https://bit.ly/49V1VhE ("Mueller Report

Vol. I") (attached as Sumar Decl. Ex. BB); Special Counsel Robert S. Mueller, III, *Rep. On The*

*Investigation Into Russian Interference In The 2016 Presidential Election: Volume II of II*, DOJ

(Mar. 2019), https://bit.ly/3upgWYI ("Mueller Report Vol. II") (attached as Sumar Decl. Ex.

CC). DOJ released this report nearly in its entirety, save for a few redactions for information

about ongoing criminal investigations that had spun off of the inquiry and information still

subject to grand jury secrecy rules. *See* Mueller Report Vol. 1; Mueller Report Vol. II.

    *The Durham Report on the Trump-Russia Investigation*. In May 2023, Attorney General

Merrick Garland released the full 306-page unclassified report by Mr. Durham himself as the

Special Counsel whom Mr. Barr had appointed to investigate the origins of the Russia

investigation, withholding only a 29-page classified appendix. Special Counsel John H. Durham,

*Rep. on Matters Related to Intelligence Activities & Investigations Arising Out of the 2016*

*Presidential Campaigns*, DOJ (May 12, 2023), https://bit.ly/3uqR5zB (attached as Sumar Decl.

Ex. DD).

    *Future Reports.* Mr. Garland has also indicated he will make public the reports by two

other Special Counsels he appointed this year: Robert K. Hur, who is examining how certain

classified documents from President Biden's vice-presidential years improperly ended up in

storage areas at an office he used at a think tank and at his home in Delaware, and David Weiss,

who is investigating various matters involving the President's son, Hunter Biden. Charlie

Savage, *Special Counsel Interviewed Biden About Classified Documents*, N.Y. Times (Oct. 9,

2023), https://nyti.ms/46p7stV (attached as Sumar Decl. Ex. EE); Glenn Thrush et al., *Garland*

*Appoints Weiss as Special Counsel in Hunter Biden Inquiry*, N.Y. Times (Aug. 11, 2023),

https://nyti.ms/3QLk08Y (attached as Sumar Decl. Ex. FF). In naming Mr. Weiss Special

Counsel in August 2023, for example, Mr. Garland said in his formal prepared public statement:

"As with each special counsel who has served since I have taken office, I am committed to

making as much of his report public as possible, consistent with legal requirements and

department policy." *Att'y Gen. Merrick B. Garland Delivers a Statement*, DOJ (Aug. 11, 2023),

https://bit.ly/3QIOKHP (attached as Sumar Decl. Ex. GG).

### IV.    The Instant Requests

Plaintiffs filed the underlying requests in June 2022. The Times submitted its request to

DOJ on June 7, seeking "all reports to the attorney general or deputy attorney general describing

or presenting findings and recommendations, and all FBI FD-302 forms and FD-1023 forms

summarizing witness and source interviews, in connection with John Durham's investigation into

the CIA's rendition, detention, and interrogation program." DOJ SUMF ¶ 3. On June 28, Mr.

Shane submitted FOIA requests to DOJ, DOJ's Criminal Division, and DOJ's Office of

Information Policy ("OIP"), seeking "all reports (and exhibits) provided to the attorney general

or deputy attorney general that describe or present findings or recommendations concerning John

Durham's investigation into the CIA's rendition, detention, and interrogation program, and all

FBI FD-302 forms and FD-1023 forms summarizing witness and source interviews conducted in

connection with that litigation." *Id.* ¶ 5. Plaintiffs brought this suit after DOJ failed to make a

determination or release records within the statutory timeframe. *Id.* ¶ 7.

### LEGAL STANDARD

Designed "to pierce the veil of administrative secrecy and to open agency action to the

light of public scrutiny," FOIA reflects "a general philosophy of full agency disclosure unless

information is exempted under clearly delineated statutory language." *Dep't of Air Force v.*

*Rose*, 425 U.S. 352, 360-61 (1976). That "strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents." *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991); *see also Chiquita Brands Int'l v. SEC*, 805 F.3d 289, 294 (D.C. Cir. 2015) (noting that the burden of proof is on the party opposing disclosure). "[I]n keeping with FOIA's presumption in favor of disclosure," FOIA allows agencies to withhold only documents falling under the nine statutory exemptions. *Pub. Citizen v. OMB*, 598 F.3d 865, 869 (D.C. Cir. 2009). Those exemptions "must be narrowly construed." *Milner v. Dep't of the Navy*, 562 U.S. 562, 565 (2011). And to the extent a record contains exempt and nonexempt information, an agency must disclose the "reasonably segregable" nonexempt portions. *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 104 (cleaned up); *see also* 5 U.S.C. § 552(a)(8)(A)(ii).

## **ARGUMENT**

DOJ's invocation of Exemption 5 to categorically withhold information sought by Plaintiffs' requests fails for two reasons. First, DOJ has not established that disclosure of any of the documents would cause foreseeable harm to an interest protected by the relevant Exemption 5 privilege.[5] Second, extensive public release of information contained in the records into the public domain waives DOJ's ability to withhold the records in blanket fashion. And as Plaintiffs note below, insofar as DOJ argues that this suit is precluded by The Times's previous litigation, it is wrong.

