**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CHARLIE SAVAGE, SCOTT SHANE, and THE
NEW YORK TIMES COMPANY,

      Plaintiffs,

v.

UNITED STATES DEPARTMENT OF JUSTICE,

      Defendant.

Case No. 1:22-cv-2477 (JEB)

**PLAINTIFFS' COMBINED STATEMENT OF MATERIAL FACTS AS TO WHICH
THERE IS NO GENUINE ISSUE AND RESPONSE TO DEFENDANT'S STATEMENT
OF MATERIAL FACTS**

Pursuant to Local Civil Rule 7(h), Plaintiffs Charlie Savage, The New York Times

Company (together, "The Times"), and Scott Shane hereby submit this combined statement of

material facts as to which there is no genuine issue and response to the statement of material

facts submitted by Defendant, ECF No. 25-1.

**PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS**

    1.      Undisputed.

    2.      Disputed in part. Though it is true that The Times previously litigated over the

Department of Justice's ("DOJ") withholding of the documents at issue, the contention that

"Plaintiffs are trying to take their second bite at the apple in this District" is an argument

inappropriately included in a statement of undisputed facts.[1] Moreover, this contention ignores

---

[1] Local Civil Rule 7(h) calls for "[e]ach motion for summary judgment [to] be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue[.]" *See Robertson v. Am. Airlines*, 239 F. Supp. 2d 5, 9 (D.D.C. 2002) (rejecting summary judgment motion because statement of undisputed material facts "liberally mixe[d] facts with argument").

the factual and legal developments since the first litigation, and the fact that Mr. Shane was not a party to those proceedings.

      3.      Undisputed.

      4.      Undisputed.

      5.      Undisputed.

      6.      Undisputed.

      7.      Undisputed.

      8.      Undisputed.

      9.      Undisputed.

      10.      Disputed in part. DOJ's submission lists only seven of the ten reports at issue in the instant litigation. The Government omitted: Final Report on Preliminary Review (May 26, 2011); Memorandum of Decision re: Non-Prosecution in the Death of Individual #1 (March 14, 2012); Memorandum of Decision re: Non-Prosecution in the Death of Individual #2 (July 11, 2012). *See* Hibbard Decl. Ex. M.

      11.      Disputed to the extent DOJ claims it located all of the FD-302s generated by these investigations, which Plaintiffs have no way of confirming.

      12.      Undisputed.

      13.      Undisputed.

      14.      Undisputed.

      15.      Undisputed.

      16.      Undisputed.

      17.      Undisputed.

      18.      Disputed. As described in Plaintiffs' Memorandum of Points and Authorities, the

responsive material at issue has been the subject of extensive public disclosures. DOJ's

contention is thus both inaccurate and an argument misplaced in a statement of undisputed facts.

19.     Disputed in part. The Times disputes the accuracy of any segregability analysis

conducted here by OIP, given the conclusion of full withholding.

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

### The Durham Investigations

20.     In the aftermath of the terrorist attacks of September 11, 2001, the CIA began

carrying out interrogations of terrorism suspects at various locations throughout the world. S.

Select Comm. on Intelligence, Comm. Study of the CIA's Detention & Interrogation Program, S.

Rep. No. 113-288 (2014) ("SSCI Report") at 11-17, https://bit.ly/3QRjeXV (attached as Sumar

Decl. Ex. A).

21.     These interrogations often employed controversial and severe techniques that

many observers have described as torture in violation of international and domestic law. Scott

Shane, *U.S. Engaged in Torture After 9/11, Review Concludes*, N.Y. Times (Apr. 16, 2013),

https://nyti.ms/3QP89GW (attached as Sumar Decl. Ex. B).

22.     In November 2005, the CIA destroyed 92 videotapes documenting some of these

harsh interrogations. Mark Mazzetti, *CIA Destroyed Tapes of Interrogations*, N.Y. Times (Dec.

