**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **CHARLIE SAVAGE,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 22-2477 (JEB)** |
| **UNITED STATES DEPARTMENT OF JUSTICE,** | |
| **Defendant.** | |

<u>**MEMORANDUM OPINION**</u>

In the last poem of his "Four Quartets," T.S. Eliot wrote:

> We shall not cease from exploration
> And the end of all our exploring
> Will be to arrive where we started
> And know the place for the first time.

Few litigants know this paradox of journeys as well as the parties here, who, on the heels of a prior dispute in the Second Circuit, return to the same starting point only to find the terrain much transformed.

Back in 2014, The New York Times Co. and star reporter Charlie Savage sued the Department of Justice to obtain certain records under the Freedom of Information Act. Their request? Federal Bureau of Investigation interview memoranda as well as reports from former Acting U.S. Attorney John Durham related to the criminal investigation into the Central Intelligence Agency's rendition, detention, and interrogation program following 9/11 (as well as

the Agency's destruction of videotapes depicting its tactics).  In the end, those plaintiffs came up largely empty.

Much has changed since that suit was filed, including the enactment of the FOIA Improvement Act of 2016 and the release of other public records concerning the CIA's use of torture.  In a second bid to secure the same records, The Times and Savage — now joined by another Plaintiff, longtime investigative journalist and author Scott Shane — filed suit in this Court, alleging that DOJ's withholdings under FOIA Exemption 5 flunk the foreseeable-harm requirement introduced under the 2016 Act and are untenable in light of other relevant information that has already been disclosed to the public.  The parties have now cross-moved for summary judgment on those issues, although Justice has since withdrawn its Motion in part as to the withheld interview memoranda.  Finding that the disclosure of any portion of the withheld reports would result in foreseeable harm, the Court will grant DOJ's Motion (as modified).  It will return to the interview memoranda once the parties have teed up that issue down the road.

I.    Background

The following facts are undisputed.  In 2008, then-Attorney General Michael Mukasey appointed John Durham — at the time, an Assistant United States Attorney in Connecticut — to serve as the Acting United States Attorney for the Eastern District of Virginia and lead an investigation into the CIA's destruction of videotapes of detainee interrogations.  See ECF No. 25-4 (Declaration of Douglas Hibbard), ¶ 4.  In 2009, Mukasey's successor, Eric Holder, expanded Durham's mandate to include whether the treatment of detainees itself violated federal law.  Id., ¶ 5.  What followed in the coming years was a series of public announcements from the Department of Justice concerning the direction and conclusions of his investigation.  First, in November 2010, Justice issued a press release stating that Durham's investigation into the

destruction of tapes had concluded and that he would not pursue criminal charges.  Id., ¶ 6.  In June 2011, it announced that, at Durham's recommendation, a full criminal investigation would be conducted into the deaths of two individuals and that Durham was vested with authority to determine whether to bring charges.  Id., ¶ 7.  Finally, in August 2012, that investigation, too, came to a close, and the Department announced that no criminal charges would be filed.  Id., ¶ 8.

In April 2014, The Times and Savage submitted a FOIA request to DOJ for "any reports to the attorney general or deputy attorney general describing or presenting [Durham's] findings," and another to both DOJ and the FBI for "all FBI FD-302 reports summarizing interviews conducted as part of" his investigation.  See ECF No. 1 (Compl.), ¶ 16.  This first effort yielding nothing, both requesters filed suit in the Southern District of New York, where the Government invoked the attorney-work-product and deliberative-process privileges under FOIA Exemption 5 as a basis for categorically withholding every responsive document.  See New York Times Co. v. DOJ, 138 F. Supp. 3d 462 (S.D.N.Y. 2015).  At issue in that litigation were an untold number of 302 forms and ten other reports.  Three reports arose from the tape-destruction investigation — viz., a 1,037-page final report, a 2012 memorandum to the Deputy Attorney General regarding whether any potential witnesses had lied to investigators or a grand jury, and a draft version of the same.  The other seven derived from the detainee-interrogation investigation — viz., two "interim reports," two "supplemental reports," a final report recommending a full criminal investigation into the deaths of two detainees, and two reports declining to prosecute anyone in connection with those deaths.  See id. at 466–67; see also New York Times Co. v. DOJ, No. 14-3777 (S.D.N.Y.), ECF No. 17 at 26–27 (2014 Vaughn Index).

The district court granted in part and denied in part the Department's motion for summary judgment, concluding that the work-product privilege shielded all the 302s and all but

five of the foregoing reports in their entirety.  New York Times, 138 F. Supp. 3d at 475–76.  As to the ones it ordered disclosed, the court found DOJ's withholding invalid under what is known in the Second Circuit as the "express adoption doctrine."  The doctrine holds that a document loses its protection under Exemption 5 if the agency "has chosen expressly to adopt it or incorporate it by reference" into official agency policy, and it rests on the intuition that "[t]he government may not rely on the legitimacy and authority that a document provides while keeping that document secret."  Id. at 472, 474 (cleaned up).  Justice, according to the district court, had "expressly adopted" Durham's final-recommendation and supplemental reports by publicly announcing that it would pursue a full investigation into the deaths of two detainees, and his two declination reports by publicly announcing a decision not to file charges — all in explicit reliance on each document.  Id. at 476–79.  Such reliance vitiated whatever work-product or deliberative-process protection that would otherwise apply.  Id. at 474.  Following another round of summary-judgment briefing, in which the Government invoked other exemptions to withhold certain information within those five reports, the Court ordered the Government to produce them with redactions.  New York Times Co. v. DOJ, 235 F. Supp. 3d 522, 542 (S.D.N.Y. 2017).