---

[5] Plaintiffs do not challenge that the records here are otherwise covered by Exemption 5.

16

## I.       DOJ Has Not Established Foreseeable Harm from Disclosure

### A.   The Foreseeable Harm Requirement

As noted above, FOIA's foreseeable harm provision permits withholding only where the agency "reasonably foresees that disclosure would harm an interest protected by an exemption," except where disclosure is prohibited by law. 5 U.S.C. § 552(a)(8)(A)(i). The requirement has "real teeth," *Colo. Wild Pub. Lands v. U.S. Forest Serv.*, 2023 U.S. Dist. LEXIS 160540, at *25 (D.D.C. Sept. 11, 2023), and "imposes an independent and meaningful burden on agencies" seeking to withhold records under a FOIA exemption, *RCFP*, 3 F.4th at 369 (cleaned up). "[B]oilerplate" and "generic" assertions of harm are insufficient. *Id.* at 370. In *RCFP*, the D.C. Circuit made clear the nature of the showing required for records withheld under the deliberative process privilege: the agency must make "a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." *Id.* The lower courts have held agencies to that burden and, when they fall short, ordered disclosure of records that are otherwise exempt. *See, e.g.*, *Vanda Pharms. v. FDA*, 2023 U.S. Dist. LEXIS 51853, at *12-13 (D.D.C. Mar. 27, 2023) (finding failure to establish foreseeable harm); *NPR v. DHS*, 2022 U.S. Dist. LEXIS 176411, at *27 (D.D.C. Sept. 28, 2022) (same), *appeal dismissed*, No. 22-5311, 2023 U.S. App. LEXIS 7265 (D.C. Cir. Mar. 27, 2023); *Cayuga Nation v. DOI*, 2022 U.S. Dist. LEXIS 54559, at *24 (D.D.C. Mar. 25, 2022) (same).

Though the D.C. Circuit has not had occasion to consider how the foreseeable harm provision interacts with the attorney work-product privilege, the same general principles apply. It is not enough for the agency to show that information constitutes work product; the agency also bears an "independent and meaningful" burden that disclosure will foreseeably harm the interests protected by the work-product privilege. *RCFP*, 3 F.4th at 369. The privilege's chief interest is to

"protect the integrity of the adversary trial process itself," which is served by "providing a working attorney with a zone of privacy within which to think, plan, weigh facts and evidence, candidly evaluate a client's case, and prepare legal theories." *Nat'l Ass'n of Crim. Def. Lawyers v. Exec. Off for U.S. Att'ys*, 844 F.3d 246, 251 (D.C. Cir. 2016) (cleaned up). But where release of privileged information would do no harm to these interests, disclosure is required. *See, e.g.*, *Jud. Watch v. DOJ*, 2019 U.S. Dist. LEXIS 163473, at *13 (D.D.C. Sept. 24, 2019) (deeming assertions of harm from disclosure of work-product material "boilerplate" and denying DOJ's motion for summary judgment); *ACLU of Mass. v. ICE*, 2023 U.S. Dist. LEXIS 138596, at *10 (D. Mass. Aug. 9, 2023) (finding that agency "only put forward generic, blanket statements" of harm to work-product privilege interests and ordering disclosure of certain information); *see also Black Hills Clean Water All. v. U.S. Forest Serv.*, 2022 U.S. Dist. LEXIS 117092, at *39 (D.S.D. June 29, 2022) (finding that agency failed to "specifically identify any harm [it] foresees would result to its interest in keeping [attorney-client] confidential information protected").

Here, DOJ's foreseeable harm argument begins with an attempt to move the goalposts. It contends that the requirement, if it applies at all in this context,[6] creates a "lower" burden for attorney work product than withholdings pursuant to the deliberative process privilege. DOJ Br. at 24-25. DOJ cites no basis for that distinction in the statute, and there is none: the foreseeable harm provision applies with equal force to all discretionary withholdings. *See* 5 U.S.C. § 552(a)(8)(A)(i)(I); *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) ("In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself."); DOJ Br. at 24 (conceding that the

---

[6] Though at one point DOJ suggests that the foreseeable harm standard might not apply to the work-product privilege at all, it appears to accept, as it must, that the statutory language forecloses any such argument. *See* DOJ Br. at 23-24.

structure of the FOIA statute "indicates that the foreseeable harm requirement applies to all exemptions").