6, 2007), https://nyti.ms/40I1FhC (attached as Sumar Decl. Ex. C); Mark Mazzetti, *U.S. Says*

*CIA Destroyed 92 Tapes of Interrogations*, N.Y. Times (Mar. 2, 2009), https://nyti.ms/47FhtUA

(attached as Sumar Decl. Ex. D).

23.     Public disclosure of the destruction of tapes prompted calls for an investigation

into whether the CIA's actions violated federal criminal law. Faye Fiore & Chuck Neubauer,

*Bipartisan Outrage Over CIA Videos*, L.A. Times (Dec. 10, 2007), https://bit.ly/3SHvAED

(attached as Sumar Decl. Ex. E).

24.     On January 2, 2008, Attorney General Michael Mukasey appointed John Durham,

who at that time worked in the United States Attorney's Office for the District of Connecticut, to

serve as the lead prosecutor and determine whether criminal charges should be lodged against

any individual. Peter Lattman, *Mukasey Appoints Durham To Lead Probe Over CIA Tapes*, Wall

St. J. (Jan. 2, 2008), https://on.wsj.com/3R5pDAj (attached as Sumar Decl. Ex. F).

25.     On August 24, 2009, while the tape destruction investigation was ongoing,

Attorney General Eric Holder expanded the scope of Mr. Durham's investigation to cover a

second, related topic: whether the interrogation of specific detainees overseas violated federal

law. Ewen MacAskill, *US Att'y Gen. Poised for Crim. Investigation into Reported CIA Abuses*,

The Guardian (Aug. 24, 2009), https://bit.ly/40JGR9p (attached as Sumar Decl. Ex. G).

26.     In June 2011, Mr. Durham recommended that full criminal investigations be

opened into the deaths of two individuals who had been held in American custody overseas.

Press Release, DOJ Off. of Pub. Affs., *Statement of the Att'y Gen. Regarding Investigation into*

*the Interrogation of Certain Detainees* (June 30, 2011), https://bit.ly/3ugeiEx (attached as Sumar

Decl. Ex. H). Attorney General Holder accepted Mr. Durham's recommendations in full, and

enlisted Mr. Durham to carry out the further investigations that he recommended. *Id.*

27.     On August 30, 2012, Attorney General Holder announced that the investigations

would be closed in their entirety based on Mr. Durham's "thorough reviews and determination

that the filing of criminal charges would not be appropriate." Press Release, DOJ Off. of Pub.

Affs., *Statement of Att'y Gen. Eric Holder on Closure of Investigation into the Interrogation of*

*Certain Detainees* (Aug. 30, 2012), https://bit.ly/3MJzZDi (attached as Sumar Decl. Ex. I).

28.     Mr. Durham's investigative work generated a number of documents: (1) three

reports related to the investigation into the destruction of tapes, two of which addressed possible charges of obstruction of justice and other crimes arising from the investigation; (2) seven reports related to the investigation of the CIA's interrogation program and detainee deaths, including exhibits appended to two of the reports; and (3) FD-302 forms, which the FBI uses to memorialize interviews. *See* Hibbard Decl. Ex. M.

### The Prior Litigation

29.     The Times sued over the same documents at issue here in May 2014. *See* Compl., *N.Y. Times Co. v. DOJ*, No. 14-cv-3777 (S.D.N.Y. May 28, 2014), ECF No. 2. The district court held that the FD-302s fell within the scope of Exemption 5 as protected attorney work product. *N.Y. Times Co. v. DOJ*, 138 F. Supp. 3d 462, 475-76 (S.D.N.Y. 2015). But it found that DOJ had "expressly adopted" some of the reports as the bases for agency decisions, vitiating to some extent the application of Exemption 5. *Id.* at 476-79.

30.     On appeal, the Second Circuit reversed, explaining that the memoranda did not represent DOJ's "binding 'working law'" and so could not have been expressly adopted. *N.Y. Times Co. v. DOJ*, 939 F.3d 479, 492 (2d Cir. 2019). Nevertheless, the Second Circuit also found that Attorney General Holder had waived the attorney work product privilege with respect to "sections of the memoranda and exhibits relating to the conclusion that a number of the detainees investigated were not in CIA custody" by giving public statements that were "specific enough to have effectuated disclosure of [those] parts." *Id.* at 496. DOJ subsequently released these portions of the documents.