The Second Circuit reversed in part, clarifying that the express-adoption doctrine did not apply.  See New York Times Co. v. DOJ, 939 F.3d 479, 492–93 (2d Cir. 2019) (doctrine applies only where "previously-privileged intra-agency document has become binding 'working law,'" which did not occur here).  The court also found, however, that the Department had waived any claim of privilege over portions of the responsive documents "relat[ing] to the conclusion that some of the detainees were not in CIA custody" because the Attorney General had divulged that information in a public statement.  Id. at 498.  All told, only a portion of one of Durham's reports was released to The Times.  See New York Times Co. v. DOJ, 550 F. Supp. 3d 26, 30–31

(S.D.N.Y. 2021); see also ECF No. 25-4 at 86–88 (Vaughn Index).  The Government was permitted to cloak the rest.

In June 2016 — after the aforementioned lawsuit was filed but before any records were disclosed — Congress enacted the FOIA Improvement Act, which introduced, in relevant part, a new requirement that an agency may withhold information subject to a FOIA exemption only if it "reasonably foresees that disclosure would harm an interest protected by [the] exemption."  5 U.S.C. § 552(a)(8)(A)(i)(I).  Whether DOJ had satisfied this new foreseeable-harm requirement was not an issue in the New York case.  See ECF No. 29 (Pl. MSJ) at 10 & n.4.  Dissatisfied with the fruits of that litigation and sensing an opportunity for further relief (based on the change in law and other developments that they believe have placed portions of the withheld reports in the public domain), The Times and Savage submitted another FOIA request to DOJ on June 7, 2022 — to wit, "all reports to the attorney general or deputy attorney general describing or presenting findings and recommendations, and all FBI FD-302 forms and FD-1023 forms summarizing witness and source interviews, in connection with John Durham's investigation into the CIA's rendition, detention, and interrogation program."  Compl., ¶ 23.  Shane submitted a separate but identical request to DOJ and two of its components — the Criminal Division and Office of Information Policy — three weeks later.  Id., ¶ 24.

Plaintiffs then filed the present lawsuit in August 2022 after the Department failed to release responsive documents or otherwise make a final determination on their FOIA requests.  Id., ¶ 25.  The agency subsequently informed Plaintiffs that its search efforts had located no 1023s, and that it was withholding the reports and 302s that its search had uncovered.  See Hibbard Decl., ¶ 18; see generally Pl. MSJ.  Because Plaintiffs do not contest the adequacy of the

search, at issue is only Justice's withholding of the same ten reports and FD-302s that were at stake in the New York litigation.  See Vaughn Index.

The parties have agreed to bifurcate the briefing in this matter, allowing the Court to address first whether the documents at issue are categorically exempt from disclosure under the attorney-work-product and/or deliberative-process privileges under Exemption 5.  If so, this would spare the Government the inconvenience of carving out withholdings on a more surgical basis under other FOIA exemptions.  See Minute Order of May 2, 2023.  Before the Court now are the parties' dueling Motions for Summary Judgment on that categorical issue.  The Times and Savage conceded at their earlier joust with the Government in New York that all of the relevant records fall within one or both of those privileges, and neither they nor Shane argue otherwise now.  See New York Times, 138 F. Supp. 3d at 470, 476.  Rather, they stake their case on the twin hills of foreseeable harm and waiver through public disclosure.  See Pl. MSJ at 16.

On March 28, 2024, the Court — as it often does in these circumstances — ordered the Government to submit all withheld records for in camera review.  See Minute Order of March 28, 2024.  While carrying out that request, however, the Government discovered that certain 302s had been disclosed to "individuals outside the Government" and that the Federal Bureau of Investigation had identified another file room where additional responsive 302 forms might be stored.  See ECF No. 43 (Mot. to Modify) at 3–4.  DOJ, accordingly, withdrew its argument that the 302s were categorically exempt under Exemption 5 and resolved to fully process them — i.e., review them and apply further (more limited) FOIA exemptions in consultation with the CIA.  Id. at 4–5.

Noting the unique burdens associated with organizing in camera review of these highly classified materials and having withdrawn the sole basis for withholding the 302s in full, DOJ

asked the Court to exempt those documents from its review.  Id. at 5–6.  The Court has obliged and reviewed only the ten reports that remain at issue.

## II.     Legal Standard

Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it can affect the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Liberty Lobby, 477 U.S. at 248; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

"FOIA cases typically and appropriately are decided on motions for summary judgment." Defenders of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009); Brayton v. Office of U.S. Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011).  In a FOIA case, a court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad

faith." Larson v. U.S. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted).

Such affidavits or declarations "are accorded a presumption of good faith, which cannot be

rebutted by purely speculative claims about the existence and discoverability of other

documents." SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation and

internal quotation marks omitted).  "Unlike the review of other agency action that must be

upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly

places the burden 'on the agency to sustain its action' and directs the district courts to 'determine

the matter de novo.'" DOJ v. Reps. Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989)

(quoting 5 U.S.C. § 552(a)(4)(B)).  Summary judgment is only proper when the court is assured

that the record justifies the result.  See Ctr. For Investigative Reporting v. Customs & Border

Prot., 436 F. Supp. 3d 90, 100 (D.D.C. 2019).