To the extent DOJ's position is that disclosure of work-product is necessarily more harmful than other types of disclosures, or that "potential for agency overuse [of the work-product] privilege is attenuated," DOJ Brief at 24-25, it is wrong again. Perhaps no single document explains that more cogently than DOJ guidance issued in 1994, shortly after the agency issued its prior foreseeable harm policy, *see supra* at 10, to assist agencies in applying the then-new standard to Exemption 5 withholdings. *FOIA Update: OIP Guidance: Applying the "Foreseeable Harm" Standard Under Exemption Five*, DOJ Off. of Info. Policy (Jan. 1, 1994), https://bit.ly/3QWBMHK (attached as Sumar Decl. Ex. HH). The guidance notes that subjecting work-product materials to the foreseeable harm standard "holds enormous potential for increased agency disclosure," largely because "the [attorney work product] privilege, as it operates under the FOIA, is extremely broad in multiple respects." *Id.* In the FOIA context, the privilege applies to all types of work product: not just "mental impressions, conclusions, opinions or legal theories" that are absolutely privileged in civil discovery, but also other kinds of work product that are subject to a "qualified" privilege in discovery, which can be overcome by a showing of need. *Id.* Moreover, under the Supreme Court's decision in *FTC v. Grolier Inc.*, 462 U.S. 19 (1983), the work-product privilege has no temporal limitation and can apply "in perpetuity." *Id.* The effect, as DOJ noted 30 years ago, is that the privilege "technically applies to a very wide and very deep range of litigation-related records that may be requested under the FOIA." *Id.*

The guidance then lays out four factors for agencies to consider when assessing whether disclosure of work-product material would foreseeably harm the interests underlying the privilege:

- The time element--Is the case still pending, or is it sufficiently past that the sensitivity of even the core information covered by the privilege's first tier has faded?
- The litigation connection element--If the case itself is at an end, does the information truly remain sensitive due to its connection to similar or recurring litigation?
- The substantive scope element--Critical distinctions should be drawn between the "attorney thought process" information within the privilege's first tier, and the information that could include even "pure facts" that are covered by its other tier. . . .
- The inherent sensitivity element--Regardless of any other consideration, some portions of litigation files simply have no inherent sensitivity in any event.

*Id.* The guidance, though of course not binding on courts, is a notable acknowledgement on DOJ's part that much of the material captured by FOIA's work-product privilege is not truly sensitive.

More to the point, the guidance's reasoning is consistent with recent decisions applying the foreseeable harm standard to work-product withholdings. For instance, courts have found foreseeable harm where the withheld work product relates to litigation that is either ongoing (the so-called "time element") or prospective (the so-called "litigation connection element"). *See, e.g.*, *River v. U.S. Army Corps of Eng'rs*, 2023 U.S. Dist. LEXIS 107436, at *26 (D.D.C. June 21, 2023) (foreseeable harm shown where an order to disclose materials would "force the agency to divulge *to* [the plaintiff] (and to the public) its preparation for anticipated litigation *with* [the plaintiff]"); *Georgia v. DOJ*, 2023 U.S. Dist. LEXIS 28341, at *43 n.8 (D.D.C. Feb. 20, 2023) ("DOJ has shown that revealing the withheld communications would hurt the Government's litigation against SB 202 by 'providing insight to the SB 202 defendants on the Department's litigation strategy in ongoing litigation.'" (cleaned up)); *Clemente v. FBI*, 2022 U.S. Dist. LEXIS 210724, at *15 (D.D.C. Nov. 21, 2022) (finding foreseeable harm where FBI represented that release of information "would hinder [prosecutors'] ability to effectively represent the United States in any future litigation related to [Jeffrey] Epstein's co-conspirators").

Finally, it bears emphasis that an agency's obligation is to demonstrate foreseeable harm as to disclosure of all withheld information. To the extent there are portions of a record that can be disclosed without undermining the interests protected by Exemption 5, DOJ must release them. *See* 5 U.S.C. § 552(a)(8)(A)(ii); *Mountgordon v. U.S. Coast Guard*, 2023 U.S. Dist. LEXIS 153531, at *20 (D.D.C. Aug. 30, 2023) ("[I]n this context, the segregability and foreseeable harm inquiries intersect, and the Court cannot conclude on the present record that the agency considered, and decided, that the disclosure of any portion of the investigative report would cause foreseeable harm.").

### B. DOJ Has Not Shown Foreseeable Harm from Release of the Records

*The Durham Reports.* DOJ is unable to show foreseeable harm from disclosure of the Durham Reports, withheld both under the deliberative process privilege (two Reports and accompanying exhibits) and the work-product privilege (all Reports). Nearly every allegation of harm is boilerplate and generalized, untethered to the contents of the Durham Reports. In fact, many of the declaration's assertions of harm to the deliberative process are, nearly word for word, the same assertions the agency has offered in prior, unrelated cases — and unsuccessfully so. In one court's words, the stated harms are "generic," "nebulous," and insufficient to carry the agency's burden. *Jud. Watch*, 2019 U.S. Dist. LEXIS 163473, at *13.[7] As to attorney work

---

[7] *Compare id.* at *12-13 ("Department employees would be much more circumspect in their discussions with each other and with other Executive Branch officials. This lack of candor would seriously impair the Department's ability to foster the forthright internal discussions necessary for efficient and proper decision-making. Certainly, disclosure of such preliminary assessments and opinions would make officials contributing to pre-decisional deliberations much more cautious in providing their views. Agency decision-making is at its best when employees are able to focus on the substance of their views and not on whether their views may at some point be made publicly available."), *with* Hibbard Decl. ¶ 30 ("Department employees will be much more circumspect in their discussions with each other and in providing all pertinent information and viewpoints to senior officials in a thorough and timely manner. This lack of candor would seriously impair the Department's ability to foster the forthright, internal discussions necessary for efficient and proper Executive Branch decisionmaking. Certainly, disclosure of such

product, too, DOJ's declaration largely parrots its own well-worn talking points about the

rationale of the privilege. *See, e.g.*, *Nat'l Ass'n of Crim. Def. Lawyers*, 844 F.3d at 252.[8]