### Post-Litigation Developments

### Public Disclosures

31.     In the years since the Durham investigations concluded, the federal Government

has made numerous disclosures regarding the CIA's use of torture.

*The SSCI Report*

32.     In December 2014, the executive summary of the SSCI Report was declassified. *See generally* SSCI Report. Like the Durham investigations, the SSCI Report "had its roots in an investigation into the CIA's destruction of videotapes of CIA detainee interrogations that began in December 2007[,]" but the study formally commenced in March 2009 to examine the CIA's detention and interrogation practices. *See* SSCI Report at iv. The SSCI inquiry reviewed "more than six million pages of CIA materials, [including] operational cables, intelligence reports, internal memoranda and emails, briefing materials, interview transcripts, contracts, and other records." *Id.* at vii-viii. Yet, "CIA employees and contractors who would otherwise have been interviewed by the Committee staff were under potential legal jeopardy [because of the ongoing Durham investigation], and therefore the CIA would not compel its workforce to appear before the Committee." *Id.* at vii.

33.     The Committee's five-year-long investigation ultimately culminated in about 6,700 pages of findings, more than 500 of which were declassified for the public in December 2014. *See generally SSCI Report*. The declassified portions of the SSCI Report detailed the brutality, inefficacy, mismanagement, and opacity of the CIA's torture program — a program acting beyond the scope approved by DOJ or CIA headquarters. "The CIA did not conduct a comprehensive or accurate accounting of the number of individuals it detained, and held individuals who did not meet the legal standard for detention." *Id.* at xxi. "The CIA [also] coordinated the release of classified information to the media," the SSCI Report found. *Id.* at xvii. All the while, the CIA evaded and impeded congressional and executive oversight of the program. *Id.* at xiv-xvii.

34.      The SSCI Report revealed the CIA's internal thought process around the destruction of the tapes, noting that a proposed "independent commission to investigate U.S. detention policies and allegations of detainee abuse resulted in concern at the CIA that such a commission would lead to the discovery of videotapes documenting CIA interrogations. That concern prompted renewed interest at the CIA to destroy the videotapes." *Id.* at 443.

35.      The SSCI also the case of Gul Rahman, a detainee who died in U.S. custody, and underscored how CIA officials had misrepresented the situation in congressional testimony. *Id.* at 54-55. The CIA officer involved in Mr. Rahman's death was not subject to disciplinary action, contrary to the recommendations of the agency's accountability board. *Id*. at 55-56 n.277. The SSCI Report also focused on then-CIA Director Michael Hayden's April 2007 testimony to the body, in which he claimed that "[p]unches and kicks are not authorized and have never been employed." *Id.* at 489. The Committee contrasted that statement with Mr. Rahman's treatment in detention. *See id.*

*Military Commissions Testimony*

36.      In military commission proceedings at Guantanamo Bay, the public audio feed is delayed by 40 seconds, allowing both the commission and the Government to block the public from hearing testimony. Carol Rosenberg, *Pentagon Building New Secret Courtroom at Guantánamo Bay*, N.Y. Times (Dec. 29, 2021), https://nyti.ms/3QSn6rK.