## III.    Analysis

Under FOIA, "each agency, upon any request for records which (i) reasonably describes

such records and (ii) is made in accordance with published rules[,] . . . shall make the records

promptly available to any person."  5 U.S.C. § 552(a)(3)(A).  If the records fall into one of nine

statutorily created exemptions, however, the Government need not turn over the requested

information.  Id. § 552(b)(1)–(9).  To show that an exemption applies and justifies the

withholding of records, the Government "must provide a 'relatively detailed justification'" for its

withholding, "specifically identifying the reasons why [the] exemption is relevant."  Morley v.

CIA, 508 F.3d 1108, 1122 (D.C. Cir. 2007) (quoting King v. DOJ, 830 F.2d 210, 219 (D.C. Cir.

1987).  This Court can compel the release of any records that do not satisfy the requirements of

at least one exemption.  See Reps. Comm. For Freedom of Press, 489 U.S. at 755.

At issue here is Exemption 5, which applies to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). In other words, under Exemption 5, an agency may withhold from a FOIA requester any "documents[] normally privileged in the civil discovery context." NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975); see also United States v. Weber Aircraft Corp., 465 U.S. 792, 799 (1984). The only Exemption 5 privileges contested here are deliberative process and the attorney work product. The former permits withholding "predecisional" and "deliberative" agency records, Access Reps. v. DOJ, 926 F.2d 1192, 1194 (D.C. Cir. 1991), to protect the free exchange of "opinions, ideas, and points of view" within an agency's operations and decisionmaking processes. Ackerly v. Ley, 420 F.2d 1336, 1341 (D.C. Cir. 1969). The latter, meanwhile, "shields materials prepared in anticipation of litigation," McKinley v. Bd. of Governors of the Fed. Reserve Sys., 647 F.3d 331, 341 (D.C. Cir. 2011) (cleaned up), to protect from disclosure the "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning litigation." Heggestad v. DOJ, 182 F. Supp. 2d 1, 7 (D.D.C. 2000).

It is important to bear in mind that Plaintiffs have no quarrel with the general applicability of the privileges to all ten reports. They challenge only DOJ's application of the "foreseeable-harm" standard to the documents. This standard dictates that an agency may withhold information that falls within a FOIA exemption's scope "only if . . . the agency reasonably foresees that disclosure would harm an interest protected by" the exemption at issue. See 5 U.S.C. § 552(a)(8)(A)(i)(I); see also Reporters Committee for Freedom of Press v. FBI, 3 F.4th 350, 370 (D.C. Cir. 2021) (The agency invoking an exemption must provide a "focused and concrete demonstration of why disclosure of the particular type of material at issue will, in

the specific context of the agency action at issue, actually impede those same agency deliberations going forward.") (emphasis added); see also Ctr. for Investigative Reporting, 436 F. Supp. 3d at 106 (explaining that agency must "identify specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials" and "connect [such] harms in a meaningful way to the information withheld") (cleaned up).

This case, accordingly, centers on whether Justice has sufficiently articulated a harm — as to all the reports — meeting the foregoing standard.  The parties have raised two threshold issues, however, that could potentially obviate the need to consider that question: (1) Is this lawsuit precluded by the judgment entered in the Southern District of New York? (2) Are the reports (or portions thereof) already in the public domain, thereby waiving any assertion of privilege?  The Court begins with these questions; ultimately answering both in the negative, it then turns to foreseeable harm.

A. *Res Judicata*

Justice initially argues that Plaintiffs' claims are all precluded "by virtue of the 2014 litigation before the Southern District of New York and the United States Court of Appeals for the Second Circuit."  ECF No. 32 (Def. Reply & Opp.) at 2.  Plaintiffs riposte that such position has been waived because DOJ did not plead it in its Answer, see ECF No. 10 (Answer), ¶ 3 (asserting only that Savage and The Times are "collaterally estopped from challenging the same issues that were decided" in New York case) (emphasis added); that the addition of Shane as a Plaintiff eliminates any preclusive effect that prior litigation would otherwise have; and that, in any event, that material factual and legal developments post-dating the filing of the New York Complaint — *i.e.*, the passage of the FOIA Improvement Act and certain public disclosures

regarding the CIA's detention and interrogation program — render preclusion inoperative.  See ECF No. 35 (Pl. Reply) at 2–5.

Whatever the merits of Plaintiffs' first contention, the latter two suffice to allow this lawsuit to proceed.  The doctrine of claim preclusion provides that "a final judgment forecloses successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit."  Taylor v. Sturgell, 553 U.S. 880, 892 (2008).  "Issue preclusion, in contrast, bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim."  Id.  Both doctrines serve to prevent "parties from contesting matters that they have had a full and fair opportunity to litigate."  Id.  As such, they generally do not apply to nonparties, except in six specific circumstances.  See id. at 893–95 (listing them).