To the extent DOJ's declaration makes assertions of harm specific to the Durham

Reports, its claims actually undercut the case for withholding. DOJ emphasizes the

"heighten[ed]" foreseeable harm that would flow from disclosure of records from "investigations

into sensitive matters of national controversy":

> If a special prosecutor or special counsel is aware that their core
> legal work-product such as that at issue in this case would be
> released after a designated amount of time passes, they will be
> hindered in their ability to fully express and document their work,
> and later special prosecutors and counsels would likewise be
> chilled.

Hibbard Decl. ¶ 37; *see also id.* ¶ 31. DOJ is right to compare the Durham investigations to a

special counsel investigation, but wrong about the implications of that comparison. Consistent

with DOJ regulations, special counsel reports are often released to the public with limited

redactions. As noted, the most recent example of that is, of course, the report released earlier this

year — written by Mr. Durham himself — regarding intelligence activities and investigations

arising from the 2016 presidential campaigns, along with Mr. Garland's promise this year to

release the eventual reports of the Hur and Weiss special counsel investigations. *See supra* at 13-

---

preliminary assessments and opinions would make Department officials much more guarded in
providing their views to Executive Branch officials. Intra-agency decisionmaking is at its best
when officials are able to focus on the substance of their recommendations and not on whether
their views may at some point be made publicly available.").

[8] *Compare id.* (release of work-product material would, according to agency, mean that "DOJ
attorneys would no longer feel free to memorialize critical thoughts on litigation strategies for
fear that the information might be disclosed to their adversaries to the detriment of the
government's current and future litigating positions"), *with* Hibbard Decl. ¶ 37 ("Department
attorneys would no longer feel free to pursue lines of questioning, avenues of investigation, or to
memorialize important thoughts on potential litigation strategies for fear that the information
might be disclosed to the detriment of the Government's current and future litigating
positions.").

14. Other examples abound: the 1998 report of Kenneth Starr's investigation of President Bill Clinton, Off. of Indep. Counsel, *Referral to the U.S. House of Reps. pursuant to Title 28, U.S. Code § 595(c)* (Sept. 9, 1998), https://wapo.st/3SLge27; two reports, released in 2000, investigating the Government's role in the confrontation at the Branch Davidian complex in Waco, Texas, *See, e.g.*, Special Counsel John Danforth, *Interim Rep. to The Deputy Att'y Gen. Concerning the 1993 Confrontation at the Mt. Carmel Complex* (July 21, 2000), https://cnn.it/47lSeXP; and of course the Mueller reports, *see* Mueller Report Vol. I; Mueller Report Vol. II.

Thus, whether or not Mr. Durham expected the Durham Reports to become public, the reality is that future special prosecutors and counsels now understand that their own reports could very well become public. Put another way, if it is true that releasing the reports to the Attorney General (and then to the public) in a highly sensitive special counsel or special prosecutor investigation risks chilling the candor of future counsels or prosecutors, that chilling has already occurred — and it is due to the voluntary actions of DOJ's most senior officials under administrations of both parties. In the context of those events, the disclosure of the Durham Reports can cause no marginal foreseeable harm to the interests protected by Exemption 5. To be sure, it does not follow that a DOJ attorney can never have an expectation of confidentiality in the work product of an investigation. But that expectation is actually diminished, not enhanced, when the subject of the investigation is high-profile and sensitive. For that reason, a ruling for Plaintiffs here would be limited to the very small number of comparable such special inquiries without setting any broader precedent for more routine investigations.

The factors in DOJ's guidance, as applied here, also underscore the absence of any foreseeable harm from disclosure. The Durham Reports are not part of an ongoing case (the

"time" element), nor are they connected to other pending or recurring litigation (the "litigation connection" element). Though DOJ has not carried its burden on foreseeable harm for any of the information in the Durham Reports, its arguments are especially dubious as to the "pure facts" contained in the documents (the "substantive scope" element). And given the agency's past and ongoing practice of disclosing reports by special counsels, the Durham Reports cannot be regarded as inherently sensitive (the "inherent sensitivity" element). By DOJ's own standards, foreseeable harm is implausible.

A final note: to the extent material in the Durham Reports has been made public through other disclosures, *see infra* at 26-33, there can by definition be no foreseeable harm to Exemption 5 interests from release of that information. *See, e.g.*, *Blank Rome LLP v. Dep't of the Air Force*, 2016 U.S. Dist. LEXIS 128209, at *32-33 (D.D.C. Sept. 20, 2016) ("[T]here is no danger of chilling agency debate and discussion in this case where the redacted material at issue . . . has been released to the public."). For this reason, too, DOJ has not carried its burden under the FOIA Improvement Act.