37.      In 2020 and 2022 proceedings, Dr. James E. Mitchell — a psychologist who was a key architect of the CIA's interrogation program — testified about the use of waterboarding and other highly coercive interrogation practices on CIA detainees. Carol Rosenberg, *Guantánamo Testimony Exposes Role of Doctors in C.I.A. Interrogations*, N.Y. Times (Jan. 27, 2020), https://nyti.ms/3QM3Lsg (attached as Sumar Decl. Ex. L) (full proceeding available at

Transcript of Commission Proceeding, *United States v. Khalid Sheikh Mohammed* (Jan. 23, 2020), https://bit.ly/3ugwo9l (attached as Sumar Decl. Ex. M)); Carol Rosenberg, *Chains, Shackles and Threats: Testimony on Torture Takes a Dramatic Turn*, N.Y. Times (Jan. 30, 2020), https://nyti.ms/3MTY4Hz (attached as Sumar Decl. Ex. N) (full proceeding available at Transcript of Commission Proceeding, *United States v. Khalid Sheikh Mohammed* (Jan. 28, 2020), https://bit.ly/3QQu28O (attached as Sumar Decl. Ex. O)); Carol Rosenberg, *C.I.A. Captive Was Too Small for Waterboard, Interrogator Testifies*, N.Y. Times (May 3, 2022), https://nyti.ms/3sEA2cT (attached as Sumar Decl. Ex. P) (full proceeding available at Transcript of Commission Proceeding, *United States v. Khalid Sheikh Mohammed* (May 2, 2022), https://bit.ly/3up8gl8 (attached as Sumar Decl. Ex. Q)).

38.     Dr. Mitchell also published a memoir in 2016 detailing his participation in interrogations at CIA black sites, which was approved by CIA's prepublication review. James E. Mitchell, Ph.D. & Bill Harlow, *Enhanced Interrogation: Inside the Minds and Motives of the Islamic Terrorists Trying to Destroy America* (2016).

*CIA Inspector General Reports*

39.     In 2004, the CIA Inspector General ("IG") issued a report on the torture of Abd al-Rahim al-Nashiri, which has been declassified in stages in 2008, 2009, and 2016. *See* CIA Inspector Gen., *Special Review: Counterterrorism Detention and Interrogation and Interrogation Activities* (Sept. 2001 – Oct. 2003) (May 7, 2004), https://bit.ly/3Gcvqxy (attached as Sumar Decl. Ex. MM). The report revealed new information about Mr. al-Nashiri's arrival at a CIA black site, the use of waterboarding on him, and how the use of waterboarding deviated from DOJ guidelines. *Id.* at 33-37.

40.     In 2008, the CIA IG issued another report on the torture of Ammar al-Baluchi,

portions of which were declassified in 2019 as part of the Guantanamo Bay military commission proceedings, but which only became public in 2022 as part of Mr. al-Baluchi's habeas corpus suit. Rep. of the Off. of the CIA Inspector Gen. Regarding Allegations of Torture By Ammar al Baluchi, *Al-Baluchi v. Gates*, No. 08-cv-02083-PLF (D.D.C. Mar. 10, 2022), ECF No. 225-3 (attached as Sumar Decl. Ex. NN). There, again, the IG described the use of enhanced interrogation techniques on al-Baluchi. *Id.* 5-12.

41.     The release of portions of the 2004 report was one factor that influenced Attorney General Holder to expand Mr. Durham's mandate, giving him the jurisdiction to review the agency's use of torture more broadly. *See* Dina Temple-Raston, *CIA Report Details Interrogation Techniques*, NPR (Aug. 25, 2009), https://n.pr/3SMz6hb (attached as Sumar Decl. Ex. OO). And, "Mr. Durham identified the matters to include within his review by examining various sources including . . . the 2004 CIA Inspector General's report on enhanced interrogations [and] additional matters investigated by the CIA Office of Inspector General." Sumar Decl. Ex. I at 2.

## The Soufan Memoir

42.     In 2020, the CIA allowed the unredacted republication of a 2011 memoir by former FBI agent Ali Soufan, recounting his interrogations of CIA detainees. *See, e.g.*, Charlie Savage & Carol Rosenberg, *CIA Uncensors Memoir of FBI Agent Who Protested Torture of Terrorists*, N.Y. Times (Aug. 29, 2020), https://nyti.ms/40Mtmpv (attached as Sumar Decl. Ex. J); *Compare Pages From an Uncensored Book on Investigating Terrorism*, N.Y. Times (Aug. 29, 2020), https://nyti.ms/3ummWkW (attached as Sumar Decl. Ex. K).