There is clearly no claim- or issue-preclusive effect as to Shane because he was not a party in the New York case, and no recognized basis for nonparty preclusion applies here. Insisting otherwise, DOJ points to two: first, Shane, as a former writer for The Times, has a preexisting "substantive legal relationship" with the company, and second, his interests were otherwise "adequately represented" by it previously.  See Def. Reply & Opp. at 4.  But Justice cites no case in which a prior employment relationship was deemed to have created an identity of interests so strong as to preclude a later suit by employer or employee.  Id. (citing caselaw on "[b]usiness partners" or "LLC" and "its sole member" or "individual and his company").  And an employment relationship bears no resemblance to the kinds of ties that have previously been found to merit preclusion.  See Taylor, 553 U.S. at 894 (listing as examples "preceding and succeeding owners of property, bailee and bailor, and assignee and assignor"); see also Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 4460 (3d ed. Apr. 2023)

("Without more, litigation by an employer is not binding on employees.").  Nor was Shane

"adequately represented" because there is no evidence that The Times and Savage "understood

[themselves] to be acting in a representative capacity" for him in their earlier litigation or that the

New York courts "took care to protect [Shane's] interests."  Taylor, 553 U.S. at 900

(characterizing both factors as "minimum" requirements for adequate representation); see also id.

at 889, 905–07 (finding that antique-aircraft enthusiast's prior FOIA lawsuit did not necessarily

preclude subsequent suit by his "close associate" for same records, in part because latter's

interests were not adequately represented).  At the least, then, Shane may press this suit forward

on his own.

        In any event, for all parties, this lawsuit presents issues and claims that were not (and

could not have been) raised at the time the New York suit was filed in May 2014.  See The New

York Times Co. v. DOJ, No. 14-3777 (S.D.N.Y.).  The sole issues here are whether certain

public disclosures postdating that suit have waived DOJ's asserted privileges and whether

Defendant has met the foreseeable-harm requirement introduced by an act of Congress in 2016.

See FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538.  Plaintiffs' only claims

arise from Justice's refusal to provide documents in response to their separate FOIA requests in

June 2022 — a refusal made in the context of a reconfigured factual and legal landscape.  See

Am. C.L. Union v. DOJ, 321 F. Supp. 2d 24, 34 (D.D.C. 2004) ("It is clear that res judicata does

not preclude claims based on facts not yet in existence at the time of the original action."); cf.

Ctr. for Nat. Pol'y Rev. on Race & Urb. Issues v. Richardson, 534 F.2d 351 (D.C. Cir. 1976)

(holding that appellants would need to file a new FOIA request if they wished to litigate whether

Congress's recent amendment entitled them to records previously found to be exempt from

disclosure, as that question presents "a different case and controversy").  Even without Shane, *ergo*, this lawsuit would not be precluded.

    B.  <u>Public Domain</u>

    Next up is Plaintiffs' contention that DOJ's across-the-board withholding is untenable because parts of the Durham reports have now entered the public domain.  <u>See</u> Pl. MSJ at 26–33. They identify four relevant disclosures.  The first is the partial declassification of a report by the Senate Select Committee on Intelligence (SSCI) on the CIA's rendition, detention, and interrogation program in December 2014.  <u>Id.</u> at 6.  The second is the public testimony of a psychologist, James E. Mitchell — whom Plaintiffs consider "a key architect" of that program — at Guantanamo Bay military commission proceedings in 2020 and 2022.  <u>Id.</u> at 7.  Third is the release over time of certain portions of CIA Inspector General reports on the use of enhanced interrogation techniques on specific detainees.  The first such report was partially declassified in piecemeal fashion between 2008 and 2016, and the second was partially declassified in 2022.  <u>Id.</u> at 8.  Finally, Plaintiffs point to a 2011 memoir by former FBI agent Ali Soufan describing his interrogations of detainees, which the CIA allowed to be published without redactions in 2020. <u>Id.</u> at 8–9.  Although Plaintiffs admit that "it is impossible [for them] to know precisely how much of the [withheld] information is in the public domain," they maintain that some of it is bound to overlap with the four aforementioned disclosures, given that they cover the same (or similar) subject matter.  <u>Id.</u> at 26.

    This argument can be dispensed with quickly.  Under our Circuit's public-domain doctrine, "materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record."  <u>Cottone v. Reno</u>, 193 F.3d 550, 554 (D.C. Cir. 1999).  The doctrine only applies, however, if three requirements are met: "(1) the

'information requested must be as specific as the information previously released'; (2) 'the information requested must match the information previously disclosed'; and (3) 'the information requested must already have been made public through an official and documented disclosure.'" CNN v. FBI, 293 F. Supp. 3d 59, 72 (D.D.C. 2018) (quoting ACLU v. DOD, 628 F.3d 612, 620-21 (D.C. Cir. 2011)).

Crucially, a disclosure is not deemed "official" if it is "made by someone other than the agency from which the information is being sought." Frugone v. CIA, 169 F.3d 772, 774 (D.C. Cir. 1999); see also Knight First Amend. Inst. at Columbia Univ. v. CIA, 424 F. Supp. 3d 36, 44 (D.D.C. 2020) ("[E]ach agency speaks for itself on FOIA disclosure."), aff'd, 11 F.4th 810 (D.C. Cir. 2021); Nat'l Sec. Archive v. CIA, No. 23-5017, slip op. at 9–10 (D.C. Cir. June 7, 2024). There is only one exception to this general rule — namely, that a public disclosure "made by an authorized representative of the agency's parent . . . is official as to the subordinate agency." Knight First Amend. Inst., 11 F.4th at 816 (cleaned up). The Circuit has applied that exception in two circumstances. First, "a disclosure by one component of an executive department may bind another component within the same department." Id. at 817 (cleaned up). Second, "the President, as the 'head' of the entire Executive Branch, may make official acknowledgments binding on its agencies." Id. (citations omitted).