*The FD-302s*. DOJ's foreseeable harm claims pertaining to the FD-302s are even less credible. In fact, its declaration does not even speak to harms specific to release of the FD-302s. In one section of its declaration, consisting of less than two pages, DOJ speaks in general terms about the purported harms of disclosing <u>all</u> documents covered by the attorney work-product privilege — not just the FD-302s, but also the Durham Reports — that together consist of thousands of pages. Hibbard Decl. ¶ 37. Again, these harms could be asserted for work-product materials created in the course of any internal Government investigation — the definition of "boilerplate" and far from the requisite "focused and concrete demonstration" that disclosure would undermine the interests underlying the work-product privilege. *RCFP*, 3 F.4th at 370.

The only arguably specific assertion of harm in the declaration is the same one just discussed: the documents relate to "investigations into sensitive matters of national controversy." Hibbard Decl. ¶ 37. And again, the harm is unclear. As noted above, DOJ not infrequently — and voluntarily — releases 302s to FOIA requesters, including from the FBI's investigation of Russia's links to the Trump campaign and the Mueller investigation. *See supra* at 10-12. These matters, one would think, are "sensitive" and "of national controversy." More broadly, FD-302s are not treated as secret documents. In a criminal investigation that results in a trial, the prosecutor typically discloses FD-302s to the defendant in discovery, and the documents can be used at trial, including for impeachment purposes. *See, e.g.*, *Mem on Crim. Discovery from Donald A. Davis, U.S. Att'y for W. Dist. of Mich.* (Oct. 2010) at 5, https://bit.ly/40Gg4e4 (attached as Sumar Decl. Ex. II); Hon. Katherine B. Forrest, *Guidelines Regarding Appropriate Use of 302 Forms in Crim. Trials*, Fed. Defs. of N.Y. Second Cir. Blog (June 11, 2018), http://bit.ly/49NaZFk (attached as Sumar Decl. Ex. JJ); Hardy Decl., *Leopold v. DOJ*, No. 19-cv-1278 (D.D.C Feb. 24, 2020), ECF No. 62-9, at 4 n.2 ("302s are written with the expectation that they will be disclosed in criminal discovery pursuant to law and Department policy if a case is prosecuted."); *see also United States v. Fifer*, 206 F. App'x 502, 509 (6th Cir. 2006) (finding that district court did not abuse discretion in admitting FD-302 at trial); *Picard v. Sage Realty*, 2021 U.S. Dist. LEXIS 243460, at *12 (S.D.N.Y. Dec. 21, 2021) (finding FD-302 admissible in civil trial); *United States v. Wong*, 2018 U.S. Dist. LEXIS 190662, at *1 (N.D. Cal. Nov. 2, 2018) (explaining basis for admitting FD-302 at criminal trial).

Two conclusions follow from the above. First, DOJ itself believes that FD-302s often contain material that is innocuous, *i.e.*, information whose disclosure would not be inimical to the interests underlying the attorney work-product privilege. *See, e.g.*, *Williams & Connolly v.*

*SEC*, 662 F.3d 1240, 1245 (D.C. Cir. 2011) ("An agency may decide to produce otherwise privileged documents because the documents are innocuous."). DOJ would never voluntarily release FD-302s, as it often does, if it thought otherwise. Second, FBI agents cannot have a reasonable expectation that FD-302s will be kept confidential, given DOJ's practice of disclosing them in criminal trials or in response to FOIA requests. *See, e.g.*, *Vanda Pharms.*, 2023 U.S. Dist. LEXIS 51853, at *11-12 (no foreseeable harm where documents' authors "know that [the records] could very well be published"). This is not to say that DOJ could never establish foreseeable harm from disclosure of a specific FD-302 — only that a court should be especially skeptical when DOJ asks, as it does here, for blanket withholding of the documents without a particularized showing of harm.

As with the Durham Reports, DOJ's 1994 guidance only underscores the absence of foreseeable harm here. The investigations at issue have been closed for more than 11 years; the FD-302s have no connection to similar or recurring litigation; they contain at least some "pure facts" that fall in the second tier of the work-product privilege; and given the regularity with which FD-302s are made public, the documents are not inherently and inevitably sensitive.

## II.    Portions of the Durham Reports Are in the Public Domain

Without knowing the full contents of the Durham Reports, it is impossible to know precisely how much of the information is in the public domain. What is clear, however, is that certain portions of the Durham Reports have been so thoroughly replicated by the parallel SSCI Report and other public disclosures regarding the CIA's use of torture that the near-total withholding of these documents is foreclosed. The clearest examples are the portions of the Durham Reports that relate to the CIA's destruction of interrogation videotapes and to the death of Gul Rahman — subjects extensively discussed in the SSCI Report. But the overlap likely goes much further, given the similar scopes of the twin investigations and the breadth of additional

public disclosures. Given these disclosures, the Court should order DOJ to re-process the Durham Reports and release information that has been publicly disclosed, or alternatively conduct its own *in camera* review of the records to determine what can be properly released.