## The FOIA Improvement Act

43.     On June 30, 2016, President Obama signed into law the FOIA Improvement Act

of 2016. *OIP Summary of the FOIA Improvement Act of 2016*, DOJ Off. of Info. Policy (Aug.

17, 2016), https://bit.ly/3QDjtG0 (attached as Sumar Decl. Ex. R). A report by the House

Committee on Oversight and Government Reform that accompanied the House version of the

bill states as follows: "Exemption five has been singled out as a particularly problematic

exemption. Some have taken to calling it the 'withhold it because you want to' exemption." H.R.

Rep. No. 391, 114th Cong., 2d Sess. (2016) at 10, https://bit.ly/3SXdYEO (attached as Sumar

Decl. Ex. S). A similar report by the Senate Judiciary Committee accompanying the Senate

version of the bill made a similar observation. S. Rep. No. 4, 114th Cong., 1st Sess. (2015) at 3,

https://bit.ly/46vsNSw (attached as Sumar Decl. Ex. T).

44.     Among the law's provisions is a "foreseeable harm" requirement, which directs

the agency to withhold information only where it "reasonably foresees that disclosure would

harm an interest protected by an exemption[.]" 5 U.S.C. § 552(a)(8)(A)(i)(I). The requirement

has its origins in a 1993 DOJ policy under which the Department would defend an agency's

assertion of a FOIA exemption "only in those cases where the agency reasonably foresees that

disclosure would be harmful to an interest protected by an exemption." *Mem. from the Off. of the*

*Att'y Gen. to Heads of Dep'ts & Agencies on the Freedom of Info. Act* (Oct. 4, 1993),

https://bit.ly/40MbyuI (attached as Sumar Decl. Ex. U).

45.     Notably, the Act also amended FOIA to now explicitly require an agency to

"consider whether partial disclosure of information is possible whenever [it] determines that a

full disclosure of a requested record is not possible" and "take reasonable steps necessary to

segregate and release nonexempt information." 5 U.S.C. § 552(a)(8)(A)(ii).

### DOJ's Disclosures of FD-302s

46.     DOJ has previously released and continues to release 302s and other witness

statements to FOIA requesters in one-off cases. *See, e.g.*, *N.Y. Times Co. v. Exec. Off. for U.S.*

*Att'ys*, No. 22-cv-03609 (S.D.N.Y.); Linda Moon & Gabe Rottman, *FBI document shows agents*

*knew Bryan Carmody was a journalist during questioning*, Reporters Comm. for Freedom of the

Press (Dec. 17, 2019), https://bit.ly/46ha9xr (noting that FBI released 302 in response to FOIA

lawsuit) (attached as Sumar Decl. Ex. V); *Pizzuti v. United States*, 809 F. Supp. 2d 164, 168

(S.D.N.Y. 2011); *Fortson v. Harvey*, 407 F. Supp. 2d 13, 17-18 (D.D.C. 2005); *Raphael v. DOJ*,

2003 U.S. Dist. LEXIS 6515, at *2 (E.D. Pa. Mar. 31, 2003); *Garside v. Webster*, 733 F. Supp.

1142, 1151 (S.D. Ohio 1989).

47.     In one recent FOIA case, which is ongoing, two news organizations sued DOJ

seeking, among other things, the FD-302s created during Special Counsel Robert Mueller's

investigation into Russian interference in the 2016 United States presidential election. *See*

Compl., *Leopold v. DOJ*, No. 19-1278 (RBW) (D.D.C. May 2, 2019), ECF No. 1; Compl., *CNN*

*v. DOJ*, No. 19-1626 (RBW) (D.D.C. June 4, 2019), ECF No. 1. DOJ released redacted versions

of the FD-302s in its possession — over 5,000 pages in total. Jason Leopold, *The FBI Has*