Plaintiffs' position falters (most obviously) on this official-disclosure requirement because none of the four proffered disclosures can be attributed to the Department of Justice. To start, the SSCI report, as they concede, "emanated from Congress rather than DOJ." Pl. MSJ at 31; see also Knight First Amend. Inst., 11 F.4th at 816 (noting that D.C. Circuit has "rejected attempts to establish an agency's official acknowledgement based on disclosures by Congress" and collecting cases). To get around this fact, they highlight the President's involvement in

14

releasing the portions of the report at issue.  <u>See</u> Pl. MSJ at 32 ("[T]he President agreed to direct

a declassification review and release of the SSCI report.") (cleaned up).  But a report authored by

a congressional committee on an investigation <u>it</u> conducted does not constitute a disclosure by

<u>him</u> — even if he approved (as Plaintiffs imply) its partial declassification.  <u>Cf.</u> <u>Afshar v. U.S.</u>

<u>Dep't of State</u>, 702 F.2d 1125, 1133–34 (D.C. Cir. 1983) (books by former CIA agents and

officials submitted to CIA "for prepublication review," and presumably published only upon

agency's approval, did not constitute official disclosures by agency).  Such approval presumably

reflects a judgment that a limited disclosure to the public would not appreciably harm the

national interest.  That is distinct, however, from an endorsement of its contents or confirmation

of its veracity.

    As for the other three disclosures — involving the CIA IG reports, James Mitchell's

testimony, and Ali Soufan's memoir — Plaintiffs have not even attempted to link them to DOJ

or the President in a way that could possibly satisfy the official-disclosure requirement.  <u>See</u> Pl.

MSJ at 8 (noting that "CIA allowed the unredacted republication" of Soufan's memoir, but

failing to contend with <u>Afshar</u>'s holding that such approval is not official acknowledgement); <u>id.</u>

at 28 (arguing that disclosures were made "with the approval of the executive branch," without

providing further specifics).  Nor would such an attempt have succeeded.  To begin, the CIA is

not a component of DOJ.  Even if the President played a role in directing the partial

declassification of the CIA IG reports, such disclosure (again) does not resemble the kind of

substantive acknowledgment that would bind any executive agency.  <u>Cf.</u> <u>Am. C.L. Union v. CIA</u>,

710 F.3d 422, 428–29 & n.7 (D.C. Cir. 2013) (finding that President officially acknowledged

that United States engages in drone strikes through his and his counterterrorism advisor's public

statements to that effect).  Mitchell, moreover, worked under contract with the CIA between

15

2001 and 2009 and had no "authority to waive that agency's privilege" via testimony well after the contract ended, let alone DOJ's.  <u>See</u> Def. Reply & Opp. at 28; <u>CNN</u>, 293 F. Supp. 3d at 73 ("Statements made by former government officials, even high-level ones, do not constitute official acknowledgment.").  The same goes for Soufan, whose memoir, like any other work written in the first person, is "received as the private product of [its] author[]" (rather than of any government agency) and "accorded such respect as [its] content seems to deserve."  <u>Afshar</u>, 702 F.2d at 1134.

In a last-ditch appeal to "common sense," Plaintiffs accept the "general rule" that "'a third party agency's disclosures cannot waive the asserting agency's right to [withhold],'" but maintain that "such disclosures may well shift the factual groundwork upon which a district court assesses the merits of such a response, revealing the futility of withholding when extensive official disclosures have been made."  <u>Id.</u> at 32 (quoting <u>Florez v. CIA</u>, 829 F.3d 178, 186 (2d Cir. 2016)).  This point seems orthogonal to the issue at hand: whether the public-domain doctrine applies.  Because Plaintiffs have not identified an official disclosure by DOJ, the answer is assuredly no.

C.  <u>Foreseeable Harm</u>

Having followed these detours to their logical conclusion, the Court returns to the main route: foreseeable harm.  DOJ has asserted attorney-work-product privilege as to every document it withheld and the deliberative-process privilege as to some of them.  <u>See</u> <u>Vaughn</u> Index.  Because the Court ultimately finds that for every report or segregable portion thereof, there is some reasonably foreseeable harm from disclosure associated with the former privilege, it so limits its analysis.