"[M]aterials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record." *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999). This is because "'the logic of FOIA' mandates that where [the] information requested 'is truly public, then enforcement of an exemption cannot fulfill its purposes.'" *Id.* (quoting *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999)). This Circuit employs a three-part test "to determine whether the public-domain doctrine applies: (1) the 'information requested must be as specific as the information previously released'; (2) 'the information requested must match the information previously disclosed'; and (3) 'the information requested must already have been made public through an official and documented disclosure.'" *CNN v. FBI*, 293 F. Supp. 3d 59, 72 (D.D.C. 2018) (quoting *ACLU v. DOD*, 628 F.3d 612, 620-21 (D.C. Cir. 2011)). A plaintiff can meet its "initial burden [by] pointing to specific information in the public domain that appears to duplicate that being withheld." *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983). But invocation of the public domain doctrine does not require a previous word-for-word identical disclosure: "the relevant inquiry is whether the *information* is in the public domain, not whether it is also in precisely the same *form*." *Jud. Watch v. HHS*, 525 F. Supp. 3d 90, 103-04 (D.D.C. 2021) (citing *Cottone*, 193 F.3d at 554). In short, where information has already been publicly disclosed, an agency may not legitimately withhold it under FOIA.

The extensive disclosures around the CIA's use of torture made since the conclusion of the Durham investigations undermine DOJ's justifications for the near-total withholding of the

Durham Reports. This is especially true as it relates to the declassified executive summary of the SSCI Report — an investigation into the same wrongdoings, conducted over roughly the same period, presumably based on the same documents as the Durham investigations. As noted above, the Durham Reports addressed not just the destruction of interrogation videotapes by the CIA but also "whether federal laws were violated in connection with the interrogation of specific detainees at overseas locations." Sumar Decl. Ex. H. The SSCI Report, likewise, "had its roots in an investigation into the CIA's destruction of videotapes of CIA detainee interrogations" but also dealt with the CIA's use of torture in detention and interrogation more broadly. SSCI Report at iv. The near-identical scopes of the two inquiries imply that at least some of "the information requested [matches] the information previously disclosed" in the SSCI Report and "already [has] been made public through [that] official and documented disclosure." *CNN*, 293 F. Supp. 3d at 72. The additional public disclosures about the CIA's use of torture in Mr. Soufan's memoir, Dr. Mitchell's testimony, and the CIA IG reports reveal the breadth of information already in the public domain. The extent of these public disclosures — all with the approval of the executive branch — underscores the need for DOJ to re-process the Durham Reports with an eye to releasing information that is already in the public domain.

        As noted above, the SSCI Report is the most significant source of public disclosure. The overlap between the SSCI Report and the Durham Reports is perhaps most obvious in their mutual focus on the CIA's destruction of interrogation videotapes — the initial trigger for the Durham investigations, and a precursor to the SSCI inquiry. The SSCI Report revealed the CIA's internal thought process around the destruction of the tapes, noting that a proposed "independent commission to investigate U.S. detention policies and allegations of detainee abuse resulted in concern at the CIA that such a commission would lead to the discovery of videotapes

documenting CIA interrogations. That concern prompted renewed interest at the CIA to destroy the videotapes." SSCI Report at 443. "I think I need to be the skunk at the party again and see if the Director is willing to let us try one more time to get the right people downtown on board with the notion of our [sic] destroying the tapes," wrote CIA Acting General Counsel John Rizzo in one email cited by the Report. "You are correct. The sooner we resolve this the better," a senior CIA attorney replied. *Id.* at 443-44 n.2488. In short, the SSCI Report revealed damning insights into the agency's obfuscation around the issue. Mr. Durham almost certainly had access to this same information, despite his ultimate conclusion "that he [would] not pursue criminal charges for the destruction of the interrogation videotapes." *N.Y. Times Co.*, 138 F. Supp. 3d at 476 (quoting Hibbard Decl. Ex. E-1).

Another area in which the two sets of documents overlap is the death of Gul Rahman — a matter the SSCI examined and one of the two cases for which Mr. Durham recommended a full criminal investigation but declined to recommend charges. Mr. Durham, as noted, initially recommended that DOJ launch a full criminal investigation into two deaths in CIA custody — Gul Rahman, who died in 2002 in a secret CIA prison in Afghanistan, and Manadel al-Jamadi, who died in 2003 at the notorious Abu Ghraib prison in Iraq. Scott Shane, *No Charges Filed on Harsh Tactics Used by the CIA*, N.Y. Times (Aug. 30, 2012), https://nyti.ms/3QQGV2y (attached as Sumar Decl. Ex. KK). After a full investigation, Mr. Durham recommended that no charges be filed in connection with either of these cases, a recommendation that Holder adopted. *Id.* The SSCI also studied Mr. Rahman's case, giving gruesome detail about his detention, interrogation, and death and underscoring how CIA officials had misrepresented the situation in congressional testimony:

> As reported to CIA Headquarters, [the] interrogation [of Rahman]
> included "48 hours of sleep deprivation, auditory overload, total

> darkness, isolation, a cold shower, and rough treatment." CIA
> Headquarters did not approve these interrogation techniques in
> advance. . . . On November [] 2002, [CIA OFFICER 1] ordered
> that Gul Rahman be shackled to the wall of his cell in a position
> that required the detainee to rest on the bare concrete floor.
> Rahman was wearing only a sweatshirt, as [CIA OFFICER 1] had
> ordered that Rahman's clothing be removed when he had been
> judged to be uncooperative during an earlier interrogation. The
> next day, the guards found Gul Rahman's dead body. An internal
> CIA review and autopsy asserted that Rahman likely died from
> hypothermia—in part from having been forced to sit on the bare
> concrete floor without pants. [CIA OFFICER 1's] initial cable to
> CIA Headquarters on Rahman's death included a number of
> misstatements and omissions that were not discovered until
> internal investigations into Rahman's death.