*Released A Final Batch Of Memos From The Mueller Probe*, BuzzFeed News (Dec. 1, 2020),

https://bit.ly/49OMJTh (attached as Sumar Decl. Ex. W). Some portions of the documents had

already appeared in the Mueller report, but other portions contained "many details . . . never

before revealed to the public." *Id.*

48.     Though DOJ finished main productions of the FD-302s in December 2020, it

would go on to release another 126 pages of documents about Michael Flynn in January 2021

after President Trump pardoned him. Jason Leopold, *Mueller Memos: The FBI Just Released Its*

*Secret Interviews with Michael Flynn After BuzzFeed News Waged A Legal Fight*, BuzzFeed

News (Jan. 15, 2021), https://bit.ly/49va6kx (attached as Sumar Decl. Ex. X). Once again the

documents contained details that not been publicly known. *Id.* The FBI is continuing to process and release attachments to the FD-302s. *See* Joint Status Rep., *Leopold v. DOJ*, No. 19-1278 (RBW) (D.D.C. Sept. 9, 2023), ECF No. 135.

49.     In a second case, DOJ released redacted versions of 12 FD-302s of FBI interviews with Bruce Ohr, a career DOJ official. In 2018, Mr. Ohr became the center of a conspiracy theory about the origins of the FBI's investigation into the Trump campaign's ties to Russia. *See* Michael D. Shear et al., *Embracing Conspiracy Theory, Trump Escalates Attack on Bruce Ohr*, N.Y. Times (Aug. 17, 2018), https://nyti.ms/49Jq0aS (attached as Sumar Decl. Ex. Y). A conservative group sued for release of the forms, which the Department initially withheld in full but subsequently released with redactions. *FBI 302 Interviews with Bruce Ohr on Spygate Released To Jud. Watch*, Jud. Watch (Aug. 8, 2019), https://bit.ly/46cPx9G (attached as Sumar Decl. Ex. Z); Josh Gerstein, *FBI Releases Bruce Ohr Interview Reports*, Politico (Aug. 8, 2019), https://politi.co/47HGOxf (attached as Sumar Decl. Ex. AA). DOJ made no redactions to the records on Exemption 5 grounds. *Jud. Watch v. DOJ*, 2020 U.S. Dist. LEXIS 221477, at *15 (D.D.C. Nov. 25, 2020).

50.     In a criminal investigation that results in a trial, the prosecutor typically discloses FD-302s to the defendant in discovery, and the documents can be used at trial, including for impeachment purposes. *Mem on Crim. Discovery from Donald A. Davis, U.S. Att'y for W. Dist. of Mich.* (Oct. 2010) at 5, https://bit.ly/40Gg4e4 (attached as Sumar Decl. Ex. II); Hon. Katherine B. Forrest, *Guidelines Regarding Appropriate Use of 302 Forms in Crim. Trials*, Fed. Defs. of N.Y. Second Cir. Blog (June 11, 2018), http://bit.ly/49NaZFk (attached as Sumar Decl. Ex. JJ); Hardy Decl., *Leopold v. DOJ*, No. 19-cv-1278 (D.D.C Feb. 24, 2020), ECF No. 62-9, at 4 n.2.

**DOJ's Disclosure of Special Counsel Reports**

*The Mueller Report*

51.     In 2019, Attorney General William P. Barr publicly released the nearly 450-page report by Special Counsel Robert S. Mueller III into Russia's assistance to the 2016 Trump campaign and the nature of interactions between people associated with that campaign and Russian government officials or proxies, along with a volume on efforts to impede the investigation by Mr. Trump that raised obstruction of justice concerns. Special Counsel Robert S. Mueller, III, *Rep. On The Investigation Into Russian Interference In The 2016 Presidential Election: Volume I of II*, DOJ (Mar. 2019), https://bit.ly/49V1VhE ("Mueller Report Vol. I") (attached as Sumar Decl. Ex. BB); Special Counsel Robert S. Mueller, III, *Rep. On The Investigation Into Russian Interference In The 2016 Presidential Election: Volume II of II*, DOJ (Mar. 2019), https://bit.ly/3upgWYI ("Mueller Report Vol. II") (attached as Sumar Decl. Ex. CC). DOJ released this report nearly in its entirety, save for a few redactions for information about ongoing criminal investigations that had spun off of the inquiry and information still subject to grand jury secrecy rules. *See* Mueller Report Vol. 1; Mueller Report Vol. II.