16

As noted earlier, under the FOIA Improvement Act, an agency may withhold exempt records only if it "reasonably foresees that disclosure would harm an interest protected by" the exemption at issue.  See 5 U.S.C. § 552(a)(8)(A)(i)(I).  Congress derived this requirement from an identical Department of Justice policy originally introduced in 1993 to address "concerns that some agencies [were] overusing FOIA exemptions that allow, but do not require, information to be withheld from disclosure" — particularly Exemption 5 and the deliberative-process privilege.  See S. Rep. No. 114-4, at 2–3; see also H.R. Rep. No. 114-391, at 9–10 ("[T]here is concern that agencies are overusing [FOIA's] exemptions to protect records that should be releasable under the law. . . .  The deliberative process privilege is the most used privilege and the source of the most concern regarding overuse."); RCFP, 3 F.4th at 369.  The requirement forces agencies to "articulate both the nature of the harm [from release] and the link between the specified harm and specific information contained in the material withheld."  RCFP, 3 F.4th at 369 (quoting H.R. Rep. No. 114-391, at 9).  They can, consequently, no longer "rely on mere speculative or abstract fears, or fear of embarrassment to withhold information.  Nor may the government meet its burden with generalized assertions."  Id. (cleaned up).

The Government contends, as a preliminary matter, that the burden of establishing foreseeable harm is "lower" for the work-product privilege than it is for deliberative process because the "risk of harm through disclosure is more self-evident and the potential for agency overuse is attenuated."  Def. MSJ at 24 (quoting Energy Pol'y Advocs. v. U.S. Dep't of State, 2023 WL 4198200, at *7 (D.D.C. June 27, 2023)).  Plaintiffs, for their part, rejoin that there is no statutory basis for that distinction and that the "foreseeable harm provision applies with equal force to all discretionary withholdings."  Pl. MSJ at 18.  If the Government means to suggest that disclosure of work product is ipso facto harmful, such that a generic recitation of interests the

17

privilege protects will discharge its obligations under FOIA, then Plaintiffs are certainly right to object.  See, e.g., Jud. Watch, Inc. v. DOJ, 2019 WL 4644029, at *3–5 (D.D.C. Sept. 24, 2019) (finding asserted harms too generic to justify withholding based on work-product privilege).  If, however, the Government means that the Court's review of whatever harm an agency articulates with respect to the deliberative-process privilege will be comparatively more exacting, the argument is sound given Congress's focus on the overuse of that privilege, see H.R. Rep. No. 114-391, at 10, which our Circuit and other courts in this district have repeatedly acknowledged. E.g., RCFP, 3 F.4th at 369; Ctr. for Investigative Reporting v. U.S. Customs & Border Prot., 436 F. Supp. 3d 90, 104–05 (D.D.C. 2019).  The Court thus proceeds with this latter understanding.

To establish that the burden to show harm is met, Justice relies on several averments in the declaration of OIP's Chief of Initial Request Staff, Douglas Hibbard — viz., that disclosing the at-issue reports would reveal the investigating attorneys' "mental impressions, conclusions, opinions, or legal theories concerning anticipated or pending litigation," and it would "'hinder the government's ability to investigate' future legal violations because Department 'attorneys would no longer feel free to pursue lines of questioning, [to explore] avenues of investigation, or to memorialize important thoughts on potential litigation strategies for fear that the information might be disclosed to the detriment of the Government's current and future litigation positions.'" Def. MSJ at 22, 25 (quoting Hibbard Decl., ¶ 37).  Plaintiffs, meanwhile, assail these asserted harms as being "generic," "nebulous," "boilerplate," and "untethered to the contents of the Durham Reports."  Pl. MSJ at 21 (citation omitted).

Although DOJ's description of the relevant harm is hardly a paragon of specificity, our Circuit has nevertheless upheld agency withholdings where the "very context and purpose" of the sought-after documents "make the foreseeability of harm manifest."  RCFP, 3 F.4th at 372.

Such is the case here, where the documents contain attorney impressions going to core legal strategy rather than, for instance, discussion of ancillary procedural matters.  The general content of each report is scrupulously described in John Durham's declaration, which was originally prepared for the New York case.  See ECF No. 25-4 at 31–40 (Durham Decl.).  As he explains, the three tape-destruction reports "memorialized [his team's] analyses and thought processes concerning whether to initiate any criminal prosecutions and [their] ultimate conclusion not to file charges."  Id., ¶ 9.  This entailed, among other things, "evaluating facts, statements and testimony of witnesses, and other evidence[,] . . . [and] assess[ing] the admissibility of the evidence in judicial proceedings."  Id., ¶ 10.

The two interim reports and the final report on the interrogation investigation "discussed the strengths and weaknesses of the facts and evidence uncovered in the course of [Durham's] preliminary reviews, the potential applicability of various criminal statutes against that evidence, and ultimately why no full criminal investigations should be pursued with the exception of" the deaths of two detainees.  Id., ¶ 14.  The two supplemental reports "provided additional detail to support" that recommendation, including "an in-depth recitation, analysis, and evaluation of the facts and evidence uncovered in the course of [his] preliminary reviews," "supporting legal and factual justification . . . under the governing standards," and an outline of "the key areas [his team] would pursue in a full criminal investigation, as well as the potentially applicable criminal statutes."  Id., ¶ 15.  These materials were prepared for the Attorney General, who was "the final decisionmaker as to whether these full criminal investigations" would be pursued.  Id.

The two declination reports, finally, "modeled the format of . . . [a] criminal prosecution memorand[um]."  Id., ¶ 18.  They "memorialized [the team's] analyses and thought processes concerning whether to initiate any criminal prosecutions and [their] ultimate conclusion not to

file charges."  Id.  More specifically, they "traced the path of [Durham's] investigations in the two detainee deaths[,] . . . analyzed the substantial volume of evidence gathered[,] . . . assessed the admissibility of the evidence in judicial proceedings[,] . . . analyzed the type and nature of criminal charges that could be brought against suspected wrongdoers, along with various defenses" they could raise, "discussed what the evidence showed and did not show, and evaluated previous investigations conducted by other entities."  Id.