SSCI Report at 54-55 (footnotes omitted). As the SSCI Report noted, the CIA officer involved in

Mr. Rahman's death was not subject to disciplinary action, contrary to the recommendations of

the agency's accountability board. *Id.* at 55-56 n.277. The SSCI Report also focused on then-CIA

Director Michael Hayden's April 2007 testimony to the body, in which he claimed that

"[p]unches and kicks are not authorized and have never been employed." *Id.* at 489. The

Committee contrasted that statement with Mr. Rahman's treatment in detention, stating that

> approximately five CIA officers . . . opened the door of Rahman's
> cell and rushed in screaming. . . . They dragged him outside, cut
> off his clothes and secured him with Mylar tape. They covered his
> head with a hood and ran him up and down a long corridor
> adjacent to his cell. They slapped him and punched him several
> times.

*Id.* In short, it is clear the SSCI deeply investigated the CIA's handling of Mr. Rahman's case —

much as Mr. Durham did upon recommendation of a full criminal investigation. These twin

investigations create not merely the possibility, but compelling likelihood, that the "specific"

information around Rahman's detention and death in the Durham Reports "match[es] the

information previously disclosed" in the SSCI Report. *CNN*, 293 F. Supp. 3d at 72.

Where, as here, Plaintiffs meet their burden to "point[] to specific information in the public domain that appears to duplicate that being withheld," *Afshar*, 702 F.2d at 1130, the agency should either release the requested documents or submit materials to rebut the showing that a public domain disclosure occurred. The decision in *Judicial Watch v. HHS* is instructive. The plaintiffs there sought from two agencies fetal tissue pricing information that had already been disclosed in "fee schedules appended to [a Senate Judiciary Committee] report." 525 F. Supp. 3d at 105. The court found that the requesters met their burden to show the information sought was in the public domain, even though it existed in a "different form." *Id.* Here, likewise, Plaintiffs have "made a 'specific showing' of the . . . information that is in the public domain so that the Court is 'not left to guess which [information] ha[s] entered the public domain and which ha[s] not.'" *Id.* (quoting *Cottone*, 193 F.3d at 555); *see also North v. DOJ*, 810 F. Supp. 2d 205, 208 (D.D.C. 2011) (holding that documents identified by plaintiff "are sufficient to demonstrate that some information within the requested documents may have been publicly disclosed" and creating "an obligation [on the agency] to search for and produce any responsive records that contain information identical that which has been publicly disclosed"). The Court should accordingly order DOJ to re-process the Durham Reports or, alternatively, conduct an *in camera* review of the requested records to identify sections already publicly disclosed. *See Ctr. for Pub. Integrity vs. U.S. Dep't of Energy*, 287 F. Supp. 3d 50, 63-64 (D.D.C. 2018) (*in camera* review revealed statements in requested documents "sufficiently match[ed]" previously disclosed statements and could not be withheld).

The fact that the disclosures in the SSCI Report emanated from Congress rather than DOJ or CIA is of no moment. As a general rule, "[d]isclosure by one federal agency does not waive another agency's right to assert a FOIA exemption." *Knight First Amend. Inst. at Columbia*

*Univ. v. CIA*, 11 F.4th 810, 815 (D.C. Cir. 2021) (quoting *Mobley v. CIA*, 806 F.3d 568, 583

(D.C. Cir. 2015)). But that rule is not implicated in a case like this one, where the executive

branch both was informed that the disclosures would be made and sanctioned them. *See* SSCI

Report at 10 n.6 (stating that the report "was provided to the executive branch for

declassification and public release" five months before publication); Michael E. DeVine,

*Procedures for Declassifying Intelligence of Pub. Interest*, Cong. Rsch. Serv,

https://bit.ly/3T2NRwD (attached as Sumar Decl. Ex. LL) (noting that "the President agreed to

direct a declassification review and release" of the SSCI report); *see also Fitzgibbon v. CIA*, 911

F.2d 755, 765 (D.C. Cir. 1990) (observing, without deciding, agency's argument that "a

disclosure by a congressional committee does not constitute 'official acknowledgment' by an

authorized Executive branch official" because such a rule would "clearly interfere[] with the

Executive's authority to control access to national security information"). The instant case is also

distinct because the Durham investigations and the SSCI Report, though housed in different

branches of Government, served a mutual purpose: oversight of the CIA and its interrogation and

detention program. Finally, from a common-sense point of view, the congressional disclosures

undermine the very logic of DOJ's withholding here. Put otherwise, although the general rule is

that "a third party agency's disclosures cannot waive the asserting agency's right to [withhold], .