*The Durham Report on the Trump-Russia Investigation*

52.     In May 2023, Attorney General Merrick Garland released the full 306-page unclassified report by Mr. Durham himself as the Special Counsel whom Mr. Barr had appointed to investigate the origins of the Russia investigation, withholding only a 29-page classified appendix. Special Counsel John H. Durham, *Rep. on Matters Related to Intelligence Activities & Investigations Arising Out of the 2016 Presidential Campaigns*, DOJ (May 12, 2023), https://bit.ly/3uqR5zB (attached as Sumar Decl. Ex. DD).

*Future Reports*

53.     Mr. Garland has appointed two other Special Counsels this year: Robert K. Hur, who is examining how certain classified documents from President Biden's vice-presidential years improperly ended up in storage areas at an office he used at a think tank and at his home in Delaware, and David Weiss, who is investigating various matters involving the President's son, Hunter Biden. Charlie Savage, *Special Counsel Interviewed Biden About Classified Documents*, N.Y. Times (Oct. 9, 2023), https://nyti.ms/46p7stV (attached as Sumar Decl. Ex. EE); Glenn Thrush et al., *Garland Appoints Weiss as Special Counsel in Hunter Biden Inquiry*, N.Y. Times (Aug. 11, 2023), https://nyti.ms/3QLk08Y (attached as Sumar Decl. Ex. FF).

54.     In naming Mr. Weiss Special Counsel in August 2023, Mr. Garland said in his formal prepared public statement: "As with each special counsel who has served since I have taken office, I am committed to making as much of his report public as possible, consistent with legal requirements and department policy." *Att'y Gen. Merrick B. Garland Delivers a Statement*, DOJ (Aug. 11, 2023), https://bit.ly/3QIOKHP (attached as Sumar Decl. Ex. GG).

**The Instant Requests**

55.     The Times submitted its FOIA request to DOJ on June 7, seeking "all reports to the attorney general or deputy attorney general describing or presenting findings and recommendations, and all FBI FD-302 forms and FD-1023 forms summarizing witness and source interviews, in connection with John Durham's investigation into the CIA's rendition, detention, and interrogation program." Compl. ¶ 23.

56.     On June 28, Mr. Shane submitted FOIA requests to DOJ, DOJ's Criminal Division, and DOJ's Office of Information Policy ("OIP"), seeking "all reports (and exhibits) provided to the attorney general or deputy attorney general that describe or present findings or

recommendations concerning John Durham's investigation into the CIA's rendition, detention, and interrogation program, and all FBI FD-302 forms and FD-1023 forms summarizing witness and source interviews conducted in connection with that litigation." *Id.* ¶ 24.

57.     Plaintiffs brought this suit after DOJ failed to make a determination or release records within the statutory timeframe. *Id.* ¶ 25.

Dated: November 21, 2023        Respectfully submitted,

/s/ *Al-Amyn Sumar*
Al-Amyn Sumar (#1614655)
David McCraw (#NY0200)
The New York Times Company
620 8th Avenue
New York, NY 10018
Telephone: (212) 556-4031
Facsimile: (212) 556-4634
al-amyn.sumar@nytimes.com
mccraw@nytimes.com

*Counsel for Plaintiffs Charlie Savage and The New York Times Company*

David A. Schulz (#459197)
Media Freedom & Information Access Clinic
Abrams Institute
Yale Law School
1675 Broadway, 19th Floor
New York, NY 10019
Tel: (212) 850-6103
schulzd@ballardspahr.com

*Counsel for Plaintiff Scott Shane*

15