Given that each report contains Department attorneys' opinions on highly sensitive issues, including the strengths and weaknesses of potential criminal charges and the weight of evidence, it is obvious that harm would result from their wholesale disclosure.  A lawyer — no less a federal prosecutor — requires a "certain degree of privacy" to "sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy."  Hickman v. Taylor, 329 U.S. 495, 510–11 (1947).  Were the records of those thoughts routinely made public, "[i]nefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial."  Id. at 511.  Because the Durham reports primarily reflect such sifting and strategizing, it seems clear that these ills would follow if they were all disclosed in full, notwithstanding the vagueness of Defendant's representations on this issue.  See, e.g., Louise Trauma Ctr. LLC v. U.S. Dep't of Homeland Sec., 2022 WL 1081097, at *5–6  (D.D.C. Apr. 11, 2022) (assertion that disclosure of immigration trial attorney's notes would "chill or deter [agency] employees from engaging in candid and frank discussions" too "boilerplate," but "context and purpose" of notes make the harm "self-evident") (cleaned up).

Resisting this conclusion, Plaintiffs raise a number of other relevant considerations that they think counsel a different conclusion.  First, they highlight that Durham's were high-profile investigations and note that DOJ has a recent history of publicly releasing special-counsel reports

in similar circumstances.  See Pl. MSJ at 22–23 (citing as examples release of Kenneth Starr's 1998 report on his investigation into President Bill Clinton, Robert Mueller's reports on Russian interference in the 2016 presidential election, and a recent report by Durham himself on potential prosecutorial misconduct during the Mueller investigation); see also ECF No. 36 (Notice of Suppl. Authority) (attaching DOJ letter explaining that public release earlier this year of Robert K. Hur's report on President Joseph Biden's handling of classified documents was consistent with Department policy).  Because "future special prosecutors and counsels now understand that their own reports could very well become public," they reason, releasing Durham's reports would not chill prosecutors' willingness to fully express and document their work in future investigations.  See Pl. MSJ at 23.

Durham, however, conducted the investigations in his capacity as the Acting United States Attorney for the Eastern District of Virginia — not as a "special counsel" within the meaning of 28 C.F.R. § 600, et seq. — which, as Justice explains, places him "among the far more common pool of career Department attorneys appointed to specially investigate and, if necessary, prosecute a sensitive matter."  Def. Reply & Opp. at 14; see also Hibbard Decl., ¶ 4. Even if the public disclosure of special-counsel reports is routine (rare though such appointments are), there is little reason to believe that other career Department officials would, for that reason, expect the records of their own sensitive investigations to be released to the public.  See, e.g., Durham Decl., ¶ 19 ("I expected that these reports would remain confidential.").

Plaintiffs also contend that there can be no foreseeable harm to the extent that information contained in the reports is already public.  See Pl. MSJ at 24.  But even if public records contain some information about what the CIA did or did not do — which Plaintiffs reasonably infer the Durham reports would likely also contain — there has been no official

confirmation by <u>Justice</u> that the information is true (or not true), or of the role that specific information may have played in its investigative and prosecutorial decisions.  Indeed, this Circuit's public-domain caselaw includes an official-disclosure requirement because such confirmation can be informative in itself.  <u>See</u> <u>Knight First Amend. Inst.</u>, 11 F.4th at 816 ("[A] statement made by one in a position to know is given unique meaning and weight.  While information from outside an agency may be viewed as possibly erroneous, confirmation by the agency itself would remove any lingering doubts.") (cleaned up).  To accept Plaintiffs' logic would be to circumvent the carefully defined boundaries of that doctrine.

Plaintiffs' last consideration is slightly more persuasive — though it, too, ultimately provides no reason to release the withheld reports in their entirety.  They cite DOJ's 1994 Guidance implementing its then-self-imposed foreseeable-harm requirement, believing that it favors disclosure here.  <u>See</u> Pl. MSJ at 19–20; <u>see also</u> ECF No. 30-38 (1994 OIP Guidance). The Guidance explains that the work-product privilege, as implemented under Federal Rule of Civil Procedure 26(b)(3), "establishes a 'two-tiered' structure of protection: It provides that an attorney's 'mental impressions, conclusions, opinions or legal theories' are privileged 'absolutely' and never have to be disclosed in civil discovery, but it affords everything else prepared in anticipation of litigation only a 'qualified' privilege that can be overcome with a showing of need."  1994 OIP Guidance at 5.  While Exemption 5 applies to work product in its entirety, regardless of the tier in which it falls, there will often be "little need for an agency to assert the work-product privilege" for information in the "fact-laden tier of the privilege" if it has "no inherent sensitivity."  <u>Id.</u> at 5–6.  The Guidance then enumerates four factors to consider in assessing work-product-related harm: (1) time — whether "the case [is] still pending" or "sufficiently past that the sensitivity . . . has faded"; (2) connection to litigation — "[i]f the case

itself is at an end," whether the information "truly remain[s] sensitive due to its connection to similar or recurring litigation"; (3) substantive scope — whether the document constitutes "attorney thought process" information within the privilege's "first tier" or "pure facts" within its "other tier"; and (4) inherent sensitivity.  Id. at 6–7.