. . such disclosures may well shift the factual groundwork upon which a district court assesses

the merits of such a response," revealing the futility of withholding when extensive official

disclosures have been made. *See Florez v. CIA*, 829 F.3d 178, 186 (2d Cir. 2016).

 Finally, the 2004 and 2008 CIA IG reports, which have been the subject of

declassification over the last decade, overlap significantly with the Durham Reports. Both IG

reports describe the use of torture at CIA black sites in cases that drew the attention of the

agency watchdog — well within the scope of Mr. Durham's examination of CIA detentions and interrogations. In fact, the release of portions of the 2004 report was one factor that influenced Attorney General Holder to expand Mr. Durham's mandate, giving him the jurisdiction to review the agency's use of torture more broadly. *See* Dina Temple-Raston, *CIA Report Details Interrogation Techniques*, NPR (Aug. 25, 2009), https://n.pr/3SMz6hb (attached as Sumar Decl. Ex. OO). And, "Mr. Durham identified the matters to include within his review by examining various sources including . . . the 2004 CIA Inspector General's report on enhanced interrogations [and] additional matters investigated by the CIA Office of Inspector General." Sumar Decl. Ex. I at 2. The use of the CIA IG reports to guide the scope of the Durham investigations makes it hard to believe that information subsequently included in the Durham Reports was not drawn from these sources. In other words, the information in the declassified portions of these IG reports "appears to duplicate that being withheld," *Afshar*, 702 F.2d at 1130. Given these overlaps, DOJ must reprocess the Durham Reports and release what has already been disclosed.

### III.   This Suit Is Not Precluded by the Prior Litigation

Fundamental changes to the facts and law at issue — as well as the presence of a plaintiff not party to the original litigation — mean that preclusion is not an obstacle to Plaintiffs' suit. DOJ contends that "because nothing has changed since the 2014 Southern District litigation and the appeal of that case, the principle of *res judicata*[9] bars Plaintiffs' argument that the

---

[9] While DOJ does not specify whether it is relying on claim or issue preclusion, both forms of preclusion are inapplicable where there are new parties. *See Taylor v. Sturgell*, 553 U.S. 880, 892-93 (2008). The same is true where there are new controlling facts. *See Lucky Brand Dungarees v. Marcel Fashions Grp.*, 140 S. Ct. 1589, 1596 (2020) (finding no claim preclusion where there is a change in essential facts); *Herrera v. Wyoming*, 139 S. Ct. 1686, 1697-98 (2019) (same for issue preclusion).

Department waived its attorney work-product privilege." DOJ Br. at 26-27. But that principle does not apply here for a host of reasons. First, Plaintiff Scott Shane was not a party to the prior litigation and "has not had a full and fair opportunity to litigate the claims and issues settled in that suit." *Taylor*, 553 U.S. at 892-93 (cleaned up). "The application of claim and issue preclusion to [a] nonpart[y] thus runs up against the 'deep-rooted historic tradition that everyone should have his own day in court.'" *Id.* In short, preclusion here would deprive Mr. Shane of his "full and fair opportunity" to be heard. *Id.* Second, the extensive declassification of information around the CIA's detention and interrogation program over the last eight years amounts to a waiver of the Exemption 5 privileges. *See supra* at 26-33. This declassification is a significant and highly relevant factual shift. *See Montana v. United States*, 440 U.S. 147, 159 (1979) ("[C]hanges in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues."); *see also Drake v. FAA*, 291 F.3d 59, 66 (D.C. Cir. 2002) (finding *res judicata* does not bar claims based on material facts not in existence at time of original suit). Finally, the law itself has changed: the 2016 FOIA Improvement Act and the introduction of the foreseeable harm standard, which requires agencies to make a particularized showing as to the possible harm of release, represent a paradigm shift in the relevant law. *See* 5 U.S.C. § 552(a)(8)(A)(i)(I); *see supra* at 9-10.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully ask this Court to (i) declare that the materials responsive to their requests are not subject to Exemption 5 and, subject to other exemptions, are public under 5 U.S.C. § 552 and must be disclosed; (ii) award Plaintiffs the costs of this proceeding, including reasonable attorneys' fees, as expressly permitted by 5 U.S.C. § 552(a)(4)(E); and (iii) grant such other and further relief as the Court deems just and proper.

Dated: November 22, 2023          Respectfully submitted,

/s/ *Al-Amyn Sumar*
Al-Amyn Sumar (#1614655)
David McCraw (#NY0200)
The New York Times Company
620 8th Avenue
New York, NY 10018
Telephone: (212) 556-4031
Facsimile: (212) 556-4634
al-amyn.sumar@nytimes.com
mccraw@nytimes.com

*Counsel for Plaintiffs Charlie Savage and The New York Times Company*

David A. Schulz (#459197)
Media Freedom & Information Access Clinic
Abrams Institute
Yale Law School
1675 Broadway, 19th Floor
New York, NY 10019
Tel: (212) 850-6103
schulzd@ballardspahr.com

*Counsel for Plaintiff Scott Shane*