Of course, the FOIA Improvement Act does not obligate DOJ to "mechanically recite" these foreseeable-harm factors when explaining its withholdings — and they certainly do not bind courts.  See Rosenberg v. U.S. Dep't of Def., 442 F. Supp. 3d 240, 260 n.7 (D.D.C. 2020) (finding "no basis in FOIA's test or case law" for such a recitation).  But they carry some persuasive weight in this case because they come from Defendant itself, and they implement a DOJ policy that Congress expressly adopted.  See S. Rep. No. 114-4, at 3 (recognizing that Act codified and clarified existing policy).

Whether DOJ's withholding passes muster under this rubric is by no means obvious.  On one hand, it is difficult to ignore the fact that there is no pending litigation or prospect of such arising from Durham's investigation, which has been closed for over a decade.  Cf.  Friends of the River v. U.S. Army Corps of Engineers, 2023 WL 4105168, at *8 (D.D.C. June 21, 2023) (foreseeable-harm requirement met because "[defendant's] being ordered to disclose materials it withheld under the work-product privilege would force the agency to divulge to [plaintiff] (and to the public) its preparation for anticipated litigation with [plaintiff]").  On the other hand, regardless of how much time has passed or whether a case is pending, the reports are inherently sensitive because of their content and purpose — which includes considering legal theories, weighing evidence, and reaching charging decisions, all of which are particularly important components of a prosecutor's preindictment decisionmaking process.

The Court thus stands by its conclusion that the foreseeable harm in releasing the reports wholesale is obvious, a conclusion bolstered by its own *in camera* review.  Given the absence of litigation and passage of time, however, it also finds that there would be no foreseeable harm — at least based on the work-product privilege — in releasing any "purely factual" segments within the reports that reveal little about investigators' mental processes.  The question now is whether any such segment exists that can be segregated and released to the public.

D.  Segregability

Under FOIA, an agency must release "[a]ny reasonably segregable portion of a record." 5 U.S.C. § 552(b).  Congress re-emphasized this point in the FOIA Improvement Act, which — in addition to making foreseeable harm a precondition for withholding — requires agencies to "consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible" and to "take reasonable steps necessary to segregate and release nonexempt information."  Id. § 552(a)(8)(A)(ii)(I)–(II).

Defendant explains that it "carefully reviewed each [report] to determine whether any information could be segregated for release" and determined that none could.  See Def. MSJ at 31 (quoting Hibbard Decl., ¶ 44).  Its sole rationale with respect to the work-product privilege, however, is that "all ten reports at issue in this case are covered by" it, and where a document is "fully protected as work product[,] . . . segregability is not required."  Id. at 31–32.  The Government, in other words, believes that it was not obligated to review whether the harms it foresees from disclosure would be attenuated with respect to any particular segment of the withheld reports.  While this position may have been sound before the FOIA Improvement Act, see Citizens for Responsibility & Ethics in Washington v. DOJ, 48 F. Supp. 3d 40, 51 (D.D.C. 2014), the D.C. Circuit has recently made clear that "[t]he segregability requirement . . . extends

to both steps of FOIA's sequential inquiry."  Leopold v. DOJ, 94 F.4th 33, 37 (D.C. Cir. 2024).

"Even if an exemption covers an entire agency record, the agency still must release any

reasonably segregable information within the record that could be disclosed without causing

reasonably foreseeable harm to an interest that the exemption protects."  Id.

The Government having conducted its segregability review on a faulty legal premise and

having provided no detail as to how the reports are structured, the Court is left to assess on its

own whether any part of any report is segregable as "purely factual."  Although this is not the

preferable route, in the interest of efficiency (and recognizing that Leopold postdates the briefing

on the present Motions), the Court will not require the Government to file further declarations

but will instead conduct the segregability review itself.

Having done so in camera, the Court finds that the facts and investigators' mental

impressions are inextricably intertwined throughout each of the disputed reports such that

nothing is releasable.  The reports outline thorough and exhaustive investigations, based on a

significant number of witness interviews, aimed at determining what happened and whom to

believe.  Each report and attachment is an analytical document where lawyers are discussing

evidence, evaluating the credibility of witnesses, finding facts by comparing their testimony, and

making legal judgments about the strength of prosecution for certain crimes.  Even the

discussion of facts therein reflects the kind of judgment and deliberation within the core of the

work-product privilege's protective sweep.

*     *     *

In short, Justice has met its burden to show that reasonably foreseeable harm to an

interest protected by the work-product privilege under Exemption 5 would result if any portion

of the reports were released.  Even though "purely factual" information devoid of an attorney's

mental impressions would be suitable for public disclosure, the Court is unable to identify a segregable portion of any report meeting that description.  As a result, only the 302s remain at issue in this litigation.  Once the Government has fully processed them, any further dispute can be addressed on a subsequent motion for summary judgment.

**IV.     Conclusion**

For the foregoing reasons, the Court will grant Defendant's (now partial) Motion for Summary Judgment and deny Plaintiffs'.  A separate Order so stating will issue this day.


/s/ James E. Boasberg
JAMES E. BOASBERG
Chief Judge

Date:  June 7, 2024